**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

v.

DAVID MACEY and
EDWIN PAGAN III,

*Defendants.*

No. 24 Cr. 641 (JHR)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**JOINT MOTION TO TRANSFER VENUE**

Sean Hecker
David Patton
Shawn G. Crowley
Thea Raymond-Sidel
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
shecker@heckerfink.com
dpatton@heckerfink.com
scrowley@heckerfink.com
traymond-sidel@heckerfink.com

*Counsel for Defendant David Macey*

Christopher M. DeCoste
Law Office of Christopher DeCoste, P.A.
40 NW 3rd Street PH 1
Miami, Florida 33128
Telephone: (305) 395-5775
cmd@christopherdecoste.com

*Counsel for Defendant Edwin Pagan III*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD............................................................................................... 2

FACTUAL BACKGROUND ................................................................................... 3

ARGUMENT ........................................................................................................... 6

    I.    Both Mr. Macey and Mr. Pagan Have Long Resided in Miami, Strongly Favoring Transfer............................................................................................ 7

    II.    The Vast Majority of the Potential Witnesses at Trial Reside in Florida. .................. 8

    III.    South Florida is the "Nerve Center" of the Events in the Indictment. ...................... 11

    IV.    Frequent Trips to New York for Preparation and Trial Will Substantially Disrupt Mr. Macey and Mr. Pagan's Businesses.................................... 12

    V.    Travel to New York for Trial Has and Will Entail Significant Expense to the Parties. ............................................................................................... 13

    VI.    The Southern District of Florida Has a Lighter Docket, and Takes Cases to Trial Faster, Than the Southern District of New York. ......................................... 14

    VII.    Mr. Macey and Mr. Pagan Expeditiously Move to Transfer to Limit Expenditure of Excess Judicial Resources in New York. ................................. 14

    VIII.    The Remaining Factors Are Insignificant and Either Neutral or in Favor of Transfer.................................................................................. 15

CONCLUSION....................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Platt v. Minn. Mining & Mfg. Co.*,
    376 U.S. 240 (1964) .................................................................................................... 1, 2, 6, 7

*United States v. Alter*,
    81 F.R.D. 524 (S.D.N.Y. 1979) ...................................................................................... 11, 12

*United States v. Aronoff*,
    463 F. Supp. 454 (S.D.N.Y. 1978) .................................................................................... 7, 12

*United States v. Cashin*,
    281 F.2d 669 (2d Cir. 1960) ................................................................................................... 2

*United States v. Gruberg*,
    493 F. Supp. 234 (S.D.N.Y. 1979) .................................................................................. 14, 14

*United States v. Hanley*,
    No. 94 Cr. 394, 1995 WL 60019 (S.D.N.Y. Feb. 10, 1995) .......................................... 8, 11

*United States v. Layne*,
    No. 5 Cr. 87, 2005 WL 1009765 (S.D.N.Y. May 2, 2005) ............................................... 7, 9

*United States v. Maldonado-Rivera*,
    922 F.2d 934 (2d Cir. 1990) ................................................................................................... 2

*United States v. Martino*,
    No. 1 Cr. 389, 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ................................. 11, 13, 15

*United States v. Paccione*,
    949 F.2d 1183 (2d Cir. 1991) ................................................................................................. 9

*United States v. Posner*,
    549 F. Supp. 475 (S.D.N.Y. 1982) .............................................................................. 1, 3, 9, 15

*United States v. Rodriguez*,
    No. 16 Cr. 41, 2018 WL 2126429 (W.D.N.Y. 2018) ......................................................... 15

*United States v. Russell*,
    582 F. Supp. 660 (S.D.N.Y. 1984) .................................................................................. 8, 12

*United States v. Shvartsman*,
    No. 23 Cr. 307, 2024 WL 1258393 (S.D.N.Y. Mar. 25, 2024) ......................................... 15

*United States v. Spy Factory, Inc.*,
    951 F. Supp. 450 (S.D.N.Y. 1997) .............................................................................*passim*

*United States v. Templin*,
    251 F. Supp. 2d 1223 (S.D.N.Y. 2003)............................................................................. 16

*United States v. Valdes*,
    2006 WL 738403 (S.D.N.Y. Mar. 21, 2006) ............................................................*passim*

## FEDERAL RULES

Fed. R. Crim. P. 21(b).......................................................................................................... 1, 2

## OTHER AUTHORITIES

Transcript, *United States v. Myles*, No. 7 Cr. 840, ECF 39 (S.D.N.Y. Oct. 23, 2007)................. 10

## PRELIMINARY STATEMENT

Defendants David Macey and Edwin Pagan III respectfully submit this memorandum of law in support of their motion to transfer this case to the Southern District of Florida pursuant to Federal Rule of Criminal Procedure 21(b).

Mr. Macey is a Miami lawyer who is accused of bribing a Drug Enforcement Administration ("DEA") agent in Miami and conspiring with Miami-based participants, including Mr. Pagan. Mr. Pagan is a former Coral Gables police officer, on unpaid leave because of these charges, alleged to have participated in the Miami-based conspiracy and then later committed perjury in describing the events surrounding it. Mr. Macey and his wife have resided together in Miami for over 25 years. Mr. Pagan has spent his entire life—52 years—in Miami.

Nearly all of the prosecution and defense witnesses reside in and around Miami, and many would be substantially burdened if required to travel to New York to provide testimony—perhaps most significantly Mr. Macey and his wife who are ███████████████████████████████ █████████████████ As Rule 21(b) contemplates, venue in Miami would be far more convenient for the parties and the witnesses—indeed, the Southern District of New York is inconvenient to nearly everyone except for the prosecution team.

The Supreme Court has set forth a list of factors for courts to consider in determining whether a case should be transferred under Rule 21(b), including the residence of the defendants, the locus of the "nerve center" of events, and the location of likely witnesses. *See Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964). Here, those factors overwhelmingly support transfer because "in every significant aspect, this is a peculiarly and inherently Florida case," *United States v. Posner*, 549 F. Supp. 475, 480 (S.D.N.Y. 1982).

## LEGAL STANDARD

Federal Rule of Criminal Procedure 21(b) provides that a defendant may move for a change of venue based on "the convenience of the parties, any victim, and the witnesses, and in the interest of justice." The Supreme Court has set forth ten factors that district courts should consider in assessing a motion for transfer under Rule 21(b): (1) the location of the defendants; (2) the location of possible witnesses; (3) the location of the events likely to be in issue; (4) the location of documents and records to be involved; (5) the disruption of defendants' business if the case is not transferred; (6) the expense to the parties; (7) the location of counsel; (8) the relative accessibility of the place of trial; (9) the docket condition of each district involved; and (10) any other special elements which might affect the transfer. *See Platt*, 376 U.S. at 243–44. "No one of these considerations is dispositive and it remains for the court to try and strike a balance and determine which factors are of greatest importance." *United States v. Valdes*, No. 5 Cr. 156, 2006 WL 738403, at *3 (S.D.N.Y. Mar. 21, 2006) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990)).

Courts have often given the heaviest weight to the residence of defendants and their ties to their home community because Rule 21(b) reflects the long-standing principle that, "[r]ecognizing the unfairness and hardship to which trial in an environment alien to the accused exposes him, . . . venue statutes should, whenever possible, be construed so to permit trial at the residence of the defendant." *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 456 (S.D.N.Y. 1997) (Sotomayor, J.) (quoting *United States v. Cashin*, 281 F.2d 669, 675 (2d Cir. 1960)).

The Second Circuit has found that "application of the liberal transfer provision of Rule 21(b) . . . , permits the selection of the place of trial in each case as justice and convenience dictate." *Cashin*, 281 F.2d at 675. "[T]he determination of whether a particular case calls for transfer

2

depends upon the peculiar facts and circumstances of that case." *Spy Factory*, 951 F. Supp. at 456 (quoting *Posner*, 549 F. Supp. at 477).

Here, the *Platt* factors overwhelmingly favor transfer to the Southern District of Florida.

## FACTUAL BACKGROUND

**David Macey**

David Macey has never lived or worked in New York City.  Macey Decl. ¶ 3.  After the age of six, he grew up and attended high school in Miami, Florida, attended college in Tampa at the University of South Florida, and pursued his law degree and early legal career in Colorado as a public defender until 1999.  *Id*.  In 1999, Mr. Macey returned to Miami, Florida, where he has spent the better part of the last three decades building a family and career.  *Id.* ¶¶ 4–5.

From 1999 to 2005, Mr. Macey served as a prosecutor in the Miami-Dade State Attorney's Office, specializing in narcotics offenses and organized crime.  *Id.* ¶ 5.  Since 2005, Mr. Macey has owned his own law firm in Miami, providing representation to criminal defendants who have been or expect to be charged with narcotics offenses primarily in the Miami area.  *Id*.

Shortly after Mr. Macey put down roots in Miami in 1999, he married his wife of nearly 25 years, Shari—whom he met in middle school in Miami—and started a family.  *Id.* ¶ 5.  Mr. and Ms. Macey's older son, Mack, 21, is a junior at Florida State, ████████████████

████████████████████████████████████████████████████████████  ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



David and Shari Macey's deep ties to the Miami community are beyond dispute. They have long engaged in meaningful civic activities, including by starting their own foundation, the Maya Macey Foundation, to honor the memory of their infant daughter who they lost shortly after her birth. *Id.* ¶ 9. Since 2002, Mr. Macey and his wife have provided college scholarships to students in South Florida through the foundation. *Id.* Scholarships are awarded yearly to students who have faced hardships in their lives and have overcome those challenges to succeed in the classroom and beyond. *Id.* Maya Macey scholarships have helped over 100 students across South Florida attend college. *Id.*

The indictment in this case charges Mr. Macey with substantive and conspiracy counts of bribery of a public official and honest services fraud. ECF 28. The indictment alleges that Mr. Macey and Mr. Pagan, along with an investigator who worked for Mr. Macey, Manuel Recio, "paid and assisted in paying bribes" to a DEA agent, John Costanzo. *Id.* ¶ 1. Nearly all of the acts alleged in the indictment occurred in and around Miami, Florida. They include, among others: a

series of payments from Mr. Macey to Recio that were supposedly meant for Costanzo; a lunch in Coral Gables on January 17, 2019, *id.* ¶ 9; a payment from Mr. Pagan to Costanzo's family member in Miami to help Costanzo with the down payment on a Miami condo, *id.* ¶¶ 8–9; all of which took place in and around Miami.

Only two allegations against Mr. Macey have any relationship to the Southern District of New York: First, an April 2019 Yankees game and dinner attended by Mr. Macey and Costanzo, *id.* ¶¶ 10–11; and second, a single phone conversation in July 2019 between Recio, who was in New York at the time, and Costanzo, which included neither Mr. Macey nor Mr. Pagan. *Id.* ¶ 20(m).

Mr. Macey is out on bond awaiting trial, residing with his family in Miami-Dade County.

**Edwin Pagan III**

Edwin "Eddie" Pagan III has never lived or worked in New York. *See generally* Pagan Decl. He was born in Miami, Florida in 1972 and has spent his entire life living and working in Florida. *Id.* ¶ 3. He graduated from Sunset Senior High in 1990 and then went to Miami-Dade College and earned his associate's degree. *Id.* Next, he attended Florida International University (FIU) and the University of Florida. *Id.* In 1995, he graduated with a bachelor's degree in criminology. *Id.* In 1997, he was hired by the Coral Gables Police Department (CGPD). *Id.* ¶ 4. During that time, he continued his education, earning a master's degree from FIU/Nova Southeastern University in Behavioral Science in 2004. *Id.*

Mr. Pagan committed 27 years of his life to CGPD. *Id.* ¶ 5. Within the department he was promoted to the Vice, Intelligence, and Narcotics units. *Id.* In 2007, he was attached to the South Florida Money Laundering Strike Force. *Id.* In 2009, he transferred to the DEA as a task force officer in Homestead, Florida. *Id.* In 2015, he was transferred as a DEA task force officer to

Weston, Florida. *Id.* For 24 years of his time with the police department, he served in the Special Weapons and Tactical unit ("SWAT") and was the head SWAT instructor. *Id.*

For decades, Mr. Pagan has engaged in extraordinary volunteer public service separate and apart from his service as a police officer. *Id.* ¶ 6. After earning his blackbelt in Brazilian Jiu-Jitsu (BJJ), he began providing free instruction to residents of Coral Gables interested in self-defense. *Id.* He also volunteered for fellow law enforcement by teaching seminars in police defensive tactics. *Id.* He volunteers at his church every Sunday and provides free security for church events. *Id.* For many years, he engaged in approximately 30 hours of volunteer work every month. *Id.*

In addition to allegations that he participated in the bribery conspiracy with Mr. Macey, Mr. Pagan is charged with perjury because he was called as a witness by the defense in the trial last year of the alleged coconspirators in this case, Recio and Costanzo, longtime Miami residents who are both currently incarcerated, and the government claims Mr. Pagan lied. *See* ECF 28 ¶¶ 28–35. That trial was held before the Honorable Paul Oetken here in the SDNY. *See United States v. Costanzo*, 22-cr-281 (S.D.N.Y.). Although the trial was held here, Mr. Pagan's testimony related entirely to events in Miami. He testified about JEM Solutions, a Florida-based company; his work for Recio on a criminal case in the Southern District of Florida; a payment to invest in a piece of Miami real estate; and a payment to Costanzo's girlfriend in Florida. *See* ECF 28 ¶¶ 28–35.

Thus, the perjury charges against him, and the question of whether he lied about the events of 2019 in Miami, will exclusively involve events and witnesses in Miami.

## ARGUMENT

As discussed below, the *Platt* factors strongly favor transfer to the Southern District of Florida. *Platt*, 376 U.S. at 243–44. Mr. Macey and Mr. Pagan have both long resided, and continue

to reside, in Miami. *Id.* at 243. The vast majority of the potential trial witnesses reside in Miami, and some—most notably Mr. Macey's wife, Shari—would face significant hardship if forced to attend trial in New York. *Id.* at 244. Miami is the "nerve center" of the events in the indictment, where each of the events at issue at trial took place, and where evidence proving or disproving the government's theory is located. *See id.* Frequent trips to New York to prepare for trial will both substantially disrupt Mr. Macey's business, which requires in-person contact with individual, sometimes incarcerated, defendants, and entail significant expense to the parties. *Id.* The Southern District of Florida has a lighter docket, and takes cases to trial faster, than the Southern District of New York, militating towards transfer. *Id.* And finally, Mr. Macey and Mr. Pagan have expeditiously moved to transfer this case to limit the expenditure of critical judicial resources here prior to transfer. *Id.*

## I. Both Mr. Macey and Mr. Pagan Have Long Resided in Miami, Strongly Favoring Transfer.

"[A]s a matter of policy, a defendant should ordinarily be tried, whenever possible, where he resides." *Spy Factory*, 951 F. Supp. at 456 (quoting *United States v. Aronoff*, 463 F. Supp. 454, 457 (S.D.N.Y. 1978)). This is why "courts in this district have afforded greater weight to the defendant's interest in being tried in the district of his residence than to any other factor." *United States v. Layne*, No. 5 Cr. 87, 2005 WL 1009765, at *2 (S.D.N.Y. May 2, 2005) (internal quotation marks omitted).

Mr. Macey and Mr. Pagan have long resided in Miami, Florida and have virtually no connection to New York. Mr. Macey's law firm has operated out of Florida since 2005, and before that, Mr. Macey served as a prosecutor in the Miami-Dade State Attorney's Office. Macey Decl. ¶ 4. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ Requiring

Mr. Macey (and his wife, *see infra* Section II) to travel back and forth from New York ████

██████████████████████████████ "militat[ing] in favor of transferring

proceedings to the district in which a defendant resides." *Valdes*, 2006 WL 738403, at *4; *see also*

*United States v. Hanley*, No. 94 Cr. 394, 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995); *United*

*States v. Russell*, 582 F. Supp. 660, 662 (S.D.N.Y. 1984).  Accordingly, Mr. Macey's "residence

and family responsibilities in Florida clearly favor transfer of venue to Florida." *Valdes*, 2006 WL

738403, at *4.

Mr. Pagan has resided in Florida for the entirety of his life, and has worked and resided in

Miami since he was first hired by CGPD in 1997.  Pagan Decl. ¶¶ 4–5.  His family members all

live in Miami, including his elderly mother, whom he helps with household tasks and drives to

doctor's appointments.  *Id.* ¶ 7.  As discussed above, he has weekly, ongoing volunteer and public-

service commitments in Miami.  *Id.* ¶ 6.  Finally, he owns and maintains four rental properties in

Miami, requiring him to be on hand in case of immediate, unexpected repairs.  *Id.* ¶ 8.

## II.  The Vast Majority of the Potential Witnesses at Trial Reside in Florida.

Mr. Macey intends to call numerous percipient fact witnesses, all of whom reside in South

Florida.  At the heart of the government's charges are claims that Mr. Macey paid a DEA agent,

funneled through others, for confidential information relating to current or prospective clients.  Mr.

Macey categorically denies those claims, and at trial, intends to demonstrate, largely through

witnesses located in Miami (and none in New York), that the transactions the government points

to had nothing to do with bribes and that his relationships with the so-called "coconspirators" were

entirely legitimate.    In other words, these witnesses would testify to directly rebut the

government's claims of wrongdoing by explaining the lawful reasons for Mr. Macey's conduct

alleged in the indictment.

These witnesses all live and work in South Florida, and it would be extremely burdensome, financially and otherwise, to fly to New York to participate in a trial. This includes Mr. Macey's wife, Shari, who is knowledgeable about many of the facts alleged in the indictment. Ms. Macey would be severely inconvenienced by having to fly to New York to attend trial, ███████████

███████████████████████████████████████████████████████████████████████████████

███████ Each of "[t]hese Florida witnesses would undoubtedly be inconvenienced by having to testify in New York." *Valdes*, 2006 WL 738403, at *5.

As to the events alleged to have occurred in the Southern District of New York—the April 2019 Yankees game and the July 2019 phone call—while Mr. Macey plans to argue at trial that these events cannot serve as a basis for venue,[1] he does not plan to dispute whether either of the events in question occurred. Thus, not only are they minor events in what the government claims was a long-running conspiracy based in Miami, they won't be the subject of any debate that can be resolved by New York-based witnesses.

Mr. Macey also expects to call character witnesses to testify to his reputation in the Miami community for, among other traits, honesty and truthfulness. *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (in a fraud case, the Court "properly allowed . . . four character witnesses to testify to their opinions that [the defendant] was a forthright man of honesty whose integrity was beyond reproach"). This factor, too, favors transfer, since "the impact of character witnesses is generally greater in the district where such witnesses live and work." *Valdes*, 2006 WL 738403, at *5; *Layne*, 2005 WL 1009765, at *3; *see also Posner*, 549 F. Supp. at 477–78 (finding that the location of witnesses strongly favors transfer where the defendant sought to call Miami character

---

[1] While not at issue in this motion, Mr. Macey does not concede that venue is proper in the Southern District of New York. Should the Court decline to transfer this case to Florida, the government must prove venue in New York at trial, and Mr. Macey will make arguments at that time about why venue does not lie here.

witnesses, noting the "special problems" the defendant would face "inducing [such witnesses] to travel to New York to testify as character witnesses on his behalf"); Patton Decl. Ex. B, Venue Motion Hearing Tr. at 17:13–19, *United States v. Myles*, No. 7 Cr. 840, ECF 39 (S.D.N.Y. Oct. 23, 2007) (finding that this factor "tip[s] decidedly in favor of transfer" because the defendant "has substantial witnesses, to the extent that he has character witnesses, and there may be other witnesses in Florida with respect to the subject matter of the crime").

So too, Mr. Pagan. The fact witnesses he is likely to call, and the character witnesses that know his reputation for honesty, are all located in Miami: The vast majority of his CGPD and DEA colleagues live in Miami; members of his Jiu-Jitsu studio and his church, where he volunteers regularly, live in Miami; friends, family, and colleagues of Mr. Pagan who can testify about his relationships with the alleged coconspirators are in Miami; those who worked on the Southern District of Florida case who can testify about the work Mr. Pagan described in his testimony are in Miami; and people knowledgeable about the condo purchase in question are in Miami.

The government, too, will likely call few, if any, witnesses who reside in New York, and certainly none who do not work for the government. In the prior trial of Recio and Costanzo, the only New York-based witnesses called by the government—a minority of the government's witnesses overall—were those who worked for the FBI or the SDNY U.S. Attorney's office itself. The government's other witnesses were either based in disparate locations across the country due to placements at investigative agencies (Virginia, Colorado, Washington, and Puerto Rico); or based in and around Miami, Florida. The government's witnesses would therefore be just as inconvenienced by a trial in New York as a trial in Miami, and their locations do not militate in favor of a trial in this district.

In sum, the overwhelming number of expected witnesses reside in Florida and would be

greatly burdened by a trial in New York.  Moreover, the few non-Miami-based witnesses for the defense are located outside of New York and do not support trial here.  The few likely witnesses that are located in New York are employed by the government—mainly the prosecutor's office charged with bringing this case.  Accordingly, the location of likely witnesses strongly weighs in favor of transfer.

### III.  South Florida is the "Nerve Center" of the Events in the Indictment.

"The location of where the events in issue took place carries considerable weight." *Valdes*, 2006 WL 738403, at *6.  While venue may be proper in multiple districts, transfer is appropriate where the "nerve center" of the events at issue took place in another district.  *Id.*; *United States v. Martino*, No. 1 Cr. 389, 2000 WL 1843233, at *7 (S.D.N.Y. Dec. 14, 2000); *Hanley*, 1995 WL 60019, at *3; *see also United States v. Alter,* 81 F.R.D. 524, 526 (S.D.N.Y. 1979).

The "nerve center" of this case is in South Florida.  There can be no doubt that "[m]ost, if not all, of the alleged acts and conduct of the defendant in furtherance of the alleged scheme . . . occurred in" Florida.  *Hanley*, 1995 WL 60019, at *3.  The charges here alleged that a Miami criminal defense attorney paid a Miami DEA agent via a recently retired Miami DEA agent and a Coral Gables police officer (who supposedly later lied about those events) in order to help the attorney with his law practice in Miami.  *See generally* ECF 28.  The case has nothing to do with New York, other than the government's decision to prosecute it in the SDNY.

Aside from the general nature of the case, all of the contested detailed events took place in the Southern District of Florida:  the lunch underpinning the allegations related to the payment between Mr. Pagan and Costanzo, *id.* ¶ 9; the location of Mr. Macey's payments to Recio and Recio's subsequent payments to Costanzo, *id.* ¶ 7; the location of the company that Pagan, Recio, and Costanzo allegedly used to funnel the money at issue, *id.* ¶ 12; and the location of the property the government claims is at issue. *Id.* ¶ 8.  The events in New York—a single baseball game and

a phone call that included neither Mr. Macey nor Mr. Pagan—hardly render this case "national in scope," *Spy Factory*, 951 F. Supp. at 457. Finally, the Florida nexus of the events in this case was apparently not lost on the government, either: Its codename for the investigation appears to have been "Sunshine Cleaning," a clear reference to the "Sunshine State." *See, e.g.*, Patton Decl. Ex. A.

"In sum, the central location of the allegedly criminal acts charged against defendants is Miami, not New York, and this fact weighs in favor of transfer." *Alter*, 81 F.R.D. at 526.

## IV. Frequent Trips to New York for Preparation and Trial Will Substantially Disrupt Mr. Macey and Mr. Pagan's Businesses.

"[W]here a business, especially a struggling business, depends heavily upon the personal involvement of the defendant[], this factor favors transfer." *Valdes*, 2006 WL 738403, at *6. As an attorney with his own law firm that he runs along with his wife, Mr. Macey's practice relies heavily on personal interaction, often requiring jail and prison visits or in-person interviews with current and prospective clients. And because Mr. Macey's practice has been hit hard as a result of the government's allegations, Mr. Macey's business relies on his ability to attain, and retain, every individual client he can, which means spending as much time as possible working on existing and prospective cases in South Florida. *See Aronoff*, 463 F. Supp. at 458 ("To a failing business that depends so much on personal involvement, even a few hours each weekday plus weekends could make a substantial difference."). Although, of course, "a substantial amount of [Mr. Macey's] time will be occupied by the trial wherever it is held, it will still be possible for [him] to carry on [his] business at least to a limited extent if [he is] tried in" Florida. *Russell*, 582 F. Supp. at 663. "Such a potential reduction in business interruption is an additional factor in favor of transfer." *Id.*

Travel to New York causes significant disruption to Mr. Pagan's ability to work as well. As discussed above, Mr. Pagan owns, manages, and maintains four rental properties in Miami.

Pagan Decl. ¶ 8.  He receives unexpected calls from tenants to conduct repairs immediately, and if he is unavailable to complete those repairs quickly, he could lose income.  *Id.*  Mr. Pagan also supplements his diminished income while on leave from the police department by teaching self-defense and CPR classes to police departments in the Miami area.  *Id.*  ¶ 9.  If he had to cancel those trainings on short notice for a court conference or appearance, he could lose income associated with that training or lose the department as a client entirely.  *Id.*

**V. Travel to New York for Trial Has and Will Entail Significant Expense to the Parties.**

Mr. Macey and Mr. Pagan have and will continue to incur significant expenses in preparation for, and to attend, trial in New York.  Without family or friends in the area to help defray the cost, they anticipate paying for travel and lodging in New York for at least several weeks, if not longer, to attend conferences,[2] prepare for trial with (in Macey's case) New York-based attorneys, *see infra* Section VIII, and attend a multiweek trial.  In addition, they are prepared to cover costs for witnesses to travel to New York if they cannot afford to do so on their own, further ballooning their own costs, when each of those witnesses could attend trial in Florida with little issue.  *Martino*, 2000 WL 1843233, at *7 (finding that a New York trial would impose a "substantial financial burden" on the defendant, "who must pay for lodging and transportation expenses on her own behalf, as well as on behalf of her Florida-based witnesses").  While the government would presumably incur some "additional expenses arising from the transfer, the government is in a better position to bear such an expense."  *Id.*[3]  Because "[t]he Government's

---

[2] In late 2024, Mr. Pagan appeared before the Court and undersigned stressed the financial strain when inquiring about him appearing remotely for any pretrial conferences.

[3] Indeed, if this case is transferred, it is plausible that the government might spend less overall.  The prosecutors could meet with and prep New York-based witnesses locally and would only have to fly them to Florida for trial.  And the Florida witnesses could be prepped and attend trial in Florida—as opposed to the status quo, which requires the government to fly Florida witnesses up to New York for preparation and trial, incurring significant expense to the government.

convenience" is "given little weight when other considerations of convenience suggest transfer of a trial under Rule 21(b)," *United States v. Gruberg*, 493 F. Supp. 234, 243 (S.D.N.Y. 1979), this factor, too, weighs in favor of transfer.

## VI. The Southern District of Florida Has a Lighter Docket, and Takes Cases to Trial Faster, Than the Southern District of New York.

Docket conditions in the Southern District of Florida, as opposed to the Southern District of New York, also favor transfer. As of December 31, 2024, the Southern District of New York has 3,425 pending criminal cases shared among 26 active judges, for an average of 132 active criminal cases per judge.[4] The Southern District of Florida, by contrast, has 1,310 pending criminal cases split between 17 active judges, or just 77 active criminal cases per judge. *Id.* The Southern District of Florida, too, consistently takes criminal cases to trial faster than the Southern District of New York. The median time from commencement of a criminal case in SDNY to a jury trial is 28.9 months; in the Southern District of Florida, it's a mere 14.7 months.[5] As a result, if the Court transfers the case at this early stage, the parties are likely to receive a judge with a lighter caseload than here.

## VII. Mr. Macey and Mr. Pagan Expeditiously Move to Transfer to Limit Expenditure of Excess Judicial Resources in New York.

To determine the propriety of transfer, courts have also considered the "defendant's delay in moving to transfer," *Spy Factory*, 951 F. Supp. at 461, and relatedly whether "the docket reflects

---

[4] U.S. Courts, Table D cases—U.S. District Courts—Criminal Statistical Tables for the Federal Judiciary (December 31, 2024), https://www.uscourts.gov/data-news/data-tables/2024/12/31/statistical-tables-federal-judiciary/d-cases [last accessed Mar. 30, 2025].

[5] U.S. Courts, Table D-6, Median Time Intervals from Commencement to Termination for Criminal Defendants Disposed of, by District, During the 12-Month Period Ending December 31, 2024 (Dec. 31, 2024), https://www.uscourts.gov/data-news/data-tables/2024/12/31/statistical-tables-federal-judiciary/d-6 [last accessed Mar. 30, 2025]; *see also* Robert Tata, *The Fastest Federal Trial Courts: A Look at Virginia, Florida*, Law360 (May 13, 2022), https://www.law360.com/articles/1492342/the-fastest-federal-trial-courts-a-look-at-virginia-florida (showing that the Southern District of Florida was third-quickest to trial of all district courts, just behind the Eastern District of Virginia's "rocket docket").

investment by one court or the other in the particular case." *United States v. Shvartsman*, No. 23 Cr. 307, 2024 WL 1258393, at *4 (S.D.N.Y. Mar. 25, 2024). The defendants seek transfer at this early date, immediately upon the first conference on the superseding indictment and before any substantive rulings, to limit the Court and parties' investment of judicial resources in the case before it is transferred to the location of trial. As the "Court is not yet familiar with this case, . . . transferring it would not duplicate judicial effort or bind a new judge with decisions of this [c]ourt. Consequently, this factor supports transfer." *United States v. Rodriguez*, No. 16 Cr. 41, 2018 WL 2126429, at *6 (W.D.N.Y. 2018).

### VIII. The Remaining Factors Are Insignificant and Either Neutral or in Favor of Transfer.

The remaining factors—the location of documents and records, the accessibility of the location of trial, and the location of counsel—are of limited applicability and are either neutral or counsel in favor of transfer.

Where the government has sought evidence in this case and brought it to New York, the "consolidation of the records in New York was voluntarily accomplished by the Government," and "[i]t would be grossly unfair to permit the government to 'create' venue, or to alter the balance of relevant considerations, simply by shipping documents." *Spy Factory*, 951 F. Supp. at 458. "[I]n these days of easy and rapid transportation," these documents could just as easily be transferred back to Miami for trial. *Id.* Similarly, while New York is an inconvenient location for the Miami-based defendants and witnesses, *see supra* Section II, both locations are accessible via air and other public transport, and this factor, too, is neutral. *See Posner*, 549 F. Supp. at 479.

As to the location of counsel, Mr. Macey has hired New York attorneys solely because this case is being prosecuted in the Southern District of New York. *See Martino*, 2000 WL 1843233, at *7 (finding that this factor was neutral because the defendant hired New York counsel "when it

15

became apparent that the case would be brought in New York"). Were this case to be transferred to the Southern District of Florida, Mr. Macey would likely hire local counsel that would not have to travel for preparation and trial.[6] In fact, Mr. Macey's counsel has had to travel, and will continue to travel, to Miami frequently to meet with potential witnesses and Mr. Macey. *See supra* Section II. Frequent attorney travel from New York to Miami will incur significant further expense that Mr. Macey would not be required to pay were he to retain Miami counsel for a Miami trial. *See supra* Section V.

Mr. Pagan's counsel is Miami-based and is incurring substantial additional expense traveling to New York.

## CONCLUSION

In sum, "[t]his is an unusual case" where "the center of gravity . . . is so clearly in the State of" Florida that transfer is warranted. *United States v. Templin*, 251 F. Supp. 2d 1223, 1225 (S.D.N.Y. 2003). Mr. Macey and Mr. Pagan have lived and worked in Miami for decades and have deep and longstanding ties there, but no similar ties to New York. Nearly all potential witnesses reside in Florida, and many, especially Mr. Macey's wife, would face substantial hardship if required to travel to New York frequently for preparation and trial. And the events that will be at issue at trial—the Coral Gables lunch, the payments, the relationships between the alleged conspirators—all center on Florida.

Because every significant *Platt* factor weighs in favor of transfer, the Court should transfer this case to the Southern District of Florida.

---

[6] Florida counsel has offered to take Mr. Macey's case pro bono, which would also limit his expenses incurred in defending this case. *See supra* Section V.

16

Dated: March 31, 2025                         Respectfully submitted,
      New York, New York

Sean Hecker
David Patton
Shawn G. Crowley
Thea Raymond-Sidel
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
dpatton@heckerfink.com
scrowley@heckerfink.com
traymond-sidel@heckerfink.com

*Counsel for Defendant David Macey*

Christopher M. DeCoste
Law Office of Christopher DeCoste, P.A.
40 NW 3rd Street PH 1
Miami, Florida 33128
Tel: (305) 395-5775
cmd@christopherdecoste.com

*Counsel for Defendant Edwin Pagan III*

17