EXHIBIT A

Nb62Cos1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        22 Cr. 281 (JPO)

JOHN COSTANZO, JR.,
MANUEL RECIO,

              Defendants.

------------------------------x        Trial

                                       New York, N.Y.
                                       November 6, 2023
                                       9:25 a.m.


Before:

                    HON. J. PAUL OETKEN,

                                       District Judge
                                        -and a Jury-

                         APPEARANCES


DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
SEBASTIAN A. SWETT
EMILY S. DEININGER
MATHEW ANDREWS
     Assistant United States Attorneys

MUKASEY FRENCHMAN LLP
     Attorneys for Defendant Costanzo
MARC L. MUKASEY
MICHAEL F. WESTFAL
STEPHANIE GUABA
TORREY K. YOUNG

GAINOR & DONNER
     Attorneys for Defendant Recio
RONALD GAINOR
AMBER E. DONNER

Nb62Cos1

APPEARANCES (continued)


Also Present:   Dean Iannuzzelli, Paralegal Specialist (USAO)
                Nerlande Pierre, Paralegal Specialist (USAO)
                Marie-Lou Serna, Paralegal (Gainor & Donner)
                Sal Chan, Paralegal (Mukasey Frenchman)
                Delise Jeffrey, Special Agent, F.B.I.

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          COUNSEL:  Good morning.

4          THE COURT:  Preliminary matters.  I received some

5    letters over the weekend, and let's start with -- well, I will

6    start with the defense.  Is Mr. Pagan being called.

7          MR. MUKASEY:  That's our intention, Judge.

8          THE COURT:  Government, what do you want to say?

9          MR. ANDREWS:  Judge, at this point the -- you have

10   read the letters.  The question of service is what it is.  You

11   can take what you want from the letters.  I think our ask for

12   today is that Mr. Pagan be *voir dired* outside the presence of

13   the jury about when he received the subpoena and what he knew

14   about it because we believe the government is entitled to

15   cross-examine him about it.

16         THE COURT:  Well, I don't think he was served.  I

17   don't think service is based on actual notice, and I don't

18   think I can ask him about when his lawyer told him about a

19   subpoena.  From what I understand, September 27, the government

20   asked for confirmation that his lawyer would accept service.

21   No response.  So the lawyer didn't accept service.  Unless I am

22   missing something.  The fact that the lawyer accepted service

23   on behalf of his company doesn't seem to be -- to constitute

24   service on behalf of him.  I think you need to serve him today,

25   we will do the direct, and when he is served, I will tell him

Nb62Cos1

1  he has to produce documents within 24 hours, and then when he

2  produces them, you will do your cross.

3        MS. DEININGER:  I think that's fine.  The only thing I

4  would note is the lawyer did tell us he was accepting service

5  on Saturday and then rescinded that yesterday.

6        THE COURT:  Is his lawyer here?

7        MR. MUKASEY:  Judge, his lawyer is in Florida, as I

8  understand it.  We did speak to him yesterday, and suggested

9  that he make himself available by phone, if possible.  I think

10  we, I think, maybe tried to facilitate him getting in touch

11  with Mr. Hampton.  I don't know that we have a dog in this

12  fight, but we certainly told Mr. DeCoste that we thought the

13  Court might entertain a telephonic meeting or discussion or

14  consultation.  My understanding is that he is in court

15  somewhere else in Florida today or on the way to court, but I

16  think you could get in touch with him by phone or he could get

17  in touch with you by phone.

18        MR. SWETT:  Your Honor, we don't intend to delay this

19  trial on this issue, and so to the extent there was any doubt,

20  we will hand the subpoena to Mr. Pagan.  If we feel like there

21  is cross-examination on that point, we will pursue that, and

22  whatever documents we get we get.  But I think we are fine

23  moving forward in the current posture.

24        We do, however, also have the issue of whether he

25  will be allocuted on his Fifth Amendment rights before he

Nb62Cos1

1    testifies.

2            MR. MUKASEY:  Before we get to the Fifth, is the idea

3    to serve him with a subpoena before he gets into the courtroom?

4    I mean, you are not going to do it on the witness stand right

5    in front of the jury.

6            MR. SWETT:  Right.  We wouldn't give him the subpoena

7    on the witness stand.  I think what we would do, just because

8    there is ambiguity as to whether he's been given notice of the

9    subpoena yet, is we would just give it to him if we see him out

10   in the hallways, and then we will decide whether we think this

11   is something worth pursuing on cross-examination.

12           MR. MUKASEY:  Well, you can't subpoena him in the

13   hallway and then cross-examine him about his failure to produce

14   documents pursuant to the subpoena, right?  I mean that's sort

15   of --

16           THE COURT:  Well, I was hoping his lawyer would be

17   here.  There is an argument that he was served on Saturday

18   afternoon because his lawyer said in an e-mail "I accept

19   service on the understanding that our obligations begin today."

20   What does that mean?  That could be a unilateral understanding

21   or it could be on a condition.  I think it's ambiguous.  If

22   it's a condition, he has a point.  It was not accepted.  The

23   condition wasn't accepted.  It could have been, but it wasn't.

24   And then he rescinded.

25           If it was a unilateral understanding, that is, I

Nb62Cos1

1  accept, my understanding is that my obligations begin today,

2  then he has been served as of Saturday.

3          MR. SWETT:  Your Honor, can we confer for one second?

4          THE COURT:  Sure.

5          (Counsel confer)

6          MR. SWETT:  Your Honor, we are not going to explore

7  this on cross-examination.  I think, as the Court has noted,

8  there is a messy record here, and so we don't need to resolve

9  this particular issue.

10         The two issues, one of which I flagged, that we do

11 think the Court should be aware of is, first, the fact that

12 he's already invoked, and so we think it is appropriate to

13 allocute him on his Fifth Amendment rights.  The other point we

14 want to flag for the Court and for defense counsel is that our

15 understanding is that it is appropriate on cross-examination to

16 ask him whether he previously refused to appear before the

17 grand jury without asking him directly whether he invoked his

18 Fifth Amendment rights, and we want to raise that with the

19 Court, so that the Court is aware that line of questioning

20 would come up on cross-examination.

21         MR. ANDREWS:  And just to add to the record, your

22 Honor, the government has also asked to speak with him multiple

23 other times beyond the grand jury as well, but as Mr. Swett

24 just said, we believe that based on Second Circuit precedent

25 you can't ask specifically did you invoke.  However, you can

Nb62Cos1

1    ask the fact that he was served a subpoena and he chose not to

2    attend.

3                THE COURT:  He did not appear before the grand jury.

4                MR. ANDREWS:  Right.

5                MR. MUKASEY:  Well, Judge, obviously I don't represent

6    Mr. Pagan, and I would be hesitant to take any position on this

7    without hearing from his lawyer or having his lawyer respond.

8    I don't know the history of Pagan getting a subpoena.  I don't

9    know if that was accepted, not accepted, served on him, not

10   served on him, went through counsel, didn't go through counsel.

11   I don't know what he knows about it.

12               I also don't understand what's relevant about the fact

13   that he got a grand jury subpoena and refused to testify.  If

14   you are not drawing a negative inference from that, what are

15   you doing?

16               MS. DEININGER:  He was served in person and it was

17   only after that that he retained counsel with regard to that

18   particular subpoena.  And there is clear case law from the

19   Supreme Court and the Second Circuit saying that witnesses can

20   be cross-examined.  Is it goes to bias and credibility on prior

21   silence, on the prior silence as opposed to their willingness

22   to testify in a defense case.  We don't intend to elicit the

23   fact that he invoked his Fifth Amendment right, but the fact

24   that he refused to, you know, meet with us and talk to us or

25   appear before the grand jury while talking to defense counsel

Nb62Cos1

1    is a straightforward issue of bias.

2            MR. ANDREWS:  And we would also add, your Honor, that

3    before he testifies you could even instruct him he should not

4    say on the record in front of the jury that you had invoked

5    your Fifth Amendment right and that would address any concern

6    in terms of --of that accidentally coming up.

7            MR. MUKASEY:  I would like to look at that case law

8    and I would also like to note for the record we have tried to

9    be as transparent as possible in terms of who is going to be

10   our potential witnesses.  And every witness, virtually every

11   witness we have disclosed has all of a sudden been bombarded

12   with subpoenas and, you know, what we think is obstacles to

13   allowing them to testify.  So before I say, you know, I'm not

14   going to object to questions about grand jury subpoenas to

15   Pagan and his apparent refusal to testify, I don't know what

16   his reaction was, I don't know what his lawyer said to

17   Mr. Andrews or Mr. Swett.  I would want to look at that case

18   law.  I think that is -- what's the argument that you make on

19   summation?  Ladies and gentlemen, remember he got a grand jury

20   subpoena and he refused to testify?  What do you think about

21   that?  I mean, if that's not using his silence against him, I'm

22   not sure what is.  I would like to see that case law and

23   appreciate it.  He is not a defendant in this case.  He is an

24   ordinary citizen who has a right to invoke his Fifth.  I'm not

25   sure what the relevance is to his invoking his Fifth other than

Nb62Cos1

1    to draw the negative inference.

2            THE COURT:  It's not that he invoked the Fifth, it's

3    that he did not testify before the grand jury.

4            MR. MUKASEY:  Okay.  Without saying that he invoked

5    his Fifth, they are going to say that he refused to testify or

6    he just failed to testify?  I mean if he failed to testify, it

7    could be because they decided they didn't need him.  Obviously

8    the inference is he refused to testify.

9            MR. ANDREWS:  Well, Judge, that is not actually what

10   the inference is.  As Ms. Deininger pointed out before, the

11   Supreme Court has said silence can be used in order to impeach

12   the witness based on prior bias.  The witness has been asked

13   repeatedly, multiple times, to both speak with the government

14   and speak in front of the grand jury.  He has declined every

15   one of those times, and his testimony is going to be today that

16   all of this was completely innocent, there was nothing to hide,

17   the defendants are being wrongfully prosecuted and we are

18   allowed to impeach him over the fact that over this entire time

19   period he never spoke to anybody——the government, the grand

20   jury——about what he is saying today is entirely innocent

21   activity.

22           THE COURT:  Okay.  I haven't looked at this case law

23   at least not recently.  Do you have cites or --

24           MS. DEININGER:  I have one handy.  It's U.S. v. *Caro*,

25   637 --

1          THE COURT:  Hold on one second.

2          MS. DEININGER:  637 F.2d 869, and this is a case in

3   which the witness in question was the defendant himself, not a

4   civilian witness, but the question was whether the government

5   could introduce evidence of the defendant's silence in order to

6   cross-examine them in prior interactions with law enforcement.

7   And that principle, I think, we think is essentially the same

8   here.  And I believe that *Caro* cites to the underlying relevant

9   Supreme Court cases as well and the same idea, which is, that

10  someone's refusal to talk to law enforcement is a proper matter

11  for cross-examination as to their credibility and bias if they

12  later then choose to voluntarily get up and testify either in

13  their own defense or in someone else's defense.

14         THE COURT:  All right.  I'll take a look.  I'm not

15  sure when, but are there any other -- is there anything else in

16  the government's case, first of all?

17         MR. SWETT:  Your Honor, we are going to introduce a

18  text message and two attachments to that text message and then

19  we will rest.

20         THE COURT:  Okay.  Is there any defense witness before

21  Pagan?

22         MR. MUKASEY:  Yes, there are two before Pagan, both

23  about 30 minutes.

24         THE COURT:  Any issues with them?

25         MR. SWETT:  No, your Honor.

Nb62Cos1

1          THE COURT:  Okay, so we can start.

2          MR. MUKASEY:  And, Judge, did your Honor want us to

3   make Rule 29 applications after the government rests at

4   sidebar?  Are you going to send the jury back in?  However you

5   want to do it.

6          THE COURT:  As a procedural matter, can you do it now?

7   I guess not.  The appellate guy is saying no.  I would rather

8   not.

9          MR. MUKASEY:  I would rather not do it now, right.

10         MR. GAINOR:  And, your Honor, also I think the

11  government's rebuttal case, the earliest it begins is tomorrow,

12  so perhaps maybe after, when the jury gets sent home, we make

13  the Rule 29.  I don't know what works better for the Court, but

14  after the witnesses that are scheduled for today, that might be

15  it.

16         THE COURT:  Right, but I think, as a procedural

17  matter, at least, we need to do it at sidebar, so a formal

18  motion is clearly made at the close of the government's case.

19  We can do that at sidebar and then you can expound on it at the

20  end of the day or something like that.

21         MR. MUKASEY:  Right.

22         And just scheduling wise, assuming there is no nuclear

23  problem today, I think we discussed with the government that

24  your Honor will probably get somewhere in the neighborhood of

25  four hours worth of summations, probably one, one, one and a

Nb62Cos1

1    half for their main summation and 30 minutes for their

2    rebuttal.

3              THE COURT:  I think we will do them tomorrow.

4              MR. MUKASEY:  So if the rebuttal case starts at 9:30

5    and ends at 10:30 or 11:00, your Honor would be inclined to go

6    right into summations for the rest of the day and then charge

7    on Wednesday morning?

8              THE COURT:  Wait.  Say that again.

9              MR. MUKASEY:  Your Honor would be inclined to do all

10   the summations tomorrow, correct?

11             THE COURT:  Yes, if possible.  It depends when we

12   finish tomorrow.

13             MR. MUKASEY:  And then charge them on Wednesday

14   morning.  I'm just mindful of the fact that we have this sort

15   of short week that's going to create sort of this artificial

16   deadline for them of Thursday afternoon, and I want them to

17   have as much time as possible, as much as they need, and not

18   have some artificial backstop, which is why I am trying to play

19   out the --

20             THE COURT:  I think it's impossible to say now because

21   I don't know how long these witnesses are and I don't know if

22   the government is going to have a rebuttal case and how long

23   that's going to be.

24             MR. SWETT:  Your Honor, we also want to see what these

25   witnesses say but we are lining up two very short rebuttal

Nb62Cos1

1   witnesses for tomorrow.  They are both -- one is in Florida,

2   one is in Texas, and we are flying them in tonight.  So if

3   defense counsel finishes with their witnesses before the end of

4   the full jury day, we would not be prepared to put on a

5   rebuttal case, but by tomorrow morning we could have our

6   rebuttal case done we think within an hour or an hour and a

7   half max.

8           THE COURT:  Okay.  So then we go to closings tomorrow.

9           MR. MUKASEY:  Could we find out who the rebuttal

10  witnesses are?

11          MR. SWETT:  Sure.  It's David Kubiliun, who was on our

12  original witness list, and it's Katie Foster who was also on

13  our original witness list.

14          THE COURT:  Well, if that's the case, then I think we

15  would be hopefully able to close and charge the jury on

16  Wednesday.

17          MS. DEININGER:  Which would be to push forward if the

18  time allows.

19          MR. MUKASEY:  Are you saying close the jury Wednesday

20  or tomorrow?

21          MS. DEININGER:  Sorry, tomorrow.

22          THE COURT:  Tomorrow.

23          MR. MUKASEY:  We also have a preliminary read on *Caro*.

24  I want to have a chance to read that before the Pagan thing

25  happens.  Does your Honor want us to try to get the Court in

Nb62Cos1

1    touch with Pagan's lawyer?  I think that might be a prudent

2    thing to do for Mr. Pagan, although we don't represent him.

3              THE COURT:  I am planning to ask him about the Fifth

4    Amendment outside the presence of the jury, and I guess it

5    would make sense to talk to the lawyer about the documents

6    issue, because either he was served on Saturday or he will be

7    served today, assuming he is here in person, with a subpoena,

8    and there would be an obligation to produce documents before

9    the cross.  And if the government wants to take a break and

10   review any documents, you can, or you can decide not to.  But

11   unless the government tells me you don't care about the

12   subpoena now . . .

13             MR. SWETT:  I think we need to see what he says on

14   direct, and I think we need to see what he brings with him, if

15   anything.  I think there are some documents that we care about,

16   and we don't know if he intends to bring those documents or if

17   he has them with him already.  But, again, we don't want this

18   to unnecessarily delay the trial.  That's our primary concern

19   here.

20             THE COURT:  Do you think it makes sense to have a call

21   with his lawyer?

22             MR. SWETT:  As in the Court having a call with his

23   lawyer on the record?

24             THE COURT:  On the record with counsel and me, yeah.

25             MR. SWETT:  Your Honor, I don't know how much that's

Nb62Cos1

1   going to accomplish because he is taking the stand today.  The

2   documents he has are -- the documents he is able to produce

3   today are going to be what they are, and I don't really know if

4   there is a realistic remedy on our end even if the Court were

5   to find that we were entitled to some sort of remedy.  So for

6   the time being, we don't think that's necessary.

7       I think we would just make sure he gets the subpoena

8   before he takes the stand and see what documents he produces,

9   and maybe when his direct is finished we could have a brief

10  recess and figure out if we need a little more time.  But,

11  again, we want to get through these defense witnesses today.

12      MR. MUKASEY:  I don't oppose that, I just want to

13  point out that the wrestling match between the government and

14  Pagan and his lawyer should not prejudice our client; and

15  serving him with a subpoena, putting him on the witness stand,

16  serving him with a subpoena in the hallway, and then saying

17  "how come you haven't produced any documents" in front of the

18  jury is a bit of a gimmick and a bit unfair to Mr. Costanzo.

19  So I don't mind if they serve him with a subpoena, but I don't

20  think cross-examination about why he didn't go and grab his

21  documents from Florida and come back here and produce them is

22  fair play.  That's a stunt.

23      THE COURT:  You are not planning to ask about that,

24  are you?

25      MR. SWETT:  Your Honor, I don't know if it helps our

1    case to ask him why he didn't serve -- or produce documents for

2    a subpoena he got a few hours before.  I think it's really more

3    just to the extent he is going to produce documents that

4    removes any doubt as to whether he's been served under the

5    subpoena.

6         THE COURT:  Do you know if he is planning to produce

7    documents today?  Do you have any understanding about that?

8         MR. SWETT:  Your Honor, it's been a moving target with

9    his attorney.  When the attorney called late Friday night, he

10   said that they were gathering documents and would produce.

11   There was back-and-forth on Saturday where the attorney

12   indicated that he had accepted service, but since then I'm not

13   sure we can rely on those prior representations.

14        MR. MUKASEY:  We are going to want a little while, you

15   know, 10, 15 minutes to take a look at *Caro* before the

16   cross-examination.

17        MR. GAINOR:  And obviously with regard to Mr. Recio,

18   we make the same arguments, have the same position.

19        THE COURT:  Okay.  All right.  Well, let's go ahead

20   with what we can.  You are going to do two witnesses before

21   Mr. Pagan, right?

22        MR. MUKASEY:  Correct.

23        THE COURT:  Why don't we go ahead and finish the

24   government's case now then you will rest and we will go to

25   sidebar for motion of the defendants and then maybe I will give

Nb62Cos1

1    them a break at that point and even though it will be pretty

2    quick, and then we will resume with defendant's case.

3            How long do you think the remainder of government's

4    case will be?

5            MR. SWETT:  Two to four minutes.

6            THE COURT:  Okay.  And then the first defense witness

7    is who.

8            MR. MUKASEY:  Is Neil Ross.

9            THE COURT:  Are you ready to go with him?

10           MR. MUKASEY:  Yes.

11           THE COURT:  So we will proceed with that after the

12   sidebar.  All right.  Can we bring out the jury?  Get the jury.

13           (Continued on next page)

Nb62Cos1

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.

3    Please be seated.  Welcome back.

4              Mr. Swett.

5              MR. SWETT:  Thank you, your Honor.

6              At this time the government would offer Government

7    Exhibits 1037, 1037A and 1037B.

8              THE COURT:  Any objection.

9              MR. MUKASEY:  No objection.

10             THE COURT:  They are receive received.

11             (Government's Exhibits 1037, 1037A, 1037B received in

12   evidence)

13             MR. SWETT:  Let's briefly publish for the jury

14   Government Exhibit 1037.  This is a What's App chat thread.

15   There is Umberto with the gray messages and JC with the green

16   messages.

17             I'm going to start reading the third gray message in

18   the middle of this page dated January 31, 2019.  I'm going to

19   read these first two messages -- excuse me, that message and

20   the one that follows.

21             Umberto, in gray, says:  "A reliable acquaintance

22   (Daniel Garcia Barragan also a lawyer) recommended Lic. Sergio

23   Becerril Vega as a criminal lawyer in Mexico, cell" and a long

24   string of numbers, "e-mail," e-mail address.

25             Costanzo, in green, responded:  "Okay.  Manuel Recio,

Nb62Cos1

1    my partner, gonna contact him to see if he is interested in

2    meeting next week.  We have a shit ton of attorneys read to go.

3    How is everything going?  Do you need anything?"

4              We can take that down.

5              Your Honor, at this time the government rests.

6              THE COURT:  All right.  Thank you.

7              MR. MUKASEY:  We have an application, Judge.

8              THE COURT:  Yeah.  We will go to the sidebar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nb62Cos1

```
1              (At the sidebar)

2              MR. WESTFAL:  Your Honor, pursuant to Rule 29 of the

3    Federal Rules of Criminal Procedure, Special Agent Costanzo

4    moves for judgment of acquittal based on the government's

5    failure to introduce sufficient evidence to sustain a

6    conviction on each of the four counts against Special

7    Agent Costanzo.  As to each element of each of the four counts,

8    the government has failed to introduce sufficient evidence to

9    sustain a conviction beyond a reasonable doubt.

10             Go through the counts?

11             THE COURT:  You don't need to.

12             MR. WESTFAL:  I can go through that after, if that is

13   sufficient.

14             THE COURT:  That is sufficient to make your motion.

15             MR. WESTFAL:  Okay.  I just want to go through two

16   more points.

17             THE COURT:  Okay.

18             MR. WESTFAL:  As to the aiding and abetting

19   allegation, the government has failed to introduce sufficient

20   evidence to establish beyond a reasonable doubt that Special

21   Agent Costanzo aided and abetted the commission of any crime.

22             As to venue, with respect to each of the four counts

23   against Special Agent Costanzo, the government has failed to

24   introduce sufficient evidence to establish by a preponderance

25   that Special Agent Costanzo or anyone else committed an act in
```

Nb62Cos1

1    furtherance of any of the charged counts in the Southern

2    District of New York.

3              THE COURT:  Okay.  Do you want to respond?

4              MR. GAINOR:  Do you want me to put mine on the record

5    too?

6              THE COURT:  Yeah.  You can go ahead.

7              MR. GAINOR:  Your Honor, on behalf of Mr. Recio, we

8    would reassert all previously made objections, pretrial

9    motions, and motions for mistrial.  In addition, we would be

10   adopting the arguments of codefendant Costanzo and also echo

11   the fact that, with regard to Mr. Recio, on each count that he

12   is charged, the government has failed to produce evidence

13   sufficient for conviction, sufficient to establish a *prima*

14   *facie* case.

15             That's what I have at this time.

16             THE COURT:  Okay.  Mr. Swett.

17             MR. GAINOR:  We would reassert, obviously, all of

18   this, including the venue argument, as well.

19             THE COURT:  Okay.

20             MR. SWETT:  Sure.

21             So on the aiding and abetting, that is the indictment

22   charged in section 2, which is the aiding and abetting

23   statute, but that's also inherent in every charge, so there is

24   no reason to rule on an aiding and abetting theory when it is

25   baked into the charges that are contained in the substantive

Nb62Cos1

1    counts, so we would oppose a Rule 29 on an aiding and abetting

2    theory.  The jury will be charged on that, and the jury can

3    make that determination.  But that is part of the statute

4    itself.  That's part of the crime.

5            And with respect to venue, as the Court heard at

6    trial, there was a phone call in which Mr. Recio called

7    Special Agent Costanzo.  There was a stipulated agreement to

8    that phone call heard in Manhattan, where they discussed an HSI

9    case involving an individual named AAO and how HSI was coming

10   for this person and how, I believe the line was, his world is

11   about to come crashing down, and Costanzo said, well, he needs

12   to hire you.  So this is clearly a conversation about the

13   scheme where one of the participants is in the Southern

14   District of New York.

15           Furthermore, Special Agent Costanzo and David Macey

16   traveled to New York together to attend a Yankees game, a game

17   that David Macey paid for and a game that was designed to

18   impress and to curry favor with another senior DEA agent, an

19   individual named Nic Palmeri, as demonstrated by subsequent

20   text messages where Costanzo and Recio discussed how they were

21   going to, quote, hold Mexico because of Palmeri's promotion

22   there.

23           So there is clearly evidence that acts occurred in

24   Southern District of New York.  All of these are continuing

25   offenses for purposes of venue, so we don't need to prove that

Nb62Cos1

1    a specific act or that specific acts occurred as long as one

2    act as part of the overall course of conduct occurred in the

3    Southern District of New York.  We have established venue,

4    which we have clearly done for purposes of a Rule 29 and for

5    purposes of the ultimate decision in this case.

6              THE COURT:  Okay.  The motion is made as to both

7    defendants.  I am reserving decision until after the close of

8    all the evidence on both.

9              COUNSEL:  Thank you.

10             (Continued on next page)

1              (In open court)

2              THE COURT:  Mr. Mukasey, Ms. Young, who ever wants to

3    go.

4              MR. MUKASEY:  Your Honor, the defense chooses to put

5    on a case, and our first witness is Neil Ross.

6     NEIL ROSS,

7         called as a witness by the defendant Costanzo,

8         having been duly sworn, testified as follows:

9              THE COURT:  Ms. Young.

10   DIRECT EXAMINATION

11   BY MS. YOUNG:

12   Q.  Good morning, Mr. Ross.

13   A.  Good morning.

14   Q.  Where do you work?

15   A.  I work in Miami, at Ross Home Loans, a mortgage brokerage.

16   Q.  What is your current title at Ross Home Loans?

17   A.  President.

18   Q.  How long have you worked there?

19   A.  Since 2004.

20   Q.  And generally what does your role at Ross Home Loans

21   entail?

22   A.  I focus on the operation, origination, and other activities

23   for the company.

24   Q.  And the company is a mortgage company?

25   A.  Yes, mortgage brokerage company.

1  Q.  And how does your company relate to mortgage wholesale

2  companies?

3  A.  As a mortgage broker, we are the intermediary between a

4  borrower and a lender, which would include a wholesale lender.

5  Q.  And did there come a time when you assisted John Costanzo

6  with a mortgage?

7  A.  Yes.

8  Q.  Could you please look around the courtroom and do you

9  recognize anyone?

10  A.  Yes.

11  Q.  Would you please identify John Costanzo, Jr.?

12  A.  He is over there.

13  Q.  Perhaps by an article of clothing.

14  A.  He has a tie.  I'm color blind.  He is next to the bald

15  guy, nothing against bald people.

16          THE COURT:  My deputy is next to the bald guy, too.

17          In the second table on the right there?

18          THE WITNESS:  Yes.

19          THE COURT:  Next to Mr. Mukasey.

20          THE WITNESS:  Yes.

21          THE COURT:  He's identify Mr. Costanzo.

22          MR. MUKASEY:  A handsome bald guy.

23  BY THE COURT:

24  Q.  So around what time did you assist John with a mortgage?

25  A.  I believe it was around 2019.

1    Q.  And what type of mortgage did you assist him with?

2    A.  It was to finance the purchase of a property.

3    Q.  Was that property residential or commercial?

4    A.  Residential.

5    Q.  And where was the property located?

6    A.  Coral Gables, Florida.

7    Q.  And was there a wholesale mortgage company involved in the

8    purchase?

9    A.  Yes, United Wholesale Mortgage.

10   Q.  And could you please explain the relationship of Ross Home

11   Loans to United Wholesale Mortgage for the purpose of John's

12   mortgage application?

13   A.  We would gather the information from John and then present

14   it to United Wholesale, which would then underwrite the file

15   and make the decision.

16   Q.  And were you personally the mortgage broker for purposes of

17   this transaction?

18   A.  Yes.

19   Q.  So you have personal knowledge from the time of John's

20   mortgage application?

21   A.  Yes.

22   Q.  And you communicated with John?

23   A.  Back then, yes.

24   Q.  And how did you communicate with him?

25   A.  Telephone.

Nb62Cos1                          Ross - Direct

1    Q.  And you just described being sent information.  What types

2    of information did you gather?

3    A.  Income, assets, credit, and other information.

4    Q.  And how were you paid for your role in this mortgage

5    application?

6    A.  Upon closing of the application, we received an origination

7    fee.

8    Q.  And who paid the origination fee?

9    A.  Back then it could have been either the lender or the

10   borrower.

11   Q.  Sal, could you please pull up GX 434, which is already in

12   evidence, at page 1667.

13           Mr. Ross, do you recognize this document?

14           Sorry, 1667.

15   A.  This would be part of the loan application documents that

16   are packaged through the transaction.

17   Q.  And is this a standard form for the loan application?

18   A.  It's a standard uniform loan application.

19   Q.  And what type of information did John provide for purposes

20   of this loan application?

21   A.  It would include his address, personal information, such

22   as, age, Social Security, it would include where he lived for

23   at least two years, where he worked for at least two years,

24   income information, asset information, authorization to pull

25   credit.

Nb62Cos1                          Ross - Direct

1   Q.  And why does the mortgage company collect all of this

2   information?

3   A.  That's my job.

4   Q.  Why is the financial picture for the applicant important

5   for your job?

6   A.  So we take that information and we put it into a system

7   that goes to Fannie Mae or Freddie Mac.  You don't get a loan

8   necessarily for this type of transaction through Bank of

9   America, Wells Fargo.  Institutions like that, or us, go to

10  Fannie Mae/Freddie Mac.  Those institutions have certain

11  guidelines.  So we take information from someone like John, put

12  it in the system.  Fannie Mae/Freddie Mac then make the

13  determination if it's eligible for a loan.  If it's eligible

14  for a loan, we send that information to United Wholesale.

15  Q.  Sal, if we could please go to page 2016.

16          What is the title of this page?

17  A.  Disclosure history.

18  Q.  And what type of information is logged here?

19  A.  It looks like the interest -- it shows when the interest

20  rate was locked.

21  Q.  And what's that date here?

22          Sal, if you could scroll back up still.

23  A.  January 18, 2019, 6:35 p.m.

24  Q.  I would like to direct your attention now to page 32.  What

25  is this portion of the mortgage?

1    A.  An appraisal.

2    Q.  And is this a standard process?

3    A.  Yes.  When you obtain financing, the lender will request

4    an appraisal of the property to determine the value.

5    Q.  Sal, we could please go to page 53 and then scroll a little

6    bit.

7            What are these images of?

8    A.  The actual subject property—the front, the rear, and then

9    eventually there should be that's a street view, and then

10   eventually interior, the side view, side view, street view, the

11   community name, the unit number for the subject property, the

12   patio, the AC compressor, the handler, the front door entry,

13   the foyer, laundry, staircase.

14   Q.  We could stop there.

15           So these are photographs of the specific unit that is

16   subject to the loan, is that right?

17   A.  Correct.

18   Q.  Sal, if you could please now go to page 75.

19           What is the title of this page?

20   A.  Loan approval conditions.

21   Q.  And what was the appraised value?

22   A.  Appraised value $530,000.

23   Q.  And what was the purchase price?

24   A.  $470,000.

25   Q.  Does that mean there was equity in the condo from the time

Nb62Cos1                          Ross - Direct

1    of purchase?

2    A.  $60 in equity.

3    Q.  And what was the down payment?

4    A.  I believe it was 20 percent.  Yes, 20 percent.

5    Q.  And is that a standard amount?

6    A.  Yes.

7    Q.  And, Sal, if you could scroll up just slightly.

8    A.  20 percent is $94,000.

9    Q.  Thank you.  The column that says——16, scrolling up just

10   slightly——"housing/debt ratios," could you please explain

11   that?

12   A.  Sure.  So one of the guidelines that the underwriter looks

13   at is the amount of debt a borrower has relative to the

14   income, and usually you need to have below a certain ratio,

15   such as, 45 percent, and many times 49.99 percent.  In this

16   case, his ratio is 27.64 percent, which is much lower than what

17   is required.

18   Q.  And in this instance, low is good, is that fair to say?

19   A.  Positive.

20   Q.  So he was a solid candidate, then, for the loan?

21   A.  Correct.

22   Q.  And in the middle column, FICO, what does that mean for

23   purpose of this loan?

24   A.  Another factor they determine is credit score and history,

25   and usually you need to have over a 640 or a 600.  In this case

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    he had a 771.  The highest band starts at equal to or greater

2    than 740.

3    Q.  And then in the far right column, "submission date"?  What

4    does that mean?

5    A.  The date that the file was actually submitted to the

6    wholesale lender.

7    Q.  And here that is January 23, 2019, is that right?

8    A.  Correct.

9    Q.  And then in the lower part of the screen, where it says

10   "conditions closing," what are these items that are listed?

11   A.  After the underwriter reviews the documentation submitted,

12   they issue a list of conditions the borrower has to clear, and

13   this is a list of those conditions.

14   Q.  And then here it says, "Gift funds from John Costanzo, Sr.

15   are being transferred prior to release of final closing package

16   in the amount of $50,000.  Provide a copy of the cashier's

17   check or wire directly to the settlement agent.  If the gift

18   amount is exceeded, provide an updated, fully executed gift

19   letter."

20            So were there gift funds in John's mortgage

21   transaction?

22   A.  Correct.

23   Q.  And who provided those funds?

24   A.  His father, John Costanzo, Sr.

25   Q.  And what was required at closing for those gift funds to be

Nb62Cos1                    Ross - Direct

1  received?

2  A.  An executed gift letter and a copy of the cashier's check

3  or wire directly to the settlement agent from the source.

4  Q.  Now I want to direct your attention to GX 434A.  Do you

5  recognize this form?

6  A.  This is a standard gift letter completed for the

7  transaction.

8  Q.  And, Sal, if you could please highlight at the top, it's a

9  little cut off, but do you recognize what it says up here,

10 Mr. Ross?

11 A.  Yes.  It says, "Ross Home Loans license number,

12 originator."

13 Q.  And so is this your form?

14 A.  Yes, it comes from an origination system called Calyx

15 Point.

16 Q.  Sal, if you could actually zoom in.

17       It's a little bit covered up by the government exhibit

18 stamp, but what does that say?

19 A.  Calyx form.

20 Q.  So this is a standard form, is that what you called it?

21 A.  Correct.

22 Q.  Okay.  If we could zoom back out, please, Sal.

23       Now, did you provide this form to John Costanzo, Jr.?

24 A.  Yes.  Me or one of my staff would have provided it to him.

25 Q.  And so he didn't draft the form.  This is a standard form

Nb62Cos1                        Ross - Direct

1    that you sent or someone from Ross Home Loans sent?

2    A.   Correct.

3    Q.   And what information is requested on the form?

4    A.   The donor's information, the amount from the donor, the

5    recipient, their relationship, and the source of the gift, such

6    as, which bank account.

7    Q.   And why is this information requested when there is a gift

8    for a mortgage?

9    A.   To meet the guidelines, they want to make sure that it

10   comes from a family member or a fiancée or a fiancée's family

11   member.  They also want to make sure that it's a gift so that

12   there is no -- so that the recipient doesn't have to pay back

13   the donor.

14   Q.   And so when, in this instance, where the recipient doesn't

15   have to pay back the donor, that would mean that John Costanzo,

16   Jr. would not have to pay back John Costanzo, Sr.?

17   A.   Correct.

18   Q.   And if the gift -- sorry, withdrawn.

19        Where in the form does it request that the donor

20   provide additional information beyond the bank account number

21   from which the gift is being sent?

22   A.   It does not.

23   Q.   And where on the form does it request identification of

24   additional information about the source of funds from the

25   donor, how the donor received funds?

1  A.  It does not.

2  Q.  And does the form require identification of how long the

3  funds have been in the source account?

4  A.  It does not.

5  Q.  Does the form request that the source provide the source's

6  own bank statements?

7  A.  The form does not.

8  Q.  And in this mortgage application for John Costanzo, Jr.,

9  what was required from the source at closing?

10 A.  It would be a proof of the cashier's check or the wire.

11 Q.  From whom?

12 A.  From John Costanzo, Sr., to the settlement agent.  They

13 would want to see the cashier check cleared or the wire

14 between the two and this gift letter.

15 Q.  And were those two items provided?

16 A.  Yes.

17            MS. YOUNG:  Nothing further.

18            THE COURT:  Mr. Swett.

19            MR. SWETT:  Thank you, your Honor.

20 CROSS-EXAMINATION

21 BY MR. SWETT:

22 Q.  Good morning, Mr. Ross.

23 A.  Good morning.

24 Q.  Mr. Ross, how did you end up working for John Costanzo on

25 this mortgage origination?

Nb62Cos1                    Ross - Cross

1   A.  He was referred to me.

2   Q.  Was he referred to you by an attorney?

3   A.  Yes.

4   Q.  Was this an individual named Umberto Bonavita?

5   A.  Yes.

6   Q.  This is an attorney who specializes in yachts, right?

7   A.  Yachts and corporate title.

8   Q.  Have you worked --

9   A.  Corporations, sorry.

10  Q.  Yachts and corporations.

11          And you have worked with Mr. Bonavita in the past?

12  A.  Yes.

13  Q.  And he's referred clients to you in the past?

14  A.  Yes.

15  Q.  And I think you said on direct that this would have been

16  sometime in 2019, right?

17  A.  Yes.

18  Q.  Do you think it was probably beginning of the year in 2019?

19  Does that make sense?

20  A.  Well, when the actual relationship was introduced?

21  Q.  Exactly.

22  A.  It could have been slightly before then, but the process

23  started officially sometime in January 2019, I believe.

24  Q.  So prior to Mr. Bonavita referring this case to you, you

25  had never met Special Agent Costanzo before?

Nb62Cos1                          Ross - Cross

1    A.   Until we started working together, I don't recall meeting

2    John before.

3    Q.   Okay.  Why don't we pull up Government Exhibit 1037, which

4    is in evidence.

5         Okay.  Mr. Ross do you see that on your screen?

6    A.   Yes.

7    Q.   Do you see that this says "What's App chat thread" at the

8    top?

9    A.   Yes.

10   Q.   And then there is an Umberto, right?

11   A.   Yes.

12   Q.   I believe you just testified that you have worked with an

13   Umberto Bonavita, right?

14   A.   Yes.

15   Q.   And then those messages are in gray, correct?  If you

16   look --

17   A.   Yes.

18   Q.   -- to the right of the header?

19   A.   Yes.

20   Q.   And then underneath it says there is messages from JC,

21   right?

22   A.   Yes.

23   Q.   Those are John Costanzo's initials, correct?

24   A.   Correct.

25   Q.   It says those messages are in green, isn't that right?

1   A.   Correct.

2   Q.   Then there is system messages in blue, right?

3   A.   Correct.

4   Q.   Why don't we just read this.  It's this page and then a

5   little bit on the next page.  I will read the gray messages and

6   then you can read the green messages, is that okay?

7   A.   Yes.

8   Q.   Do you need us to blow it up for you?

9   A.   A little.

10  Q.   Okay.  And it's hard to see now, but if you see sort of on

11  the right-hand side of the screen, these messages are from

12  January 31, 2019, right?

13  A.   Yes.

14  Q.   And that's about when you recall beginning your

15  relationship with John Costanzo, right?

16  A.   Around that time.

17  Q.   Okay.  So there is a system message that says "messages to

18  this chat and calls are now secured with end-to-end encryption.

19  Tap for more info."  And then Umberto sends two attachments.

20          So why don't you read that first green message?

21  A.   "Wow, nice."

22  Q.   "A reliable acquaintance (Daniel Garcia Barragan also a

23  lawyer) recommended Lic. Sergio Becerril Vega as a criminal

24  lawyer in Mexico, cell" and there is a number, "e-mail" and

25  then there is a number.

A.  "Okay.  Manuel Recio, my partner, gonna contact him to see

if he is interested in meeting next week.  We have a shit ton

of attorneys ready to go.  How is everything going?  Do you

need anything?"

Q.  All right.  Then can we --

A.  "We may be able to close next week.  Neil sent you an

e-mail.  Can you send him or have send him the final close

costs.  Don't break your back.  I'm willing to pay, but he

needs to closing cost to finalize shit."

Q.  Okay.  And then if we go to the next page, Umberto

responds, "Will handle tomorrow."

        So maybe starting from the bottom and going up, your

name, obviously, is Neil, correct?

A.  Correct.

Q.  And when you see the phrase "closing costs," what do you

understand that to mean?

A.  At the end of the transaction, there are a list of items

needed to close the transaction.  That must be referring to the

closing costs for the transaction.

Q.  Okay.  And then before that there are these messages about

criminal lawyer in Mexico and then this person, Manuel Recio.

As far as you know, did that have anything to do with the real

estate transaction you were involved in?

A.  I don't know anything about Manuel Recio.

Q.  Have you ever heard anything about an individual named

1    Manuel Recio?

2    A.  No.

3    Q.  Okay.  In January of 2019, when you started working with

4    John Costanzo, did you know what he did for work?

5    A.  Manuel or John?

6    Q.  John Costanzo.

7    A.  Yes.

8    Q.  What was his job?

9    A.  He was involved in the government.  I think he was DEA.

10   Q.  Okay.  But you don't know whether this individual, Manuel

11   Recio, was his partner in the DEA or anything like that?

12   A.  No, I don't know.

13   Q.  Okay.

14        All right.  Now, Mr. Ross, you are a mortgage broker,

15   right?

16   A.  Yes.

17   Q.  And you are a licensed mortgage broker?

18   A.  Yes.

19   Q.  Are mortgage brokers required to obtain licenses?

20   A.  Now they are, yes.

21   Q.  Okay.  And being a licensed mortgage broker carries some

22   requirements, right?

23   A.  Yes.

24   Q.  And one of those requirements is that you have to continue

25   taking classes in your field, isn't that right?

1    A.  Yes.

2    Q.  That basically means that you can keep up with developments

3    in the law and be aware of issues that might arise in your line

4    of work, is that right?

5    A.  Sometimes that's included in the courses.

6    Q.  Okay.  And so you work out of Florida, right?

7    A.  Yes.

8    Q.  And in Florida, the continuing education requirement is

9    eight hours of classes every year, is that right?

10   A.  I believe it's -- yes, it's seven hours for certain topics

11   and one hour for Florida.

12   Q.  Okay.  And that includes training on ethics, right?

13   A.  From time to time that can be one of the courses.

14   Q.  And that also includes trainings on frauds, as well, right?

15   A.  Yes.  Well.  From time to time, there will be topics about

16   fraud, yes.

17   Q.  Now it looked like you had quite a reaction when I said

18   fraud.  Is that a big topic for mortgage brokers?

19   A.  It's an important topic for me.  I don't necessarily know

20   many focus on it.  I have a compliance attorney which, yeah,

21   we actually take another step and we retained an attorney.  I

22   have had no issues, but I thought it shows that we are going

23   beyond the requirements of what we are supposed to do.

24   Q.  Right.  Because, obviously, there are a number of ways

25   that people can commit fraud in terms of acquiring mortgages,

1    isn't that right?

2    A.   Correct.

3    Q.   I mean, you are familiar with the term "mortgage fraud,"

4    aren't you?

5    A.   Correct.

6    Q.   And there is --

7    A.   There is actually a disclosure that we send out regarding

8    it.

9    Q.   You send it to your clients, is that right?

10   A.   Yes.

11   Q.   So that they are aware that it could be a crime if they

12   provide false information to the bank, is that right?

13   A.   Correct.

14   Q.   Now, obviously a mortgage broker shouldn't participate in

15   mortgage fraud, right?

16   A.   Correct.

17   Q.   That could jeopardize your career, right?

18   A.   Correct.

19   Q.   And it could result in criminal charges, isn't that right?

20   A.   Correct.

21   Q.   Now, when you work with your clients, I think on direct you

22   talked about a lot of information that you have to collect as

23   part of preparing the loan application, right?

24   A.   Correct.

25   Q.   Now, you are to some extent relying on what your clients

Nb62Cos1                        Ross - Cross

1    give you when you put that information together, right?

2    A.  Correct.

3    Q.  I mean, the loan document has like 2,000 pages, right?

4    A.  It's a tremendous amount of pages.

5    Q.  And there is a lot of information that goes into a loan

6    application, isn't that right?

7    A.  Correct.

8    Q.  Now, obviously you are alert for red flags, isn't that

9    right?

10   A.  Yes.

11   Q.  Can you just explain to the jury what a red flag?

12   A.  Yes.  There are a number of items that you use to determine

13   if there is someone trying to do something that would cause a

14   concern.

15   Q.  But obviously not everything can be identified through red

16   flags, isn't that right?

17   A.  I mean, yeah, I would need an example.

18   Q.  So let me ask this a different way.

19          At the end of the day, you are not able to verify

20   every piece of information that's provided --

21   A.  Correct.

22   Q.  -- in a loan application, right?

23   A.  Correct.

24   Q.  Okay.  But you said that you send a notice to your clients

25   warning them about the penalties for mortgage fraud, is that

Nb62Cos1                          Ross – Cross

1   right?

2   A.  Correct.

3   Q.  And that's also baked into the entire loan process, isn't

4   that right?

5   A.  Yes.

6   Q.  There are a number of documents making it clear that

7   applicants have to provide truthful information, isn't that

8   right?

9   A.  Yes.

10  Q.  They are warned about the penalties for not providing

11  truthful information, isn't that right?

12  A.  Yes.

13  Q.  And that obviously includes providing information that's

14  just false on its face, isn't that right?

15  A.  False on the?

16  Q.  False on its face.

17  A.  Yes.

18  Q.  But people can also engage in fraud by omitting material

19  information, isn't that right?

20  A.  That could potentially happen.

21  Q.  All right.  Why don't we look at the loan files.

22          So I would like to pull up Government Exhibit 434 and

23  we can go to page 154.

24          Mr. Ross, I'm not going to make you go through all

25  2,000 pages of this, but I do want to look at a few things.

Nb62Cos1                          Ross – Cross

1    A.  Sure.

2    Q.  All right.  We are going to go to 154.

3            Do you see at the top where it says "borrower's

4    certification and authorization"?

5    A.  Yes.

6    Q.  And the date on this is January 22, 2019, is that right?

7    A.  Correct.

8    Q.  So this is -- the borrower in this case was John Costanzo,

9    Jr., correct?

10   A.  Correct.

11   Q.  And these are certifications that he is making as part of

12   his loan application, correct?

13   A.  Correct.

14   Q.  All right.  Why don't you read paragraph 1 of this

15   certification?

16   A.  "I have applied for a mortgage loan and, in applying for

17   the loan, I have completed a loan application containing

18   various information on the purpose of the loan, the amount and

19   source of the down payment, employment and income information,

20   and assets and liabilities.  I certify that all of the

21   information is true and complete.  I made no misrepresentations

22   in the loan application or other documents, nor did I omit any

23   pertinent information."

24   Q.  Okay.  So that last line or that last part "nor did I omit

25   any pertinent information" that gets to what I just asked you,

1   right?

2   A.  Correct.

3   Q.  That someone can misrepresent the facts by withholding

4   relevant information from the loan company, right?

5   A.  Correct.

6   Q.  Okay.  And then can you read paragraph 4.

7   A.  "I fully understand that it is a federal crime, punishable

8   by fine or imprisonment, or both, to knowingly make any false

9   statements when applying for a mortgage, as applicable under

10  the provisions of 18 USCA 1014."

11  Q.  Okay.  And we can take this -- we can take this zoomed

12  portion down.

13          And if we scroll down, who signed this document?

14  A.  John Anthony Costanzo, January 22, 2019.

15  Q.  Okay.  Let's jump ahead to page 237.

16          Okay.  Now, do you recognize this as the mortgage

17  itself, the mortgage agreement?

18  A.  Correct.

19  Q.  Okay.  And if you see right underneath where it says

20  "mortgage," there is a name and a loan number.  So whose

21  mortgage is this?

22  A.  John Costanzo.

23  Q.  All right.  Let's jump ahead to page 243, which is further

24  in in this document and can we zoom in on paragraph 8, please.

25  A.  Do you want me to read that?

Nb62Cos1                        Ross - Cross

1    Q.  That would be great.  Thank you.

2    A.  "Borrower's loan application.  Borrower shall be in default

3    if, during the loan application process, borrower or any

4    persons or entities acting at the direction of borrower or with

5    borrower's knowledge or consent gave materially false,

6    misleading, or inaccurate information or statements to lender

7    (or failed to provide lender with material information) in

8    connection with the loan.  Material representations include,

9    but are not limited to, representations concerning borrower's

10   occupancy of the property as borrower's principal residence."

11   Q.  Okay.  So this paragraph is saying that if the borrower, if

12   John Costanzo lied as part of the mortgage application, he

13   would actually be in default of his mortgage, is that right?

14   A.  Yes.

15   Q.  And that includes failing to provide material information

16   as part of that application, right?

17   A.  Yes.

18   Q.  All right.  Let's go to page 249.

19          Who signed this document up at the top?

20   A.  John Anthony Costanzo.

21   Q.  Okay.  And then one more thing I want to look at in

22   Government Exhibit 434.  Can we just pull up page 276.  Okay.

23   Can you read what it says at the top?

24   A.  "Mortgage fraud is investigated by the F.B.I."  This is the

25   form we discussed.

Nb62Cos1                           Ross - Cross

1    Q.  This is the form that you provide your clients.

2    A.  (Nodding head).

3    Q.  So this is basically your way of saying mortgage fraud is

4    really, really serious, right?

5    A.  Yes.

6    Q.  And you put it in capital letters right at the top, isn't

7    that right?

8    A.  Well, it's a standard form, but, yes, it has capital

9    letters on top.

10   Q.  And then there is the big F.B.I. seal underneath, right?

11   A.  Correct.

12   Q.  So John Costanzo would have seen this?

13   A.  Yes.

14   Q.  All right.  Let's now pull up Government Exhibit 434A,

15   which you talked about with Ms. Young.

16          Mr. Ross, you gave a little bit of background on gift

17   letters and gifts during your direct examination.  Do you

18   remember that?

19   A.  Yes.

20   Q.  Now, I think what you said is that gifts can only come from

21   certain sources, is that right?

22   A.  Correct.

23   Q.  And I think you also said that there are certain guidelines

24   that Fannie Mae and Freddie Mac have when they are approving

25   mortgages, isn't that right?

Nb62Cos1                        Ross - Cross

1    A.  For the -- for the underwriter approved, correct.

2    Q.  For the underwriter.  So for Special Agent Costanzo's

3    mortgage, was he only allowed to receive a gift from family

4    members?

5    A.  Family members or a fiancée or a fiancée's family members,

6    and I think back then possibly an employer.

7    Q.  Possibly employer.  Okay.  And so obviously that

8    requirement is one of the reasons why these gift letters are

9    required, right?

10   A.  Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB6KCOS2                           Ross - Cross

 1   BY MR. SWETT:

 2   Q.  Because the bank needs to know if the gift is coming from

 3   an allowed source or a prohibited source, right?

 4   A.  Correct.

 5   Q.  As you said, that was true for John Costanzo's mortgage as

 6   well, right?

 7   A.  Correct.

 8   Q.  That he was only able to receive gifts from family members

 9   for this mortgage, correct?

10   A.  Or a fiancee or possibly an employer, yes.

11   Q.  All right.  Family member, fiancee, or employer.

12           Now, Mr. Ross, it's obviously important to provide

13   truthful information in these gift letters, right?

14   A.  Yes.

15   Q.  And, in fact, at the bottom, there is a warning that false

16   statements in connection with a gift letter could result in

17   being charged with a crime, right?

18   A.  Yes.

19   Q.  Let's look a little bit at what this document says.  This

20   document says that John Costanzo, Sr. was making a $50,000

21   gift, correct?

22   A.  Yes.

23   Q.  And that represented a little over 50 percent of the total

24   down payment; is that right?

25   A.  Yes.

NB6KCOS2                         Ross - Cross

1  Q.  Now, let's look at paragraph 3.  This paragraph says, "No

2  repayment of the gift is expected or implied in the form of

3  cash or by future services of the recipient."

4          So the reason the gift letter asked that question is

5  because banks wanted to know if this gift is actually just

6  another loan, right?

7  A.  Correct.

8  Q.  Because if it was another loan, that might impact the

9  borrower's ability to repay their mortgage, right?

10 A.  The debt-to-income ratio that we discussed.

11 Q.  Exactly.

12         Let's look at paragraph 4.

13         Why don't you read paragraph 4.

14 A.  "The funds given to the homebuyer were not made available

15 to the donor from any person or entity with an interest in the

16 sale of the property, including the seller, real estate agent,

17 or broker, builder, loan officer, or any entity associated with

18 them."

19 Q.  So this paragraph is saying that the funds can't come from

20 someone with an interest in the sale, right?

21 A.  Correct.

22 Q.  Because if someone had an interest in the sale, then it

23 wouldn't really be a gift, right?

24 A.  There's other guidelines that you would follow.

25 Q.  Okay.  So if someone has an interest in the sale, they're

NB6KCOS2                        Ross - Cross

1    not making an actual gift, they've got skin in the game, right?

2    A.  Correct.

3    Q.  And so, for example, if the money was really an investment

4    in the property, with some ownership interest, that wouldn't be

5    a gift, right?

6               MS. YOUNG:  Objection; calls for speculation.

7               THE COURT:  Overruled.

8               You can answer, if you understand.

9               THE WITNESS:  Can you ask it one more time?

10   BY MR. SWETT:

11   Q.  Sure.

12              If someone gives $50,000 towards the purchase of a

13   home, and they are getting an investment stake in that home,

14   that's not really a gift, right?

15   A.  I would say that that would not be a gift.

16   Q.  Because they have an interest in the sale, right?

17   A.  Correct.

18   Q.  So it just has to be a pure gift, plain and simple, right?

19   A.  Correct.

20   Q.  No strings attached, right?

21   A.  Correct.

22   Q.  Let's look at paragraph 5.

23              So this paragraph lists the source of the gift, right?

24   A.  Correct.

25   Q.  And it's got a Wells Fargo account number, right?

1    A.  Correct.

2    Q.  And then it says "personal savings," right?

3    A.  Correct.

4    Q.  So this would be John Costanzo, Sr.'s personal savings,

5    right?

6    A.  Correct.

7    Q.  Now, I think you testified on direct that there was proof

8    of the transfer from Costanzo, Sr. towards the payment before

9    the closing, right?

10   A.  Correct.

11   Q.  So other than this gift letter, and other than that proof

12   of transfer, you don't know anything else about this gift,

13   right?

14   A.  Correct.

15   Q.  Did John Costanzo, Jr. tell you this was coming from his

16   father?

17   A.  Yes.

18   Q.  And you, in fact, saw that a payment did come from the

19   father's account, right?

20   A.  Correct.

21   Q.  So you don't know whether John Costanzo, Sr. received a

22   $50,000 payment from another person only a few weeks before,

23   right?

24   A.  I would not know that, but he can -- it's -- John, the

25   father, can get the money in a number of different ways.

NB6KCOS2                          Ross - Cross

1    That's outside the scope of what we're doing.

2    Q.  And you don't know whether the person making that $50,000

3    payment intended it to go to John Costanzo, Jr., right?

4            MS. YOUNG:  Objection; calls for state of mind of

5    another individual.

6            THE COURT:  Overruled.

7            THE WITNESS:  Can you ask that a different way,

8    please?

9    BY MR. SWETT:

10   Q.  Sure.

11           Let me approach this from a different angle.

12           You're familiar with the term "straw buyer," right?

13   A.  Somewhat.

14   Q.  It's like when you stick someone up, they don't have any

15   real interest in the transaction, but you use them --

16           MS. YOUNG:  Objection.

17           THE COURT:  Sustained.

18           MR. SWETT:  Okay.

19   BY MR. SWETT:

20   Q.  You just testified it doesn't matter how John Costanzo, Sr.

21   got the money; is that right?

22   A.  It's supposed to come from his father.

23   Q.  And what if someone gave John Costanzo, Sr. the money and

24   said give this to your son for his down payment, would that

25   matter?

NB6KCOS2                              Ross - Cross

1    A.   Technically, as long as there's no strings attached to it,

2    it's fine.

3    Q.   So you're saying that five minutes before John

4    Costanzo, Sr. sent the money, if another person handed him

5    $50,000 in cash and said use this to pay for John's closing,

6    that's fine?

7              MS. YOUNG:   Objection; misstates the evidence.

8              THE COURT:   Overruled.

9              THE WITNESS:   You're saying if they gave the money to

10   the father --

11   BY MR. SWETT:

12   Q.   And said use this to pay for your son's down payment,

13   you're saying the bank wouldn't want to know that?

14   A.   The bank doesn't ask, because there's a -- instead of

15   Fannie/Freddie, you can say, for example, FHA, it's a different

16   type of loan product, and in that type of loan product, they

17   have different guidelines, and they specifically ask to see the

18   bank statement from the donor.

19   Q.   Right, okay.  Let me ask this a different way.

20             Could John Costanzo, Jr.'s friend have made a gift

21   towards his mortgage under the type of loan that he --

22   A.   Under the type of loan he has, I will tell you that it is

23   very difficult to get a friend accepted.  I've done it in the

24   past.  If you can document that the friend is like a brother

25   that you've grown up with, but I will tell you, it is very

NB6KCOS2                            Ross - Cross

1    rare.

2    Q.  Now, Special Agent Costanzo never said to you, hey, I'd

3    like to get a gift from my friend, can you help me do that?

4    A.  I don't recall.

5    Q.  He only ever mentioned his father making a gift, right?

6    A.  From the documentation, I mean, that's what I can go by,

7    but it's many years ago.

8    Q.  Now, let me ask you, if he had told you, I'm getting a gift

9    from my friend, but I just want to route it through my dad so

10   the bank approves, would you have been okay with that?

11             MS. YOUNG:  Objection; speculative.

12             THE COURT:  Overruled.

13             THE WITNESS:  If he had said that he was getting a

14   gift from a friend through his father?

15   BY MR. SWETT:

16   Q.  That he just wanted to route it through his father so the

17   bank wouldn't cause issues, would you have been okay with that?

18   A.  I mean, I would want to make sure there's no strings

19   attached to it so that there was no debt obligations or

20   payback, so that it was truly a gift.  And I probably would

21   have tried to suggest submitting a gift through the friend, if

22   it was a friend that you've known for a long time, but it's a

23   long shot.

24   Q.  Right, because if you're just using the dad as a front,

25   you're lying to the bank, right?

NB6KCOS2                        Ross - Cross

1              MS. YOUNG:  Objection.

2              THE COURT:  Overruled.

3              THE WITNESS:  I mean, the father could get the money

4     from a credit card, the father could get the money from another

5     loan, the father -- so if the father gets the money from

6     another source, in this situation, most of the time, the

7     underwriters are not looking for that type of documentation.

8              And then, also, if I remember correctly, in John's

9     situation, I believe he had other funds available as well to

10    use for the down payment.

11    BY MR. SWETT:

12    Q.  Now, you kept referring to the idea that these gifts have

13    to be with no strings attached, right?

14    A.  Correct.

15    Q.  If a friend says to John Costanzo, Sr., here are the funds,

16    you have to use them for this, there are strings attached

17    there, right?

18    A.  That you have to use the funds for --

19    Q.  For the down payment.

20    A.  -- the down payment?

21    Q.  There are strings attached there, right?

22    A.  Well, I mean, there's no payback strings, so I guess you

23    could say, technically, he's giving the funds, I don't want you

24    to go party and buy, you know, a car; he wants it to help him

25    get a house.

NB6KCOS2                                    Ross - Cross

1  Q.  Okay.  So it's your testimony that requirements that the

2  banks have in place about gifts can be circumvented by just

3  funneling money through a family member and not telling the

4  bank?

5          MS. YOUNG:  Objection.

6  Q.  Is that your testimony?

7          THE COURT:  Overruled.

8          THE WITNESS:  What I'm saying is if he's getting money

9  where he has to pay it back, you have to pay a certain amount

10  of interest back, you have to pay a certain something back in

11  return, then that's not really a gift.

12  BY MR. SWETT:

13  Q.  Let me ask my question again, and maybe I can get a

14  yes-or-no answer this time.

15  A.  I'm sorry.

16  Q.  Is it your testimony that you can circumvent gift letter

17  requirements by funneling the money through a family member and

18  then sending it on to the --

19          MS. YOUNG:  Objection.

20          THE COURT:  Overruled.

21  Q.  I'd just like a yes or no.

22  A.  I'm going to say, no, because you're using the word

23  "circumvent," and you're not supposed to try to circumvent --

24  you know, you're not supposed to try to circumvent.

25          MR. SWETT:  No further questions.

 1                THE COURT:  All right.

 2                Redirect?

 3      REDIRECT EXAMINATION

 4      BY MS. YOUNG:

 5      Q.  Mr. Ross, number 3 on this form requires that "No repayment

 6      of the gift is expected or implied in form of cash or by future

 7      services of the recipient," right?

 8      A.  Correct.

 9      Q.  And, here, the recipient is who?

10      A.  It would be John.

11      Q.  All right.  Junior or Senior?

12      A.  Junior.

13      Q.  And so if there is no repayment expected between Senior and

14      Junior, that is the requirement by banks, correct?

15      A.  Correct.

16                MS. YOUNG:  And number 4, please.

17      Q.  "The funds given to the homebuyer were not made available

18      to the donor from any person or entity with an interest in the

19      sale of the property, including the seller, real estate agent,

20      or broker, builder, loan officer, or any entity associated with

21      them."

22      A.  Correct.

23      Q.  Are you aware of John, Sr. having any interest in the sale

24      of the property here?

25      A.  Not that I'm aware of.

NB6KCOS2

| | |
|---|---|
| 1 | MS. YOUNG:  Nothing further. |
| 2 | THE COURT:  All right. |
| 3 | Mr. Swett? |
| 4 | RECROSS EXAMINATION |
| 5 | BY MR. SWETT: |
| 6 | Q.  Did John Costanzo, Jr. ever mention someone named Edwin |
| 7 | Pagan to you? |
| 8 | A.  I don't remember that name. |
| 9 | Q.  You're not familiar with any involvement by Edwin Pagan in |
| 10 | the purchase of the home? |
| 11 | A.  I don't recall any -- I don't recall that name, I'm sorry. |
| 12 | Q.  And you're not aware that there has been testimony in this |
| 13 | trial that Edwin Pagan provided the gift -- |
| 14 | MS. YOUNG:  Objection. |
| 15 | Q.  -- for the down payment? |
| 16 | A.  No, I'm not aware of that name, no. |
| 17 | MR. SWETT:  No further questions. |
| 18 | THE COURT:  Anything further? |
| 19 | MS. YOUNG:  Nothing further. |
| 20 | THE COURT:  Thank you. |
| 21 | You may step down. |
| 22 | (Witness excused) |
| 23 | THE COURT:  Defense, are you ready for your next |
| 24 | witness? |
| 25 | MS. YOUNG:  The defense calls Elgin Polo. |

NB6KCOS2

1         THE COURT:  Sir, if you would please come up to the

2    witness stand here.

3         Please have a seat in the witness stand.  And you can

4    adjust the microphone so it's close to you, and then you will

5    be sworn in.

6    ELGIN FRANKLIN POLO,

7         called as a witness by the Defendants,

8         having been duly sworn, testified as follows:

9         THE DEPUTY CLERK:  Please state your full name, and

10   spell your first and last name slowly for the record.

11        THE WITNESS:  Elgin Franklin Polo, E-l-g-i-n P-o-l-o.

12        THE COURT:  Ms. Young.

13        MS. YOUNG:  Actually, at this time, I'd like to read

14   in language from Government Exhibit S9.

15        "To summarize the preamble, the parties agree that

16   Government Exhibits 400 to 409 are bank records from Dade

17   County Federal Credit Union, Defense Exhibits JC 748 through

18   JC 771 are bank records from Dade County Federal Credit Union."

19        Paragraph 4:  "Government Exhibits 440 through 440E

20   are records from U.S. Century Bank, Defense Exhibits MR311,

21   MR315, MR317, and MR 318 are records from U.S. Century Bank."

22        Paragraph 5:  "Government Exhibits 450 through 454 are

23   records from Regions Bank."

24        Paragraph 13:  "Defense Exhibit JC 1018 are records

25   from Experian."

NB6KCOS2                         Polo - Direct

1        Paragraph 14:  "Defense Exhibits JC 1316 contain

2   records from the State of Florida Department of Highway Safety

3   and Division of Motor Vehicles."

4        Paragraph 15:  "Defense Exhibits JC 1314 and JC 1317

5   contain records from USAA, and Defense Exhibits JC 1101 and

6   JC 1102 contain records from Vanguard."

7        Paragraph 21:  "The exhibits listed above consist of

8   records that were kept and maintained in the course and regular

9   practice of the regularly conducted business activity of the

10  entities described above and were made at or near the time of

11  the matters set forth in the records by a person, or from

12  information transmitted by a person, with knowledge of the

13  matters set forth therein."

14        "It is further stipulated and agreed that this

15  stipulation may be received into evidence at trial."

16  DIRECT EXAMINATION

17  BY MS. YOUNG:

18  Q.  Good morning, Mr. Polo.

19  A.  Good morning.

20  Q.  Where do you work?

21  A.  I work for an accounting firm in Miami, Florida.

22        THE COURT:  Do you intend to move those?

23        MS. YOUNG:  Yes, sorry.

24        THE COURT:  Any objection?

25        MR. ANDREWS:  No objection.

NB6KCOS2                          Polo - Direct

1           THE COURT:  They're admitted.

2           (Defendants' Exhibits JC 742, JC 768A, JC 775A,

3   JC 1311A, JC 1316, JC 1317, JC 1318 received in evidence)

4           MR. SWETT:  Could she clarify what's been moved in

5   because some, I think, have already been moved in?  I want to

6   make sure we have the right exhibits.

7           MS. YOUNG:  Sure.

8           JC 742, JC 768A, JC 775A, JC 1311A, JC 1316, JC 1317,

9   JC 1318.

10          Sorry, I believe for some of these, I just read the

11  full number, not just the excerpt, but the excerpt is anything

12  with an A is excerpted from that defense exhibit.

13          THE COURT:  You're moving just the As?

14          MS. YOUNG:  Yes.  For 768A and 775A and 1311A.

15          THE COURT:  Did you also move 742?

16          MS. YOUNG:  Yes.

17          1316, 1317, and 1318 at this time.

18          THE COURT:  Any objection?

19          MR. ANDREWS:  No objection.

20          THE COURT:  They're admitted.

21          (Defendants' Exhibits 1316, 1317, and 1318 received in

22  evidence)

23  BY MS. YOUNG:

24  Q.  Apologies, Mr. Polo.  Where do you work?

25  A.  I work for an accounting firm, Forensic Partners.

NB6KCOS2                              Polo - Direct

1   Q.  What is your title?

2   A.  I'm a managing member and founding member of the company.

3   Q.  How long have you worked there?

4   A.  I started my company last month.

5   Q.  Prior to starting the company, where did you work?

6   A.  I was a partner at a public accounting firm called Kabat,

7   Schertzer, De La Torre, Teraboulos for the last 12 years.

8              THE COURT:  Would you mind spelling those?

9              THE WITNESS:  The first name is K-a-b-a-t, the second,

10  S-c-h-e-r-t-z-e-r, then it's three words, D-e L-a T-o-r-r-e,

11  and the last name is Teraboulos, T-e-r-a-b-o-u-l-o-s.

12             THE COURT:  Thank you.

13             THE WITNESS:  We go by -- they went by KSDT, so we

14  didn't have to have a spelling test.

15  BY MS. YOUNG:

16  Q.  Now I know why you have Forensic Partners.

17  A.  Yes.

18  Q.  Briefly, what are your qualifications to be the president

19  of Forensic Partners?

20  A.  All right.  So I am a certified public accountant licensed

21  here in the State of New York.  I'm also licensed in the State

22  of Florida.  I have an undergraduate degree in accounting from

23  Binghamton University, and I have a Master's in business

24  administration from the University of Miami, Coral Gables,

25  Florida.

1        In addition to that, I've served as an expert witness

2   in many matters — family law, divorce cases, as well as

3   commercial disputes between partners and shareholders typically

4   dealing with assets or valuation, and I have been serving in

5   that role at various different accounting firms for the last

6   20 years, and last month, I started my own company handling

7   forensic partner disputes.

8   Q.  When did you become involved in this case?

9   A.  Last month.

10  Q.  What information were you provided?

11  A.  I was provided the financial discovery, banking records,

12  invoices, and other financial matters that was provided in

13  discovery.

14  Q.  You have no personal knowledge of the events of this case;

15  is that correct?

16  A.  That's correct.

17  Q.  Do you know either of the defendants in this case?

18  A.  No.  I've never met them.

19  Q.  What were you engaged to do for this case?

20  A.  To review the financial discovery, prepare exhibits, and

21  prepare -- and then testify to that.

22  Q.  Did anyone assist you in that process?

23  A.  I had a team that helps me at my office, and that team

24  helped me.  They're my employees.

25  Q.  Are you being paid for your services in this case?

NB6KCOS2                         Polo - Direct

1    A.  I am.

2    Q.  By whom?

3    A.  My cost is being divided between the two defendants.

4    Q.  What was your rate?

5    A.  My hourly billing rate is $290 an hour.

6    Q.  Is there any past due balance for this case currently?

7    A.  No, there's not.

8    Q.  Is your payment dependent in any way on the testimony you

9    provide today?

10   A.  Not at all.

11   Q.  Are you employed by any of the law firms representing

12   either of the defendants?

13   A.  No.

14   Q.  Have you ever previously been engaged by either of the law

15   firms representing Mr. Recio or Mr. Costanzo?

16   A.  No.  It's my first engagement with both.

17   Q.  I'd like to turn your attention to the voluminous records

18   you were engaged to summarize.

19         You received bank records; is that right?

20   A.  Yes.

21   Q.  And from a number of financial institutions, including Dade

22   County Federal Credit Union?

23   A.  That's correct.

24   Q.  Wells Fargo?

25   A.  Yes.

NB6KCOS2                          Polo - Direct

1    Q.  USAA?

2    A.  Yes.

3    Q.  Regions Bank?

4    A.  Yes.

5    Q.  And U.S. Century Bank; is that right?

6    A.  That's correct.

7    Q.  Now I'd like to direct your attention to your summary

8    charts.

9            MS. YOUNG:  Just for the witness, could you please

10   pull up DX JC 2621.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's an analysis of banking transactions for -- the top of

15   the chart, it's Global Legal Consulting, and at the bottom is a

16   separate, which is EBCO International Miami, and I prepared

17   this.

18           MS. YOUNG:  At this time I'd like to offer DX JC 2621.

19           MR. ANDREWS:  No objection.

20           THE COURT:  It's admitted.

21           (Defendants' Exhibit DX JC 2621 received in evidence)

22           MS. YOUNG:  Please publish.

23   BY MS. YOUNG:

24   Q.  One more time, what is the title of this chart?

25   A.  "Analysis of Banking Transactions During November and

1  December 2018."

2  Q.  For the top portion of the page, what account were you

3  summarizing?

4  A.  This is a U.S. Century Bank account ending in 5188, owned

5  by Global Legal Consulting.

6  Q.  Do you recall what source documents you reviewed for

7  purposes of making this chart?

8  A.  Yes.  It specifically was the U.S. Century Bank account,

9  and the source, GX 440.

10 Q.  Could you please describe the chart columns here?

11 A.  Yes.  The first column is the date showing -- the next

12 column showing the beginning balance before the transactions

13 occurred.  The third column are withdrawals or checks or

14 debits, meaning money being removed from the account.  And then

15 the next column are deposits or other credits or additions to

16 the bank account.  And then the last column is the ending

17 balance as a result of the transaction.

18 Q.  Who or what owns account number 5188 at U.S. Century Bank?

19 A.  Global Legal Consulting.

20 Q.  Based on your review of the bank records, do you know who

21 owns Global Legal Consulting?

22 A.  Yes.

23 Q.  Who is that?

24 A.  Manny Recio.

25 Q.  Was John Costanzo, Jr. identified as a financial account

NB6KCOS2                          Polo - Direct

1    owner of Global Legal Consulting?

2    A.   No.

3    Q.   Now, I'd like to direct your attention to the transaction

4    on November 13, 2018.

5          Could you please explain what this row shows on the

6    chart?

7    A.   This shows a deposit of $5,000.

8    Q.   And do you know where the $5,000 came from prior to being

9    deposited?

10   A.   Yes.  It came from a law firm, Macey, David Macey.

11   Q.   Was it the firm or an individual; do you recall?

12   A.   It was a law firm.

13   Q.   The next row on the chart, November 16, 2018, based on your

14   review of the records, what transaction occurred here?

15   A.   This is a disbursement or a check being withdrawn from the

16   account and paid to another company by the name of EBCO

17   International Miami.

18   Q.   When was that check written?

19   A.   The check date on the check is November 14th, and it

20   cleared the bank on November 16th.

21   Q.   So the beige statement reflects the November 16th date; is

22   that right?

23   A.   Or that's the date the check cleared, but the check was

24   actually issued on the 14th of November.

25   Q.   Where was the $2,500 check deposited?

NB6KCOS2                          Polo - Direct

1    A.   Into another company called EBCO International of Miami.

2              MS. YOUNG:   Sal, can we please move down to the lower

3    part of this.

4    Q.   What does this portion of your summary chart describe?

5    A.   This is that other company, EBCO International of Miami,

6    their Wells Fargo account ending in the last numbers 8835.

7    It's also source DX JC 742.  And as you can see on

8    November 15th, 2018, that third row is the $2,500 check that

9    you just asked me about.

10   Q.   Based on your review of the records, do you know who owns

11   EBCO International of Miami?

12   A.   Yes.

13   Q.   Who is that?

14   A.   John Costanzo, Sr.

15   Q.   And was John Costanzo, Jr. identified as a financial

16   account owner of EBCO International of Miami?

17   A.   No.

18   Q.   After the $2,500 deposit into EBCO, what other transactions

19   were reflected in the EBCO account for the months of November

20   and December?

21   A.   Well, this chart reflects four withdrawals, and there's an

22   $1,800 payment to a credit card and then the other three

23   transactions, and the next page of the chart shows you the

24   payees listed on the bank statements.

25             MS. YOUNG:   Sal, if we could please go to page 2 of

1    2621.  Thank you.

2    Q.  When you just said "the payees," are those listed in the

3    description column here?

4    A.  That's correct.  This is what was listed on the bank

5    statement at Wells Fargo Bank for EBCO International of Miami,

6    reflecting the disbursements out to Citi card, hmfusa.com,

7    Transamerica Insurance, as well as BMW Financial.

8    Q.  Based on your review of the records, was John Costanzo, Jr.

9    the recipient of any of the following transactions?

10   A.  No.

11   Q.  Was there any cash withdrawal reflected in the bank records

12   from EBCO during this time period?

13   A.  No.

14        MS. YOUNG:  Sal, can we please pull up DX JC 2622,

15   just for the witness.

16   Q.  Do you recognize this document?

17   A.  Yes.

18   Q.  What is it?

19   A.  This is an analysis of Edwin Pagan and his account with his

20   father, Edwin Pagan Romero, that he had at Dade County Federal

21   Credit Union, account 12971, for the 25 months starting the

22   beginning of 2018, the entire year, all of 2019, and then the

23   first month of 2020.

24        MS. YOUNG:  At this time the defense would like to

25   offer DX JC 2622 into evidence.

1          THE COURT:  Any objection.

2          MR. ANDREWS:  No objection.

3          THE COURT:  JC 2622 is admitted.

4          (Defendants' Exhibit JC 2622 received in evidence)

5          MS. YOUNG:  Can we please publish?

6   BY MS. YOUNG:

7   Q.  So, what does this chart summarize?

8   A.  Well, this summarizes the transactions of the deposits or

9   additions to the account for that 25-month time period, all of

10  2018, 2019, and one month of 2020, and then the withdrawals and

11  disbursements from that account for that same time period, and

12  then reflecting what the ending balance was as well.

13  Q.  Sorry, to back up, whose account is this?

14  A.  This is the joint account with Ed Pagan and Ed Pagan

15  Romero.

16  Q.  And this account is at Dade County Federal Credit Union; is

17  that right?

18  A.  That's correct.

19  Q.  Where is that located?

20  A.  That's a credit union located where I live, in Miami-Dade,

21  Florida.

22          MS. YOUNG:  Sal, if we could please go to the next

23  page of this chart.

24  Q.  Mr. Polo, could you please describe the headers of this

25  chart again?

NB6KCOS2                           Polo - Direct

A.   Okay.  So this is the detail of the last chart that we just

reflected.  That detail reflects the individual transaction

line items.  The first column has the date of the transaction,

the beginning balance is the next column, and then I have the

deposits and other additions or credits -- additions to the

account.  The next column are the withdrawals, checks, and

other debits or subtractions from the account, and then you

have the ending account balance after the transaction occurred.

Each of the lines reflect the ending balance.  And then there's

whatever description was listed on the credit union statement,

that's also reflected in the last column.

Q.   So in January of 2018, the balance is 88,800, to begin

with; is that right?

A.   That's correct.

Q.   And description, "Deposit Coral Gables pay," based on your

review of the records, what is that referring to?

A.   That's a portion of Mr. Pagan's income, his Coral Gables

pay that he receives every 14 days.

Q.   The $107.41 appears every 14 days on this chart; is that

right?

A.   Yes.  That's a biweekly pay.

         MS. YOUNG:  Could we zoom out, actually, please?

Q.   So this page goes from January 2018 down to September 30,

2018?

A.   Well, page 1 does, yes, but it's a four-page chart.

NB6KCOS2                          Polo - Direct

1          MS. YOUNG:  Okay.  So why don't we go to the next

2     page.

3     Q.  And looking at -- let me do December 10th, 2018.  There is

4     a deposit of $2,500.

5          Based on your review of the records, are you aware of

6     the source of that $2,500?

7     A.  Yes.

8     Q.  What is it?

9     A.  There are two checks.  One of the checks that was received

10    was a rent check, and then there was another check, and two of

11    them were deposited together.

12    Q.  So does this $2,500 have anything to do with the $2,500 on

13    the prior summary chart?

14    A.  No.

15    Q.  And then at the end of December '18, what is the balance in

16    this account?

17    A.  It's 113,467.

18    Q.  At this point, do the records reflect a deposit from

19    Manny Recio?

20    A.  No.

21    Q.  Do the records reflect a deposit from Global Legal

22    Consulting?

23    A.  No.

24    Q.  Do the records reflect a deposit from David Macey?

25    A.  No.

1    Q.  Do the records reflect a deposit from Luis Guerra?

2    A.  No.

3    Q.  What is the vast majority of the money in this account by

4    that point in time?

5    A.  Well, the initial account balance at the beginning of the

6    analysis period would be the vast majority.  The additions

7    would be accounted for by the pay that was received every

8    two weeks, as well as a rent check and other items.

9    Q.  I'd like to direct your attention to --

10   A.  I'm sorry, and dividends received for -- it's a savings

11   account, so it earns dividends.

12   Q.  Let's focus for a moment on January 17, 2019.  The chart

13   reflects a transaction.

14          Could you please describe it?

15   A.  It's a cashier's check withdrawal, so it's a subtraction

16   from the account.

17   Q.  Are you aware of where that $50,000 was subsequently

18   deposited?

19   A.  Yes.

20   Q.  Where is that?

21   A.  That went to John Costanzo, Sr.

22   Q.  So for the year prior to that payment, there were no

23   payments or deposits from those individuals I just listed —

24   Manny Recio, Global Legal Consulting, and David Guerra — right?

25   A.  That's correct.  None of those people -- for all four of

NB6KCOS2                         Polo - Direct

1    those would be a no.

2    Q.  And then continuing with the chart, for the entire year

3    after January 17, 2019, do the records reflect a deposit from

4    Manny Recio?

5    A.  No.

6    Q.  Global Legal Consulting?

7    A.  No.

8    Q.  David Macey?

9    A.  No.

10   Q.  Or Luis Guerra?

11   A.  No.

12        MS. YOUNG:  Let's, please, turn to page 4 of this

13   chart.

14   Q.  What transaction occurs on January 3, 2020?

15   A.  It's a cashier's check withdrawal, or subtraction from the

16   account, for $20,000.

17   Q.  And based on your review of the records, do you know who

18   received that $20,000?

19   A.  Susana Rueda.

20   Q.  And where was that money then deposited?

21   A.  Into her account, her bank account.

22   Q.  So, again, up to this point, is there any transaction that

23   reflects Manny Recio, Global Legal Consulting, David Macey, or

24   Luis Guerra?

25   A.  No to all of those.

1            THE COURT:  What was that?

2            THE WITNESS:  I said no to each one of those.

3            MS. YOUNG:  Let's please go to the last page, page 5

4    of this chart.

5    BY MS. YOUNG:

6    Q.  What is this account?

7    A.  All right.  So a credit union has subaccounts, and this is

8    a subaccount of that same credit union.  So it's the same

9    account, but it has a 002 subaccount.  And I also did the

10   tracing of that account during the same time period.

11   Q.  There are two descriptions that say "IRS Treasury."

12            What are those transactions describing?

13   A.  Those are tax refunds received by Pagan.

14   Q.  Once those tax refunds are received, where do you see that

15   money going?

16   A.  Well, it's deposited into this 002 subaccount in the Dade

17   County Federal Credit Union.

18            MS. YOUNG:  Sal, could you please pull up DX JC 1317,

19   which is now in evidence.

20            And if we could please go to page 15, I believe.

21   S.D.N.Y. 010595.  There we go.

22   Q.  Mr. Polo, what is the date of this document?

23   A.  May 13, 2019, the top of the document.

24   Q.  Who was sent this document?

25   A.  This is -- the sender is USAA Federal Savings Bank; the

1    recipient is John A. Costanzo.

2              MS. YOUNG:  If we could zoom out.

3    Q.  And then could you please read the sentence that begins

4    "Congratulations."

5    A.  Sure.

6              It says -- it's addressed to John A. Costanzo.  It

7    says, "Congratulations.  We're pleased to notify you that your

8    loan referenced below has been paid in full."

9    Q.  And then if we could take a look at the VIN, what does VIN

10   stand for?

11   A.  That's a vehicle identification number.  It's an acronym

12   typically used when you're referring to, like, a long number

13   for cars.

14   Q.  So what are the last four digits of this VIN?

15   A.  It's 1012.

16   Q.  And the vehicle?

17   A.  It's a Porsche Panamera 2012.

18              MS. YOUNG:  We can take that down.

19              And if we can please pull up now JC 1316, which is in

20   evidence.

21   Q.  What is this document?

22   A.  This is a certificate of title --

23   Q.  And --

24   A.  -- for the State of Florida.

25   Q.  Who is the registered owner here?

1  A.  Ed Pagan.

2  Q.  What are the last four digits of the identification number

3  here?

4  A.  1012.

5  Q.  And the year?

6  A.  It's a 2012 Porsche.

7  Q.  And the date of issue here?

8  A.  June 17, 2019.

9          MS. YOUNG:  We can take that down.

10          And, Sal, could you please pull up DX JC 2623 just for

11  the witness.

12  Q.  Do you recognize this document?

13  A.  Yes.  It's an analysis of John Costanzo, Jr., as well as an

14  analysis of JEM Solutions, Inc., their respective Wells Fargo

15  bank accounts, for the period of April 23rd, 2019, through

16  October 4, 2019.

17          MS. YOUNG:  At this time the defense would like to

18  offer DX JC 2623.

19          MR. ANDREWS:  No objection.

20          THE COURT:  Admitted.

21          (Defendants' Exhibit JC 2623 received in evidence)

22          MS. YOUNG:  Please publish.

23  BY MS. YOUNG:

24  Q.  Let's start with the top portion of this.

25          What is this summarizing?

1  A.  This is John Costanzo, Jr.'s Wells Fargo checking 2084, as

2  well as his Wells Fargo savings number 1347, for the period of

3  April 23, 2019, through September 17, 2019.

4  Q.  Do you recall what date you just read for the date the USAA

5  car loan was fully paid by John Costanzo?

6  A.  The letter was dated May 13, 2019.

7  Q.  And based on your review of the financial records, what are

8  these payments that you summarized here?

9  A.  These are payments to USAA Insurance.

10 Q.  Why did you include this date range on the chart?

11 A.  Because these are USAA insurance payments that covered the

12 period of time post the sale of the car.

13         MS. YOUNG:  And now let's zoom out and look at the

14 bottom portion of this chart.

15 Q.  You also reviewed JEM Solutions' bank accounts, correct?

16 A.  That's correct.

17 Q.  What are these payments you summarize from JEM Solutions'

18 bank account?

19 A.  These are three payments to American Airlines for airfare

20 that occurred during that same time period, actually a little

21 bit past that, starting July 4, 2019, and they stretched out to

22 October 4, 2019.

23 Q.  Based on your review of the records, are you aware of who

24 owns JEM Solutions, Inc.?

25 A.  Yes.  It's Ed Pagan, the purchaser of the car.

NB6KCOS2                          Polo - Direct

1    Q.   What is the total amount for these flights?

2    A.   It's 3,396 on my chart, but I believe there's another

3    transaction of $178 that I would have to add to that, so it's

4    approximately $3,600.

5         MS. YOUNG:   And if we could zoom out, please.

6    Q.   Does the total for the insurance payments approximate the

7    total for the flights?

8    A.   It's a little less, but it's very close.

9    Q.   Which one is less?

10   A.   The payments made by John Costanzo, Jr. would be 3,287,

11   about 3300, and the flights were about 3600.  So about a $300

12   difference.

13        MS. YOUNG:   We can take that down.

14   Q.   And for the three summary charts we just reviewed, who

15   prepared these?

16   A.   I did.

17        MS. YOUNG:   One moment?

18        (Pause)

19   Q.   For the amounts listed here, are these truncated or

20   rounded?

21   A.   Yes.  The decimals are cut off from the -- if you add up

22   the three amounts with the decimals, it equals 3,396 and

23   change, but I cut off the decimals just to make the chart a

24   little narrower.

25        MS. YOUNG:   Thank you.  Nothing further.

NB6KCOS2                         Polo - Direct

1            THE COURT:  Mr. Andrews?

2            MR. ANDREWS:  Yes, Judge.

3            Now would be a good time for a quick bathroom break.

4            THE COURT:  Okay.  Let's take a ten-minute break, and

5     we'll resume after we recess for ten minutes.  Please leave

6     your notepads on your chairs, members of the jury.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB6KCOS2                        Polo - Direct

1                    (Jury not present)

2                    THE COURT:  You may step down, as well, if you'd like.

3                    THE WITNESS:  Okay.

4                    (Witness temporarily excused)

5                    THE COURT:  Are you ready for the jury?

6                    MR. GAINOR:  Yes, your Honor, but just one moment.

7            So — I guess the Court knows this — Mr. Polo and

8    Mr. Pagan are also on our witness list, so I don't have any

9    questions, but I wanted to let the jury know that, or I can

10   just do it now, and let the Court know, but they are on our

11   witness list as well, rather than sitting as a bump on the log

12   here.

13                   THE COURT:  Okay.  How do you want to do that?

14                   MR. GAINOR:  Well, if the Court wanted just to turn to

15   me, Mr. Gainor, do you have any questions, I can stand up and

16   say, no, and keep it that way, do it simply.

17                   THE COURT:  Okay.  I'll ask you right away or after

18   the cross.  I guess right now.

19                   MR. GAINOR:  I guess so.  That might be best.

20   Whatever the Court wants us to do.

21                   THE COURT:  Okay.

22           So I'll first turn to Mr. Gainor and say, do you have

23   any questions -- that's all I'll say, I guess.

24                   MR. GAINOR:  Yes, your Honor.

25                   THE COURT:  All right.

NB6KCOS2                        Polo - Direct

1        We'll get the jury, please.

2            (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB6KCOS2                        Polo - Cross

1           (Jury present)

2           THE COURT:  Please be seated.

3           Ladies and gentlemen, we'll go until 1:00 o'clock, and

4    then we'll break for lunch from 1:00 to 2:00 again.

5           Mr. Gainor, do you have any questions of the witness?

6           MR. GAINOR:  No questions, your Honor.

7           THE COURT:  All right.

8           Cross, Mr. Andrews?

9           MR. ANDREWS:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. ANDREWS:

12   Q.  Mr. Polo, I want to talk a little bit about your business

13   first.

14          And, by the way, I forgot to say good morning.  Good

15   morning, sir.

16   A.  Good morning.

17   Q.  So, Mr. Polo, you run a legitimate business, right?

18   A.  I do.

19   Q.  Before you agreed to do any work in this case, you sent

20   over a contract, right?

21   A.  Yes.

22   Q.  And the contract outlined the services you would provide

23   and how much you would be paid; is that right?

24   A.  In the most part, yes.

25   Q.  And the defendants, your clients, signed the contract; is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NB6KCOS2                        Polo - Cross

1    that right?

2    A.   They did.

3    Q.   And you kept a copy of the contract; is that right?

4    A.   I did.

5    Q.   Because signing a contract is a normal thing to do for your

6    legitimate business, correct?

7    A.   Yes.

8    Q.   And keeping a copy of the contract is a normal thing to do

9    for your legitimate business, right?

10   A.   Yes.

11   Q.   Then as you started working on the account, you prepared

12   documents, right?

13   A.   Exhibits, yes.

14   Q.   And you sent the exhibits to defense counsel, right?

15   A.   I did.

16   Q.   And you kept copies of those exhibits, correct?

17   A.   I retained them, yes.

18   Q.   You kept copies, right?

19   A.   Yes.

20   Q.   Because keeping copies of records is a normal thing for

21   your legitimate business to do, correct?

22   A.   Yes.

23   Q.   Now, you also do work for legal cases; is that correct?

24   A.   I do.

25   Q.   When I say "legal cases," I mean cases that are in court.

NB6KCOS2                         Polo - Cross

1  Is that right?

2  A.  Yes.

3  Q.  And you would agree with me that it's important to keep

4  records when you're doing work for legal cases; is that right?

5  A.  Yes.

6  Q.  Because your records can be subpoenaed, right?

7  A.  No.  It's just -- I mean, I suppose -- a subpoena would be

8  an alternate point of view, but I keep records so I -- I don't

9  have a crystal clear memory, so I keep records for that.

10 Q.  Right, because it's very important to keep records when

11 you're doing work in connection with a legal case; you would

12 agree with that?

13 A.  Well, accounting is different than other types of work,

14 but, yes.

15 Q.  You also keep records because you might one day have to

16 testify; is that right?

17 A.  That's correct.

18 Q.  Now, you were also sent documents by defense counsel; is

19 that correct?

20 A.  I was provided records, yes.

21 Q.  And you were sent a protective order when you got those

22 documents; is that right?

23 A.  That's correct.

24 Q.  And a protective order is a court order illuminating who

25 can obtain documents, correct?

NB6KCOS2                        Polo - Cross

1    A.  Yes.

2    Q.  And you had to sign a confidentiality agreement saying you

3    would abide by the protective order before you were allowed to

4    see any of the documents; is that right?

5    A.  Yes.

6    Q.  And that's a requirement, you've got to sign the

7    confidentiality agreement before you get any documents,

8    correct?

9    A.  I don't know.

10   Q.  Well, if you violate the protective order, you could be

11   held in contempt, right?

12   A.  That's correct.

13   Q.  So it's very important you abide by a protective order in a

14   case; is that correct?

15   A.  Yes.

16   Q.  You also communicate with your clients, correct?

17   A.  It depends.

18   Q.  You have clients that you don't communicate with?

19   A.  Yes.

20   Q.  Does somebody else in your company communicate with them?

21   A.  No.

22   Q.  So maybe, then, help me understand.  You have clients that

23   you've never communicated with, nobody in your company has

24   communicated with, yet you're doing work for them in the

25   context of a legal case?

NB6KCOS2                        Polo - Cross

1   A.  That's correct.

2   Q.  So you don't retain -- do you retain records of

3   communications as to how you retained the client?

4   A.  I'm sorry, I couldn't hear that.

5   Q.  How do you get the client, then?

6   A.  How do I get the client?  Typically, my -- majority of my

7   cases are referred by attorneys.

8   Q.  So then you communicate with the attorney, correct?

9   A.  Correct.

10  Q.  And then the attorney communicates with their client,

11  correct?

12  A.  That's correct.

13  Q.  So you have some record of a communication with an

14  intermediary; is that right?

15  A.  Not an intermediary; the attorney.

16  Q.  The attorney.

17          Who, in this instance, is the intermediary between you

18  and the client, right?

19  A.  Their attorney, yes.

20  Q.  And you would agree with me when you're doing tens of

21  thousands of dollars of work, it's important to speak with

22  someone who is representing your ultimate client; is that

23  correct?

24  A.  With someone, their attorney.

25  Q.  With someone, exactly.

1      Your business also has expenses, right?

2   A.  Of course.

3   Q.  And you pay these business-related expenses out of your

4   business account?

5   A.  It depends.

6   Q.  Well, you pay some of the expenses out of your business

7   account, correct?

8   A.  Most of them, yes.

9   Q.  Most of them, right?

10      Because that's a normal thing to do for your

11  legitimate business, correct?

12  A.  Correct.

13  Q.  So let's talk about JEM Solutions.

14      You testified that you reviewed JEM Solutions' bank

15  accounts; is that correct?

16  A.  Yes.

17  Q.  I want you to compare some numbers in those charts to some

18  other charts, so I'm going to have the paralegal publish

19  Government Exhibit 604.

20      MR. ANDREWS:  If we could turn to page 14.

21      And if we could just zoom in on the top third of the

22  page.  Perfect.

23  Q.  So this is a tax return for Edwin Pagan, III; is that

24  correct?

25  A.  Yes.

NB6KCOS2                          Polo - Cross

1   Q.  And it's a tax return for JEM Solutions, correct?

2   A.  Yes.

3          MR. ANDREWS:  If we can now focus on Part II of the

4   tax return.

5   Q.  So I'm just going to have you read off the numbers as I go

6   through these expenses, okay?

7          Advertising, how much?

8   A.  That's number 8, and it says 120.

9   Q.  Okay.

10          Car and truck expenses, how much is that?

11  A.  That's the next line, number 9, 3,480.

12  Q.  And insurance, line 15, how much is that?

13  A.  1,386.

14  Q.  And legal and professional services, how much is that?

15  A.  Line 17, it's 825.

16  Q.  Repairs and maintenance, how much is that?

17  A.  The other column, number 21, is 3,005.

18  Q.  Supplies, how much is that?

19  A.  Number 22 is 205.

20  Q.  And taxes and licenses, how much is that?

21  A.  The next row, number 23, is 400.

22  Q.  Travel, how much was that?

23  A.  3,010.

24  Q.  Keep that number, about 3,000, in your mind because I want

25  to go back to that.

1           And deductible meals, how much was that?

2    A.  975.

3    Q.  If we look at the bottom here, where it says, "Tentative

4    profit or loss," we see a negative number; is that right?

5    A.  That's correct.

6    Q.  So a negative number means that JEM Solutions said or it

7    recorded that it lost money; is that correct?

8    A.  This is expenses greater than its revenue, yes.

9    Q.  And, therefore, JEM Solutions paid no taxes; is that

10   correct?

11   A.  Well, JEM Solutions doesn't pay taxes; it's a sole

12   proprietorship.  The individual that owns the company would be

13   paying the taxes.

14   Q.  Right, so that means that the individual actually gets to

15   pay less taxes because they get to deduct this $3,136 from

16   their individual return; is that correct?

17   A.  It depends.  In this specific case, that's true.

18   Q.  In this specific, that's true, right?

19   A.  Yes.

20   Q.  So let's see whether any of these alleged expenses show up

21   on JEM Solutions' bank records.

22           MR. ANDREWS:  Let's now publish Government

23   Exhibit 705.

24   Q.  And you reviewed JEM Solutions' bank records, correct?

25   A.  I did.

1    Q.  So this is a schedule of JEM Solutions' bank records

2    through November 18th of 2019; is that correct?

3    A.  Yes.

4    Q.  And you're aware of why this chart stops on November 18th

5    of 2019, right?

6    A.  I didn't prepare this chart, so the answer would be no.

7    Q.  So defense counsel didn't tell you that on November 18,

8    2019, law enforcement interviewed John Costanzo and Manuel

9    Recio, that's correct?

10   A.  I don't know.

11   Q.  Well, did they tell you that, or no?

12   A.  No.

13   Q.  So you would agree with me that, ordinarily, functioning

14   businesses have debits on their bank accounts, correct?

15   A.  They have debits and credits, but, yes.

16   Q.  Both sides, right?

17   A.  That's correct.

18   Q.  And debits are ordinarily associated with expenses?

19   A.  Right, subtractions.

20   Q.  Subtractions, right?

21   A.  And some subtractions can be expenses that are deductible

22   by the business, and some taxes could be something else, other.

23   Q.  Exactly.

24          And there are only 11 transactions in this bank

25   account through November 18th of 2019; is that right?

NB6KCOS2                          Polo - Cross

1    A.  I'll take your word for that.  I can count it if you'd

2    like.

3    Q.  Sure, yeah, go ahead.

4    A.  That's correct.

5    Q.  So let me know if you see any of the words on this page

6    that we saw on that other page of the tax return.

7             Advertising?

8    A.  No.

9    Q.  Car and truck?

10   A.  No.

11   Q.  Insurance?

12   A.  No.

13   Q.  Legal and professional services?

14   A.  No.

15   Q.  Repairs and maintenance?

16   A.  No.

17   Q.  Supplies?

18   A.  No.

19   Q.  Taxes and licenses?

20   A.  No.

21   Q.  Meals?

22   A.  No.

23   Q.  Do you see travel expenses, though?

24   A.  Well, American -- the last three rows would be American

25   Air, yes.

NB6KCOS2                          Polo - Cross

1    Q.  So that's a travel expense, right?

2    A.  Yes.

3    Q.  And --

4    A.  Well, let me correct that.  They are payments to American

5    Air.  I don't know if they're travel expenses or not.

6    Q.  But American Airlines is an airplane company, that's

7    correct?

8    A.  That's correct, but you're creating whether I have a

9    personal knowledge of how the numbers on the tax return were

10   effected.  I didn't prepare the tax return.

11   Q.  Exactly.  And I don't want you to speculate.  So at no

12   time, please do not speculate.

13            Now you're aware, though, that John Costanzo bought

14   three American Airlines tickets using JEM Solutions' bank

15   account, correct?

16   A.  No.  JEM Solutions purchased these three transactions.

17   That corporation purchased those.

18   Q.  Okay.  The corporation purchased them, but you don't

19   personally know who those tickets were for, correct?

20   A.  They were for John Costanzo, Jr.

21   Q.  Okay.  So fair to say these three airplane tickets were for

22   John Costanzo, Jr.; is that right?

23   A.  Yes.

24   Q.  Okay.  And they add up to about $3,574, right?

25   A.  That's correct.

NB6KCOS2                          Polo - Cross

1   Q.  So that's pretty close to the $3,005 that we saw on the tax

2   return, right, for travel?

3   A.  It depends how you look at it and what the materiality

4   threshold is, but 3,000 is close to 3600.

5   Q.  Well, I mean, when defense counsel was asking you

6   questions, they asked you to compare two 3,000-ish numbers, and

7   it seemed like you didn't have any problem answering that

8   question, right?

9   A.  I did answer your question, and they are comparable.

10  Q.  They're pretty close, right?

11  A.  It depends on the threshold, and I think 300 and 600 is

12  close.

13  Q.  Okay, great.

14          So let's talk about the other transactions we see, and

15  just let me know if we're missing anything here.

16          So that first transaction, that's just a starting

17  balance, right, a person put a hundred dollars in?

18  A.  Yes.

19  Q.  The second transaction, that's a $36.19 transaction for

20  checks, correct?

21  A.  Yes.

22  Q.  Then we get to the third transaction.  Do you know what the

23  third transaction is?

24  A.  Yes.  It's related to an invoice.

25  Q.  And it's a $10,000 payment from Global Legal Consulting to

NB6KCOS2                          Polo - Cross

1   JEM Solutions, correct?

2   A.   That's correct.

3   Q.   Now, you're aware that JEM Solutions received a subpoena

4   for documents related to this payment, correct?

5   A.   No.

6   Q.   So defense counsel didn't tell you that?

7   A.   I don't know how they were acquired.

8   Q.   Well, just my question, sir:  So defense counsel didn't

9   tell you that, correct?

10  A.   I said I don't know.

11  Q.   Well, do you not know if they told you, or do you not know

12  what the purpose of the -- do you not know about the subpoena?

13  A.   I know they didn't tell me.

14  Q.   Okay.

15  A.   But I don't know about the rest of it.

16  Q.   Okay.  So you're not aware that JEM Solutions produced no

17  contracts, no communications, no documentation in response to

18  the subpoena, correct?

19  A.   I'm not aware.

20  Q.   And you're aware that Global Legal Consulting received a

21  subpoena for documents related to this payment, correct?

22  A.   Again, I don't know.

23            (Continued on next page)

24

25

Nb62Cos3                         Polo - Cross

1    BY MR. ANDREWS:

2    Q.  So defense counsel didn't tell you that Global Legal

3    Consulting had received a subpoena for documents related to

4    this transaction.

5    A.  We did not discuss this, no.

6    Q.  Okay.  So you are not aware that Global Legal Consulting

7    also produced no contracts or documentation in response to this

8    subpoena, correct?

9    A.  Well, that's not correct.  I don't know.

10   Q.  Well, my question was you are not aware that Global Legal

11   Consulting produced no contracts or documentation in response

12   to this subpoena, correct?

13   A.  I don't know, like I answered your question.

14   Q.  You have also reviewed Manuel Recio's phone records,

15   though, correct?

16   A.  No, I looked at the financial transactions in this case.

17   Q.  So defense counsel didn't give you the phone records

18   either, is that right?

19   A.  I don't recall.

20   Q.  So you are not aware that Manuel Recio and Edwin Pagan

21   never called each other --

22           MS. YOUNG:  Objection to the form.

23           THE COURT:  Sustained.

24   Q.  So you don't know whether Manuel Recio and Edwin Pagan ever

25   called either other prior to this payment, correct?

Nb62Cos3                    Polo - Cross

1    A.  I mean, I don't know how to answer your question because I

2    have received voluminous amount of records.  There was

3    information, but my focus was on the financial transactions in

4    this case.

5    Q.  All right.  So let's just keep on moving along, then.

6          The fourth transaction, that's a $2,000 transfer to

7    savings account, correct?

8    A.  Yes.

9    Q.  And there was no activity in that savings account, correct?

10   A.  Correct.

11   Q.  And then we have another $10,750 payment, correct?

12   A.  It's a deposit, not a payment.

13   Q.  A deposit into the account from Global Legal Consulting, is

14   that right?

15   A.  That's correct, related to an invoice.

16   Q.  Then we see the American Air Line ticket, correct?

17   A.  When?  July 8, yes.

18   Q.  And the $1700 deposit, do you know what that is?

19   A.  I don't recall.

20   Q.  And the last three are American Air Lines tickets, right?

21   A.  Correct.

22   Q.  All right.  Are you familiar with the phrase "shell

23   company"?

24   A.  Yes.

25   Q.  Shell company is a company that doesn't have any expenses,

Nb62Cos3                          Polo - Cross

1    right?

2    A.  It's a little more complicated than that, but they

3    typically hold another asset.

4    Q.  Well, a shell company can be essentially a company that

5    doesn't really do any business, correct?

6    A.  Well, its business is to hold other assets, so I don't

7    think that you are right about that.

8    Q.  I think we might be thinking in terms of accounting terms

9    versus the common expression.

10        Maybe like a sham company how about that?

11   A.  Okay.  Well, that's not an accounting concept as it relates

12   to when I am preparing a tax return.  I don't prepare tax

13   returns for sham companies.

14   Q.  Okay.  Because sham companies aren't actually doing

15   business, right?

16   A.  Well, it depends.  If they do have a legal substance, they

17   may be prepared tax returns.  It really depends.

18   Q.  So before we move on, I just want to check with you.  Are

19   you aware that John Costanzo and Edwin Pagan opened JEM

20   Solutions together?

21        MS. YOUNG:  Objection.  Misstates the evidence.

22        THE COURT:  I'm going to sustain the objection just in

23   terms of characterization.  It is up to the jury how they

24   characterize that evidence.

25        MR. ANDREWS:  Sure.

1    BY MR. ANDREWS:

2    Q.  So why don't I do this.  Instead, if we could publish for

3    the witness Government Exhibit 507.

4            Defense counsel didn't send you text messages,

5    correct?

6    A.  I don't recall.

7    Q.  So why don't we just read through this message, because you

8    don't recall it.  So if we could zoom in at the top of it.

9            All right.  So the top is Eddie in gray and then we

10   see Gio Costanzo in the green.  So why don't we have you read

11   the Eddie in gray and I will read the Gio Costanzo, okay?  So

12   you can go ahead?

13   A.  The first gray box says, "Working on names for our company.

14   Gonna send you a list.  Tell me which one gives you movement."

15   Q.  "Okay.  You wanna call it Global something"?

16   A.  Next box says, "Yeah, maybe.  Not bad.  Needs some work.

17   Global Social Solutions, Global Social Securities, Social

18   Solutions and Securities, Social Solutions.  We need something

19   that appeals to many aspects."

20   Q.  And if we could keep going for the bottom part here, so you

21   want to keep reading Eddie?

22   A.  "Social media protection, banks, athletes, Marco."

23   Q.  "Global Vigilance and Securities Solutions"?

24   A.  "Narco."

25   Q.  "Gotcha."

Nb62Cos3                          Polo - Cross

1          If we can go to the next page?  Maybe we can just,

2   instead, go to the bottom part of it where it begins with JEM

3   Solutions.

4          MS. YOUNG:  Your Honor, may we approach?

5          THE COURT:  Yes.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nb62Cos3                          Polo - Cross

1              (At the sidebar)

2              MR. MUKASEY:  Judge, with all due respect to

3     Mr. Andrews' strategic decisions, this is a gimmick.  This is a

4     cumulative argumentive line of questioning.  These text

5     messages have been read over and over and over.  This is now

6     being read by yet another person who has literally no idea

7     about it simply for the purpose of saying he's got no idea

8     about the communications.  We can ask one question:  Do you

9     know anything about the text message communications regarding

10    the creation of JEM Solutions?  The answer is no.  Wasting time

11    while maintaining that they want to get, you know, to closing

12    arguments as fast as possible by having a guy with no

13    knowledge, who never saw this or read these for the third or

14    fourth or fifth time is cumulative and a waste.

15             MR. ANDREWS:  Judge, defense counsel repeatedly

16    cross-examined our witnesses about what documents we showed to

17    our summary witnesses and what documents we didn't.  We are

18    near the end of the document.  I will try to keep this moving

19    on.  However, this was fair game for what they did on their own

20    cross, and I will keep in mind and try to be quick.  I don't

21    want to bore the jury.

22             MS. YOUNG:  If I may, Judge, their summary charts

23    combine financial transactions and messages.  Ours did not.  It

24    was solely focused on financial transactions.  Quite frankly,

25    it is outside the scope of the direct.

Nb62Cos3                          Polo - Cross

1              MR. MUKASEY:  I will make one other point.  The

2     question, sorry, the question, "Are you aware that Costanzo did

3     this or Costanzo did that" is improper.  "Are you aware whether

4     or not something happened?"  He can say no.  But it assumes

5     facts not in evidence to say "are you aware that."

6              THE COURT:  Except unless the "that" is --

7              MR. ANDREWS:  And that is --

8              THE COURT:  He is not aware of any of the factual

9     stuff, but it is what it is.

10             MR. MUKASEY:  Correct.

11             THE COURT:  Of course it's argumentative, but it's

12    about a document in evidence.  Keep it short.

13             MR. ANDREWS:  Yeah.

14             THE COURT:  As long as it's short, I think it's fine.

15             MR. ANDREWS:  Sure.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Nb62Cos3                    Polo - Cross

1              (In open court)

2     BY MR. ANDREWS:

3     Q.  If you could just read these last three messages, please.

4     I think you were about to read "JEM Solutions."

5     A.  It says, "JEM Solutions."

6     Q.  "JEM can be your acronym, then whatever word you want to

7     use.  JEM Solutions, JEM Risk Managers, whatever.  It will take

8     two business days to get the ID number, but it's being filed."

9              So I believe on that first page Gio Costanzo says "our

10    company."  Do you remember seeing that working on names for --

11    my apologies, it's not Gio Costanzo.  It's Edwin Pagan.  Eddie

12    Pagan.  So remember seeing the word "our company"?

13    A.  It's right there, yes.

14    Q.  So that means a company owned by people together, correct?

15    A.  Yes.

16    Q.  Okay.  So we can take this down now.

17             Now, Mr. Polo you testified about Mr. Pagan's

18    finances, is that correct?

19    A.  I analyzed a bank account.  I don't know about his

20    finances.

21    Q.  Well, the bank account --

22    A.  His finance are a little bit more encompassing than just

23    the bank account analysis.

24    Q.  Correct.  Well, you talked about the transactions in his

25    bank account.

Nb62Cos3                        Polo - Cross

1    A.  Right, specifically the Dade County Credit Union.

2    Q.  Okay.  So I want to talk a little bit more about

3    Mr. Pagan's financial transactions.  So if we could publish

4    Government Exhibit 116, and I will read this first paragraph,

5    "The information contained in this document represents data

6    submitted by Edwin Pagan III for the E-QIP investigation,

7    request no. 20948510.  Applicant certified the accuracy of this

8    information at 2016 June 14 at 12:44 p.m."

9            If we can go now to page 15, so if we can focus on

10   your financial record here, specifically part A, so I will read

11   part A, "In the last seven years, have you, or a company over

12   which you have exercised some control, filed for bankruptcy,

13   been declared bankrupt, been subject to a tax lien, or had a

14   legal judgment rendered against you for a debt?"

15           What's the answer there?

16   A.  There is an X next to the "yes."

17   Q.  Okay.  And below here, what type of action did we see being

18   taken against Edwin Pagan in June of 2010?

19   A.  Like a foreclosure, it says "type of action: foreclosure."

20   Q.  Foreclosure is like when a bank takes your house, is that

21   correct?

22   A.  Not takes a house, but recovers on a mortgage.

23   Q.  Because a mortgage wasn't being paid, correct?

24   A.  Correct.

25   Q.  Now if we can go to the next page, please.  And this B

Nb62Cos3                          Polo - Cross

1    here, if we could zoom in on that, too, please, so for B, "Are

2    you now over 180 days delinquent on any loan or financial

3    obligation?  Includes loans or obligations funded or guaranteed

4    by the federal government."

5            What's the answer there?

6    A.  There is an X next to "yes."

7    Q.  Okay.  If we go to part 1, the type of loan or obligation

8    that was delinquent by over 180 days was what?

9    A.  Mortgage.

10   Q.  And the date that that happened was when?

11   A.  Right above it says 01/2016, so that would be January of

12   2016.

13   Q.  Okay.  So we can take down that exhibit.

14           Now, you have reviewed Mr. Pagan's credit report,

15   correct?

16   A.  I don't recall.

17   Q.  So you don't recall defense counsel sending you over a

18   credit report for Experian?

19   A.  I don't recall.

20   Q.  So if we could just show the witness, then, Government

21   Exhibit 2003B, and if we could go to the second page, the third

22   to last entry, if we could zoom in on the third to last entry,

23   please.

24           Does this refresh your recollection that defense

25   counsel sent you over a credit report and mentioned the fact

1    that Eddie Pagan had many mortgages?

2    A.  Yes.

3    Q.  All right.  So we can take that down.

4          So why don't we now show the witness Defense Exhibit

5    JC 1018.  Do you recognize Defense Exhibit JC 1018?

6    A.  No.

7    Q.  This is an Experian credit report, correct?

8    A.  That's what it is titled.

9    Q.  Why don't we pull up the stipulation S9.  We can go to page

10   2., and I will read this portion, no. 13.  "Defense Exhibit

11   1018 are records from Experian."

12         At this time the government offers a Defense Exhibit

13   1018.

14         THE COURT:  Admitted.

15         (Defendant's Exhibit JC 1018 received in evidence)

16   BY MR. ANDREWS:

17   Q.  If we can now publish Defense Exhibit 1018 for everybody,

18   please.

19         So I want to talk about how far Eddie Pagan was in

20   debt in 2020 and 2019.  So the name of the person on this

21   credit report is Eddie Pagan, correct?  Why don't we zoom in on

22   the top.

23   A.  Edwin Pagan III, yes.

24   Q.  So if we go to page 2 of this document and we start

25   focusing on select portfolio servicing, if you want to zoom in

Nb62Cos3                     Polo - Cross

1    on those entries, all right, now select portfolio servicing

2    typically handles delinquent mortgages, is that correct?

3    A.  I don't know.

4    Q.  You are not aware?

5    A.  No, I don't know.

6    Q.  Okay.  Well, Pagan received this mortgage, and we start

7    with the number right next to select portfolio servicing in

8    October of 2008, correct?

9    A.  I'm not familiar with this format of this report.

10   Q.  Okay.  So --

11   A.  Referring to a date, but there is no title at the top of

12   that column, so I would have to see the report.

13   Q.  Well, since you didn't have a chance to take a look at the

14   report when defense counsel sent it over to you, there is

15   actually a helpful instruction guide.

16        So why don't we publish Government Exhibit 2003C

17   instead.  And in fact, why don't we do it side by side, so

18   Government Exhibit 2003C next to Government Exhibit --

19        MS. YOUNG:  Not in evidence.

20        THE COURT:  What's that?

21        MR. ANDREWS:  My apologies.  Why don't we show the

22   witness Government Exhibit 2003C.

23        (Pause)

24        MR. ANDREWS:  All right.  Why don't we just move on

25   from that topic for a moment.

Nb62Cos3                          Polo - Cross

1   BY MR. ANDREWS:

2   Q.  So I want to go back to your summary chart, Government

3   Exhibit 2622 -- rather, Defense Exhibit 2622.  All right.

4           So I want to focus your attention on total

5   withdrawals.  In total, Pagan withdrew 64,416 from this account

6   in 2019.

7   A.  I think you said the number wrong, so no.

8   Q.  I see this is an updated form.  So in total he withdrew

9   $78,594, is that correct?

10  A.  That's the number on my chart, yes.

11  Q.  And of that money, $50,000 of it was a payment to John

12  Costanzo, Sr., is that right?

13  A.  Yes.

14  Q.  So about two-thirds of that money was to John Costanzo,

15  Sr., is that right?

16  A.  Correct.

17  Q.  And if we go to page 2, focusing on line 2, why don't we

18  actually -- it's not page 2.  It's on the prior page.  And if

19  we focus on the entry for the $50,000, it's actually on the

20  next page -- sorry, one more page down.  Do you know what John

21  Costanzo, Sr. did with this money?

22  A.  I believe he deposited it into his account.

23  Q.  And do you know what he did after with the money?

24  A.  It was used by his son.

25  Q.  So it was transferred to his son less than a month later,

Nb62Cos3                    Polo - Cross

1    is that correct?

2    A.   Correct.

3    Q.   And if we can now pull up government exhibit -- sorry

4    Defense Exhibit 2621.

5             So I want to draw your attention to the bottom of this

6    page.  So you scheduled EBCO's financial records from October

7    31 of 2018 to December 31 of 2018, is that correct?

8    A.   Yes.

9    Q.   In the first activity you see here is this $2500 payment

10   from Global Legal Consulting, is that right?

11   A.   Yes, on November 15.

12   Q.   So that's on November 15 of 2018, correct?

13   A.   Yes.

14   Q.   Now, you reviewed EBCO's financial records from before

15   November of 2018, right?

16   A.   Yes.

17   Q.   So you are aware that during the six months prior to this

18   $2500 payment, EBCO had no bank account activity, right?

19   A.   That's correct.

20   Q.   No deposits, right?

21   A.   That's correct.

22   Q.   No payments out, correct?

23   A.   I would have to go back and check.  There may have been

24   some bank fees, but I'm not familiar.

25   Q.   EBCO's bank account was completely dormant, correct?

Nb62Cos3                    Polo - Cross

1   A.  In essence, yes.

2   Q.  And then suddenly on November 15 a $2500 payment appears,

3   correct?

4   A.  Yes, on November 15.

5   Q.  And if we could just show the witness side by side, then,

6   Defense Exhibit 2621 and Government Exhibit 2010A.

7          MS. YOUNG:  Is 2010A in evidence?

8          MR. ANDREWS:  We are just showing the witness.

9   Q.  So you would agree with me that Government Exhibit 2010A

10  shows in red the absence of any bank activity during the six

11  months prior to the $2500 payment, correct?

12  A.  Well, there is no bank activity.  I don't know if that's

13  why it is red, but it is no bank activity.

14  Q.  And Government Exhibit 2010A is correct?

15  A.  The numbers are correct.

16         MR. ANDREWS:  Okay.  The government offers Government

17  Exhibit 2010A.

18         MS. YOUNG:  No objection.

19         THE COURT:  Admitted.

20         (Government's Exhibit 2010A received in evidence)

21         MR. ANDREWS:  If we could publish that to the jury,

22  please.

23  BY MR. ANDREWS:

24  Q.  And by the way, the $1800 credit card payment, do you know

25  whose expenses were being covered by that credit card?

Nb62Cos3                        Polo - Cross

1    A.  No.

2    Q.  Okay.  So let's now publish Defense Exhibit 2623.

3           Now, Mr. Polo, did you come up with this chart all on

4    your own or did defense counsel speak with you about the chart?

5    A.  Defense counsel asked me to look into these various

6    transactions, and I prepared the chart based on discussions

7    with them.

8    Q.  Okay.  So defense counsel said, Mr. Polo take a look at

9    USAA Insurance, correct?

10   A.  Yes, for this time period, can you please analyze payments

11   paid on behalf of Jr., John Costanzo, Jr., for auto insurance

12   and then compare that to any travel expenses paid by JEM or JEM

13   Solutions for that same time period.

14   Q.  All right.  So you have no idea if these payments are

15   related, correct?

16   A.  They are what they are.  They are payments out of the bank

17   account.  I don't know what the reflection is.  I'm just

18   showing the amounts that came out from his personal account,

19   from the checking and savings account for John Costanzo, Jr.

20   during the same time period that JEM Solutions paid for these

21   expenses.

22   Q.  And USAA offers lots of different types of insurance,

23   correct?

24   A.  I'm not an expert on what they offer, but I do know that

25   they provide auto insurance.

Nb62Cos3                    Polo - Cross

1    Q.   Are you aware that they provide homeowners insurance?

2    A.   I am not.

3    Q.   Are you aware that they provide life and health insurance?

4    A.   I am not aware of what product lines they have.

5    Q.   So you are also not aware they provide pet insurance,

6    travel insurance, insurance for special events, motorcycle

7    insurance, and boat insurance, right?

8    A.   I think I've answered your question.  I'm not an expert on

9    what product lines they have.

10   Q.   Okay.  So let's just talk about whether there is a car

11   insurance payment.

12           Mr. Polo, do you have a car?

13   A.   I do.

14   Q.   And does your car insurance change from month to month from

15   one number to a different number?

16   A.   Yes, it does.  It depends on the time of the year and

17   whether -- if there have been premium changes or not, so it

18   does.

19   Q.   So does it quadruple in a single month?

20   A.   I can't think of it doing that.  I would have remembered

21   that.

22   Q.   Right.  So it never goes from 300 to $1324, right?

23   A.   Well, you are equating the payments versus the premium.  So

24   I may pay my premium in various different methods.  The premium

25   may not change.  It's when I pay the premium.

1    Q.  So again --

2    A.  These are payments.

3    Q.  These are payments, correct.

4    A.  Not the actual premium.

5    Q.  And normally you pay your car insurance, right?

6    A.  That's correct.

7    Q.  And when you pay your insurance, you are charged a monthly

8    amount, is that right?

9            MS. YOUNG:  Objection.  Relevance to his own payments.

10           THE COURT:  Sustained.

11           MR. ANDREWS:  By the way, if we could publish the

12   defense exhibit side by side with this, 1316.

13   Q.  So, Mr. Polo, 1316 is a certificate of title to this car,

14   correct?

15   A.  I'm sorry I didn't hear you.

16   Q.  Defense Exhibit 1316 is a certificate of title for a

17   vehicle, is that correct?

18   A.  Yes, with the State of Florida.

19   Q.  And I think defense counsel asked you about this

20   certificate of title, is that right?

21   A.  Yes.

22   Q.  So if we could zoom in on the bottom portion of this, where

23   it says, "Date of sale."

24   A.  Yes.

25   Q.  What's the date of sale on this certificate of title?

Nb62Cos3                         Polo - Cross

1    A.   It says, it looks like there, June 17, 2019.

2    Q.   And at the bottom it says, "Under penalties of perjury, I

3    declare that I have read the foregoing document that the facts

4    stated in it are true."

5    A.   It does say that.

6    Q.   And this is a bill of sale between Edwin Pagan and John

7    Costanzo?

8    A.   It is.

9    Q.   Just to be clear, keeping that June 17, 2019 date in mind,

10   if we take a look back at the chart that you prepared, so the

11   April 23, 2019 payment, is that before or after the car was

12   sold in June 17 of 2019?

13   A.   It's before.

14   Q.   Okay.  And the May 29 also before June 17?

15   A.   Well, the date is before the June 17 date, but the date the

16   car, as I understand it, was paid off on May 13.

17   Q.   Well, I'm just focusing on the title of certificate that

18   was submitted under penalty of perjury that said the date of

19   sale for the vehicle.  That said June 17 of 2019, correct?

20   A.   That's the date that the document was executed, correct?

21   Q.   Well, it's not just the date the document was executed.

22   That was the date of sale on the document, is it not?

23   A.   It depends.

24   Q.   Well, let's pull up the document one more time, please, if

25   we can just zoom in, and I will just have you read the portion,

1    again, where it says "seller must enter date sold."  What does

2    that say?

3    A.  It says June 17, 2019 again.

4    Q.  So we can take down these exhibits as well.

5          So Mr. Polo, I would like to end with what you do and

6    don't know.

7          Now, we talked about how defense asked you to review

8    certain bank account records, is that correct?

9    A.  Yes.

10   Q.  And those bank account records were for Edwin Pagan, John

11   Costanzo, Jr., Manuel Recio, and others, right?

12   A.  And others, yes.

13   Q.  And you don't know whether Edwin Pagan has bank accounts

14   other than the ones you reviewed, correct?

15   A.  I don't know?  I didn't review them, but I'm sure he does.

16   Q.  Okay.  And you don't know if the government was able to

17   locate all of Edwin Pagan's records, correct?

18   A.  Let me restate, I don't know for sure because I didn't

19   review them.

20   Q.  You don't know whether Edwin Pagan has other bank

21   accounts --

22          MS. YOUNG:  Objection.

23          THE COURT:  Overruled.

24   Q.  You don't know whether Edwin Pagan has other bank accounts

25   besides the specific bank accounts you reviewed, correct?

Nb62Cos3                        Polo - Cross

```
 1    A.   Right.  I was asked to analyze the account where the
 2    $50,000 was drawn from in a cashier's check and analyze that
 3    account for the time period going back in time.
 4    Q.   Right.  And you don't know whether John Costanzo, Jr. has
 5    other bank accounts other than the accounts that you
 6    specifically reviewed, correct?
 7    A.   That's correct.
 8    Q.   Same for John Costanzo, Sr., right?
 9    A.   I think I looked at most of his accounts, so I looked at
10    what -- the accounts that were provided.
11    Q.   Just the accounts provided, correct?
12    A.   Correct.
13    Q.   And if there were financial transactions in these other
14    bank accounts, the ones you are not aware of, you, by
15    definition, wouldn't know about them, correct?
16              MS. YOUNG:  Objection.
17              THE COURT:  Overruled.  You can answer.
18    A.   Can you restate your question, please.
19    Q.   If there are financial transactions in these other bank
20    accounts that you are unaware of, you, by definition, would not
21    be aware of these transactions, correct?
22    A.   Oh, yes, of course.
23    Q.   Okay.  You would also agree with me that there are lots of
24    ways to pay someone without having to use a bank, correct?
25    A.   Yes.
```

Nb62Cos3                          Polo - Cross

1  Q.  You can pay someone in cash, right?

2  A.  In essence, the answer to that question is yes, but you

3  would have to have an ability to receive the cash, and that

4  would be something that you would have to document.

5  Q.  Well, if I gave you $10 in cash, that doesn't show up in a

6  bank account, right?

7  A.  It depends.  I don't know your sources of income.  I would

8  have to determine.  If your sources of income are from

9  employment, then typically the money is going to get deposited

10  into a bank account or there is going to be a record from some

11  institution paying you, so some bank somewhere is going to

12  reflect that there was a transaction.

13  Q.  And if that was in one of the thousands or millions of

14  other bank accounts that you did not review, you would not be

15  able to testify about that transaction, correct?

16          MS. YOUNG:  Objection as to form.

17          THE COURT:  Sustained.

18  Q.  You can only testify about the financial transactions that

19  you have actually reviewed, correct?

20  A.  That's correct.

21  Q.  And are you aware that people can use PayPal, Venmo,

22  Western Union, and CashApp to also transfer money?

23  A.  Yes.

24  Q.  And you are aware that somebody can also give somebody

25  property, correct?

1    A.  Well, give, no, that would be -- your question is talking

2    about payment.

3    Q.  Correct.  You can pay somebody with property, like a watch.

4    A.  Right, you can pay someone with property, as a transmittal

5    of assets, but if you are giving someone, that's different.

6    Q.  So to be clear, you don't know whether someone reimbursed

7    Edwin Pagan for the $50,000, correct?

8    A.  I did not see any transactions that were deposited into his

9    Dade County Credit Union, no.

10   Q.  For this specific account and only the account that you

11   reviewed, correct?

12   A.  The accounts that I reviewed, that's correct.

13   Q.  Okay.  And you also don't know whether someone reimbursed

14   Edwin Pagan for the $20,000, correct?

15   A.  That -- he was not reimbursed, no.

16   Q.  Based on your review of just one bank account, correct?

17   A.  Based on review of the Dade County credit union, yes.

18   Q.  And you don't know whether John Costanzo, Sr. gave his son

19   John Costanzo any money after EBCO was paid $2500 using another

20   bank account, correct?

21   A.  No, I actually reviewed John Costanzo, Sr.'s account, and I

22   was looking for cash withdrawals from the account, and I did

23   not find any, just like I did not find any cash withdrawals

24   from EBCO.  EBCO did not have any cash withdrawals, either.

25   Q.  Right, but just to circle back again, you only know about

Nb62Cos3                    Polo - Redirect

1   the bank accounts that you specifically reviewed, correct?

2   A.  That's correct.

3   Q.  So you cannot say as a factual matter whether John

4   Costanzo, one way or another, paid his son $2500 after he

5   received it from Global Legal Consulting, is that --

6            MS. YOUNG:  Objection to form.

7            THE COURT:  Overruled.

8   A.  Well, the $2500 was clearly deposited into EBCO

9   International of Miami and was not withdrawn, it was disbursed

10  out to the four transactions we had, so it was not paid to John

11  Costanzo, Jr.

12  Q.  Using that specific bank account.

13  A.  Using that account and I also reviewed his personal

14  accounts and it wasn't paid from any of those personal bank

15  accounts either.

16  Q.  But you are not aware what John Costanzo, Sr. has other

17  accounts, correct?

18  A.  I reviewed the accounts that were provided.

19           MR. ANDREWS:  Okay.  One moment.

20           (Counsel confer)

21           MR. ANDREWS:  No further questions.

22           THE COURT:  Ms. Young.

23  REDIRECT EXAMINATION

24  BY MS. YOUNG:

25  Q.  Mr. Polo, you were asked a moment ago about the formation

Nb62Cos3                        Polo - Redirect

1    of Global Legal Consulting.  Do you recall that?

2    A.  Yes.

3    Q.  Could we please pull up GX 440A.  Can you show me where in

4    this document there is any reference to John Costanzo, Jr.?

5    A.  No.

6    Q.  Why not?

7    A.  It's not there.

8    Q.  And you were also asked about JEM Solutions.

9            Could we please pull up GX 502.

10           Same question.  Could you please show me where John

11   Costanzo helped form JEM Solutions?

12   A.  No.

13   Q.  Why not?

14   A.  He is not there.

15   Q.  Again, we can take that down.

16           Now, you are a CPA, is that right?

17   A.  That's correct.

18   Q.  And you went to undergraduate, right?

19   A.  Yes.

20   Q.  And graduate school?

21   A.  Yes.

22   Q.  And you have worked in Big Four accounting firms?

23   A.  Not Big Four, but large accounting firms.

24   Q.  Large accounting firms, and you own your own accounting

25   firm now?

Nb62Cos3                          Polo – Redirect

1    A.  I do now, yes.

2    Q.  And where do you spend most of your day when you are

3    working?

4    A.  I'm working in conjunction with litigation, forensic

5    engagements.

6    Q.  And are you usually at a desk?

7    A.  Depends.  A lot of times I'm in the courtroom.

8    Q.  So when you are not in a courtroom are you usually with a

9    computer?

10   A.  I am.

11   Q.  And you are not a task force officer?

12   A.  No.

13   Q.  And you are not a private investigator?

14   A.  I am not.

15   Q.  Or a paralegal at the U.S. Attorney's office?

16   A.  No, I'm not.

17   Q.  And you were engaged to summarize financial transactions?

18   A.  That's correct.

19   Q.  And in the course of reviewing the transactions, we looked

20   at one involving $2500.  Do you recall that?

21   A.  Yes.

22   Q.  And so based on your review of the records, is it possible

23   to have two different transactions involving around or the same

24   amount and having them be unrelated?

25   A.  Yeah, well, the dollar amount may be similar, but you are

Nb62Cos3                         Polo - Redirect

 1  looking at the flow of money, so it could be similar dollar

 2  amounts, but you have to look to see where was the trail of

 3  money coming from.  In this particular case we saw a payment

 4  from Global Legal Consulting going to EBCO International Miami,

 5  and then that money being spent.

 6  Q.  And do you recall on that index that the government put up

 7  in front of you of the records that you were provided in

 8  preparation for your engagement Bates numbers, like, what you

 9  had sourced to your summary charts before?

10  A.  Yes.

11  Q.  And do you recall what those Bates numbers started with?

12  A.  SDNY.

13  Q.  And do you know what that stands for?

14  A.  It stands for this court, the Southern District of New

15  York.

16  Q.  So who provided all of those records or collected all of

17  those records?

18  A.  Well, I don't know who provided them, but they were Bates

19  stamped by using that indicator, so I really couldn't answer

20  that.

21  Q.  When you receive records from the government, are they

22  usually Bates stamped with SDNY?

23  A.  No.

24  Q.  What are they Bates stamped for you?

25  A.  It depends on what indicator, like sometimes they are -- it

Nb62Cos3                           Polo - Redirect

1  could be the name of the petitioner, it could be the name of

2  the complainant, it could be defense.  It is really up to legal

3  counsel to decide how they are going to Bates stamp and what

4  acronyms they are going to be using.

5  Q.  So are you aware that everything that the government

6  provided to us was Bates stamped with SDNY?

7  A.  Am I aware of that?  I'm not aware of that.

8  Q.  Okay.  And you mentioned something about the USAA premiums

9  versus the payment amounts?

10  A.  Yes.

11  Q.  Could you elaborate as to what you meant by that?

12  A.  Well, these are transactions of what was being paid out of

13  the bank account, and I think the question that was being posed

14  to me is does the premium change on a regular basis?  And the

15  answer is, well, we are not talking about what the premium was

16  on that particular month.  We are just reflecting how much was

17  paid.  So there may be a situation where you only pay a portion

18  of the premium one month or you maybe pay a larger portion

19  another month.  So the payment amounts can fluctuate different

20  than the actual premium itself.

21  Q.  And can someone make use of a car without the title

22  having -- yet having an effective date or sold date?

23  A.  Yes.  It's common where you have a transaction that may

24  take a period of time and someone may be able to -- you are

25  saying that the transaction occurred on a specific date.  It

Nb62Cos3                    Polo - Recross

1    could be that the transaction took longer than the date and it

2    completed on that date.

3    Q.   Now, you talked a little bit about your practices as an

4    accounting firm.  Are accounting firms different than start-up

5    companies?

6    A.   It depends.  In a recordkeeping phase they are probably

7    exactly the same.  Whereas it relates to how they operate, each

8    industry is going to be different.

9    Q.   And each industry can be different about what invoices they

10   use?

11   A.   It's dependent on the requirements by the owner of the

12   company, what records are going to be maintained.

13   Q.   And each industry can be different about what contracts, if

14   any, they use?

15   A.   Right, not only each industry, but each owner of each

16   company can decide what is going to be maintained and what is

17   not going to be maintained.

18           MS. YOUNG:  Nothing further.

19           THE COURT:  Anything further?

20           MR. ANDREWS:  Just one question, your Honor.

21   RECROSS EXAMINATION

22   BY MR. ANDREWS:

23   Q.   Do you remember being asked about the payments to USAA?

24   A.   Yes.

25   Q.   To be clear, you don't know what those payments were for,

Nb62Cos3                        Polo - Recross

1    correct?

2    A.   They were payment -- I don't know what they were for, no.

3    They were paid to USAA Insurance.

4    Q.   And you haven't reviewed any documents from USAA indicating

5    what those are for, correct?

6    A.   I have not.

7              MR. ANDREWS:  One moment.

8              No further questions.

9              THE COURT:  All right.  Sir, you may step down.

10             (Witness excused)

11             MR. MUKASEY:  May we approach regarding the next

12   witness.

13             THE COURT:  Yes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Nb62Cos3                         Polo – Recross

1           (At the sidebar).

2           MR. MUKASEY:  So the next witness is the

3    aforementioned Mr. Pagan.

4           We have had a chance to review *Caro* very quickly.  I

5    think it is distinguishable on its facts.  It has to do with a

6    defendant taking the stand to testify and doing something

7    different than he had done earlier.  I'm not sure it's even

8    applicable to the facts of this case.

9           But even before we get to the legal arguments, Pagan

10   is here.  My understanding is he has been served with a

11   subpoena.

12          MR. SWETT:  He was given a subpoena in the halls.

13          MR. MUKASEY:  I don't know what the status of is

14   DeCoste, if his lawyer has reached out to you or how the Court

15   wants to handle it, or you just want to kind of go for it.  I

16   guess they wanted to do some work outside the presence of the

17   jury.

18          MR. GAINOR:  Or reach out to the lawyer directly.  I'm

19   not sure.

20          THE COURT:  What does the government think?

21          MR. SWETT:  Well, your Honor, with respect to the

22   subpoena, it was really served just because we wanted there to

23   be clarity.  It's unclear.  I don't think we are going to

24   inquire into that much, if at all.

25          With respect to *Caro* our position remains the same.

1          And then with respect to matters before he testifies,

2     we do think the allocution is necessary and the Court had

3     indicated that it would allocute him on his Fifth amendment

4     rights.

5          His lawyer can -- we can attempt to reach out to his

6     lawyer, but I don't know if we can force his lawyer to be here

7     for that allocution.

8          MR. GAINOR:  I think the attempt should be made and

9     see where the chips fall.

10          THE COURT:  About the Fifth Amendment allocution or

11     the subpoena?

12          MR. GAINOR:  Reaching out to the lawyer in general.

13          MR. ANDREWS:  To be clear, we informed the lawyer that

14     this would be happening and asked if he wanted to come to

15     New York.  He said no.  I mean, we can try calling the

16     attorney, but he is fully aware of what's going on.

17          MR. MUKASEY:  Yeah.  I think we probably had the last

18     touch with the attorney.  Ms. Guaba and I spoke to him at about

19     10:00 --

20          MS. GUABA:  10:00 last night.

21          MR. MUKASEY:  -- last night and told him, like, if you

22     can be available, that would probably be good, but we are not

23     giving you advice on how to do your job.  And he said he would

24     try to make himself available, but he had some other prior

25     court date.  If Mr. Pagan is going to be allocuted -- let me

1  put it this way.  If my client were going to be allocuted about

2  the Fifth Amendment in a federal courtroom in the middle of a

3  criminal trial, I would want to be there for my client.  But if

4  the Court wants to call him --

5           MR. GAINOR:  And where would the allocution occur?  If

6  it would occur here, if it would occur in the robing room,

7  which is probably more appropriate.  I mean, I don't know.

8           MR. MUKASEY:  As long as it is not in front the jury,

9  I don't really care where it happens.

10          THE COURT:  I would think it would be here without the

11 jury.  I mean, I can try to make a call to the lawyer.

12          MR. MUKASEY:  You can also ask Pagan whether he wants

13 his lawyer available if he says no.

14          THE COURT:  That's one of the questions, yeah, that I

15 would ask.  So why don't we do the --

16          MR. MUKASEY:  Maybe give them an early lunch and we

17 can do that.

18          MS. DEININGER:  That's clock's an hour fast.

19          THE COURT:  Oh, right.  Yeah.

20          MR. SWETT:  It's 12:30.

21          THE COURT:  Right, it's 12:30.

22          Why don't I let them go for lunch and have them come

23 back at 2:00?

24          MR. MUKASEY:  Have you read *Caro*?

25          THE COURT:  Yeah, I think it is very different facts.

Nb62Cos3                    Polo - Recross

1   You know, I think the question, you know, whether he refused to

2   testify before the grand jury is sort of delicate because it is

3   so close to asking about Fifth Amendment, you know.  But in

4   general I do think asking about prior silence, we contacted you

5   and you wouldn't speak to us, is that right, is sort of

6   standard impeachment, so I guess I would want to think about it

7   a little more and see if there is any other case law.

8            MR. MUKASEY:  I agree with that.

9            THE COURT:  And I think also the additional time will

10   allow me to try to contact his lawyer.  But I think I'm okay

11   with going ahead and doing the allocution as to him and then

12   follow up with his lawyer.

13            MS. DONNER:  Okay.

14            MR. ANDREWS:  Sure.

15            THE COURT:  Okay.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

NB6KCOS4

1              (In open court)

2              THE COURT:  Members of the jury, I'm going to give you

3    an extra long lunch break because we have to deal with a couple

4    of things.

5              I'm going to let you go now.  We will resume promptly

6    at 2:00 o'clock.  We are making good progress in terms of

7    getting through the witnesses.  So I'm going to ask you to

8    please leave your notepads on your chairs.  You'll have an hour

9    and a half for lunch, but we will begin promptly at

10   2:00 o'clock.

11             Have a good lunch.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

NB6KCOS4

1              (Jury not present)

2              THE COURT:  Please be seated.

3              I guess I'd propose to go ahead and put Mr. Pagan on

4       the stand and ask him about the Fifth Amendment at this point.

5              Any objection to that?

6              MS. DEININGER:  No objection.

7              MR. MUKASEY:  May I have one moment?

8              (Pause)

9              MR. MUKASEY:  I'm told by Mr. Gainor that he heard

10      from Mr. DeCoste this morning, and he seems to be available.  I

11      want to give the Court all the knowledge that we have.

12             THE COURT:  Do you have a different number for him

13      than is on his office email?

14             MR. GAINOR:  I don't think so.  I think I just have

15      that number, that one number, for him.

16             THE COURT:  I guess the thing to do would be to have

17      me contact him in the robing room with counsel and the court

18      reporter present, or without counsel?

19             MR. MUKASEY:  You're the judge.  I don't see a problem

20      with doing it with all of us.

21             MR. GAINOR:  Neither do we.

22             THE COURT:  Do you think I should have a court

23      reporter there?

24             MR. MUKASEY:  I would think so.  They're the ones that

25      have to preserve this in case -- I would think we should have a

NB6KCOS4

```
 1      court reporter.

 2                  MR. GAINOR:  We would agree.

 3                  MS. DEININGER:  Yes, we would agree, it would be best

 4      if the court reporter is there.

 5                  THE COURT:  I'll contact him in the robing room with

 6      the court reporter present so there's a record of it, and, to

 7      be clear, I'm going to say we're at the point in the trial

 8      where I can allocute him regarding the Fifth Amendment, and

 9      that I understand that he has been called as a defense witness,

10      and my understanding is that he has been served in person with

11      a subpoena, to the extent there's any confusion about whether

12      he's been served has now been resolved with respect to the

13      subpoena for documents, and let him know that that's what's

14      about to happen, and if he wants to talk to his client, he

15      should, I guess.  Or if he wants to make some other

16      application, he can.

17                  All right?

18                  MS. DEININGER:  Okay.

19                  MR. ANDREWS:  Very good.

20                  THE COURT:  I'll do that now.

21                  (Continued on next page)

22

23

24

25
```

NB6KCOS4

1              (In the robing room)

2              THE COURT:  We're on the record now.

3          This is Judge Oetken, and I have contacted Lawyer

4    Christopher DeCoste by phone, and he returned the call.

5          I just wanted to touch base with you, Mr. DeCoste,

6    about Mr. Pagan because we're at the point in the trial when he

7    will be testifying shortly, and I was going to start with a

8    brief allocution regarding the Fifth Amendment, make sure he's

9    aware that he has a right under the Fifth Amendment not to give

10   any testimony that could be incriminating, and it's his

11   decision whether to testify, et cetera.  I wanted to make you

12   aware of that, and also let you know that on the subpoena

13   question, I earlier, in court, said I don't think he had been

14   served at least before Saturday, so we are where we are, and

15   then, as I understand it, the government has now seen him and

16   served him personally with the subpoena for documents.  So I

17   was going to proceed with the direct and then address the issue

18   of documents.

19             MR. DeCOSTE:  Okay.

20             THE COURT:  I wanted to make you aware of that and

21   just see if you wanted to make any applications or requests or

22   anything, or speak with your client.

23             MR. DeCOSTE:  With respect to the first issue, with

24   the allocution, no, I've spoken to my client.  If the Court --

25   I apologize, normally, in a situation like this, I'd be

NB6KCOS4

1    present, the decision was made to not have me there for this,

2    but if the Court needs me to be available by phone, I don't

3    know if that's something that the Court would do, I can do that

4    as well if I'm needed.

5            As to the second issue, given the fact that my client

6    has just now effectively been served, and given the fact that

7    he is there, in the courthouse, without his phone, I don't know

8    if the Court would allow an ore tenus motion to quash the

9    subpoena for the production of items because we can't comply

10   within that time frame.

11           THE COURT:  Well, I don't know about quashing it

12   entirely.  Can you comply in part?

13           MR. DeCOSTE:  Yes.  So it's wiser to make the motion,

14   and over the course of the weekend, I was able to work

15   diligently and get it together so that I can move very quickly

16   when your Honor gave the instruction.  And I do have a series

17   of items.  If your Honor wants me to specify, I can.  There are

18   some items that I can't get.  With my client being in the

19   courthouse and not having a phone, I was the one that was

20   communicating with his accountant to get supporting

21   documentation, to get his 2018 returns.  The response that I

22   got from Glen, who is the accountant, is that he's not back in

23   the office until tomorrow at 8:00 a.m.  Everything else, I do

24   have, and I can either produce it, I can also specify to the

25   Court what we have, whatever the Court decides.

NB6KCOS4

1          THE COURT:  Okay.  Would you be able to specify the

2     categories that you do have?

3          MR. DeCOSTE:  Yes.

4          One brief moment, your Honor?

5          THE COURT:  Sure.

6          (Pause)

7          MR. DeCOSTE:  There's a God — I'm going to fault the

8     government's subpoena — so number 1 was records sufficient to

9     show all sources of income and personal assets for the years of

10    2018 and 2019.  That was the one where I had, in my letter to

11    the Court, raised the vagueness issue.

12         THE COURT:  Yes.

13         MR. DeCOSTE:  We have done our best to pull any and

14    all bank statements that I could get that would show all

15    sources of income.  I have his Dade County Federal Credit Union

16    account for 2018 and 2019, all the statements.

17         I have statements for 2019 and 2020 for EPCV, which is

18    a -- that is his real estate investments.  I can't get 2018

19    because that is the Wells Fargo account that was shut down.

20         THE COURT:  Sorry, you said EPCV?

21         MR. DeCOSTE:  Yes.  E as in Eddie, P as in Pagan, C as

22    Chris, V as in valedictorian.

23         THE COURT:  You said you had which years?

24         MR. DeCOSTE:  2019 and 2020.

25         THE COURT:  Okay.

NB6KCOS4

1           MR. DeCOSTE:  We cannot get 2018 because the

2     government, it's my understanding, contacted Wells Fargo, Wells

3     Fargo shut down the account, and they have effectively blocked

4     Mr. Pagan out of the account.

5           THE COURT:  Okay.  Got it.

6           MR. DeCOSTE:  The third one is JP Morgan Chase.

7           THE COURT:  Okay.

8           MR. DeCOSTE:  And I have records for 2018 and 2019.

9           THE COURT:  Okay.

10          MR. DeCOSTE:  As for personal assets in those years,

11    I'm a bit confused.  Are they personal assets he's holding, are

12    they ones that he acquired?  The one that we know he acquired

13    was a car.  This is the Porsche that he purchased from

14    Mr. Costanzo.  I have the auto loan paperwork and a State

15    Farm -- it's titled "Policy Breakdown."

16          THE COURT:  "State Farm Policy Breakdown"?

17          MR. DeCOSTE:  Correct.

18          THE COURT:  Okay.

19          MR. DeCOSTE:  The auto loan is with USAA.

20          THE COURT:  USAA?  Okay.

21          MR. DeCOSTE:  The next item that I have is a

22    cryptocurrency purchase.  He bought, off memory, I believe —

23    it's opening here — .118 Bitcoin in 2017, so I consider that to

24    be an asset being held during that time, so we're going to be

25    sending that over.

NB6KCOS4

1          THE COURT:  Okay.

2          MR. DeCOSTE:  Going back quickly to the government

3    subpoena, number 2, complete tax returns, federal and state.

4    He has no state tax returns for Florida.  For yourself, for the

5    years of 2018 and 2019.  I am sending over 2019.  It includes

6    an amended tax return and the original tax return.  I cannot

7    get the 2018 tax return until the accountant returns.

8          THE COURT:  So you have 2019?

9          MR. DeCOSTE:  Correct.

10          THE COURT:  Okay.

11          MR. DeCOSTE:  Next, number 3, is documentation

12    justifying expenses claimed on the JEM tax return for year

13    2019.  This is things like a car expense, advertising,

14    insurance.  I can't get that from the accountant, and it's also

15    past the recommended retention period for the IRS.

16          I would note that certain items, like the car

17    expenses, are in the bank statements that were sent pursuant to

18    the JEM subpoena.

19          THE COURT:  Okay.  So you do not have additional tax

20    documents on that?

21          MR. DeCOSTE:  Things like receipts, emails, invoices,

22    we can't get them right now.  There is undoubtedly stuff that

23    shows the $3,000 of travel or the $975 of meals.  If the

24    accountants don't have them, or if Mr. Pagan can't do it from

25    there, and the accountant won't be in until tomorrow.  Some of

NB6KCOS4

1    it, however, is within the bank statements for JEM that shows

2    what the car expenses were, what the travel expenses were, but

3    I think the government was looking for things like receipts,

4    stuff that you would normally retain for three years, but these

5    taxes were filed three and a half years ago, and many times

6    somebody's not even going to retain them.

7            I apologize for the roundabout explanation.  The best

8    way to answer it is he doesn't know what he has, and he would

9    have needed time to be able to look.  So, at this point, we

10   don't have anything to provide.

11           THE COURT:  Okay.

12           Any others?

13           MR. DeCOSTE:  Yes.  Number 4 is records related to or

14   reflecting any criminal or regulatory investigation.  There are

15   none.

16           Number 5 is records sufficient to show educational and

17   work history.  We had already provided my client's resume

18   pursuant to the JEM subpoena, and I'm also sending over to them

19   a picture of his diploma, which is the one thing that we could

20   get with him being in New York, the one thing we could scrounge

21   up to support that.

22           THE COURT:  Okay.

23           MR. DeCOSTE:  Next is number 6, the foundational

24   documents for JEM Solutions, including articles of

25   incorporation.  That was already provided pursuant to the JEM

NB6KCOS4

1  subpoena, and there are no operating agreements or managing

2  agreements.

3        THE COURT:  Okay.

4        MR. DeCOSTE:  The last two items have to do -- well,

5  the first one is 2018-2019 records reflecting income payments,

6  fees, commissions, gifts, or any other form of remuneration

7  received by the defendants before you or any of the believed

8  coconspirators, and the answer to that is no.

9        Then number 8 has to do with any and all records

10  regarding gifts, money transfers, from JEM to Mr. Costanzo,

11  Mr. Recio, or the other people that are involved.  The answers

12  to all of that are contained within either the bank statements

13  that were provided pursuant to this subpoena or what was

14  provided pursuant to the JEM subpoena three years ago.

15        THE COURT:  Okay.

16        MR. DeCOSTE:  Then the last item, the biggest one, are

17  communications between January 2018 and now.  And I have -- and

18  I can sum this up:  For the list of people of David Macey, John

19  Costanzo, that John Costanzo and Mr. Macey, John Costanzo and

20  Susana Rueda, Luis Guerra and Susana Rueda, there are a series

21  of WhatsApp messages and iMessages that pretty much go back to

22  January of 2018 and go up to, I want to say, the middle of

23  2020.  That is the most -- that is the biggest document that

24  we're sending over, it's probably a couple of hundred pages.

25  My understanding, though, is that the government and the

NB6KCOS4

1    defendants already have these.

2              THE COURT:  So that covers it?

3              MR. DeCOSTE:  That's everything that I'm providing

4    over.

5              THE COURT:  Okay.

6              Are you able to provide -- well, let me talk to them

7    and just give them where things stand.

8              Are you able to provide those electronically?

9              MR. DeCOSTE:  Yes.  They had provided me access to a

10   portal before to give to them.  I can either do it through that

11   or I can link them to my office's Dropbox.

12             THE COURT:  Okay, great.  I will let them know this,

13   and then have them follow up with you.

14             MR. DeCOSTE:  Understood.  I will stand by and make

15   myself available in the afternoon for you, your Honor.

16             THE COURT:  Great.  Thank you so much.

17             MR. DeCOSTE:  Thank you.

18             THE COURT:  All right.  Bye-bye.

19             (Continued on next page)

20

21

22

23

24

25

NB6KCOS4

1     (In open court; jury not present)

2     THE COURT:  Should we wait?

3     MR. MUKASEY:  If your Honor wants to go on the record

4 and would excuse the defendants, since this is, I think -- I

5 think they're in the cafeteria.

6     THE COURT:  Oh, okay.

7     MR. MUKASEY:  This is largely a legal discussion, I

8 think.

9     THE COURT:  If you're okay with it, it's okay.

10     MR. GAINOR:  Yes, we are, your Honor.

11     THE COURT:  I did speak with Mr. DeCoste, and there's

12 a transcript of it, which you can see.

13    On the Fifth Amendment allocution issue, he said,

14 fine, doesn't have a problem with it.  The decision was made

15 not to have him be here, but he's available to speak with the

16 Court, with his client, and he didn't have an issue with my

17 doing the allocution of Mr. Pagan regarding the Fifth

18 Amendment.

19    And then on the issue of the subpoena, he said

20 something about an oral motion to quash given the timing.  I

21 indicated that it wasn't necessary to resolve whether it had

22 been properly served on Saturday because it appears the

23 government has served him personally at this point, so what

24 have you got, what can you produce.  He proceeded to say I'm

25 prepared to produce a number of things, and he gave me the

NB6KCOS4

1    categories of things.  I guess the question is whether these

2    are things that you already have or not.

3          The transcript reflects — and this is what I took

4    notes on — first, 2018 and 2019 bank statements from Dade

5    County Federal Credit Union.  This is what he is prepared to

6    provide electronically.

7          Two, an EPCV account, he has 2019 and 2020 records,

8    but, as I understand it, he could not get 2018.

9          Third, a JP Morgan Chase account, he has 2018 and 2019

10   records.

11         Fourth, Porsche auto loan paperwork from USAA as well

12   as a State Farm policy breakdown.

13         Next, a cryptocurrency Bitcoin purchase from 2017 of

14   .118 Bitcoin.

15         And then the 2019 tax return.  He is not able to get

16   the 2018 tax return because the accountant is away and will not

17   be returning until tomorrow.

18         And then next was J-E-M, JEM, expenses, documentation,

19   he's unable to get right now, to the extent that that is, I

20   believe, talking about specific receipts and things that might

21   be kept.  He's unable to get those right away.

22         Next was the request for criminal and regulatory

23   investigation information.  He said there's nothing in that

24   category.

25         Next was educational and work history.  He said he

NB6KCOS4

1  already provided a resume, and he is sending a diploma.

2          Next was JEM foundational documents.  He had provided

3  the main document, I guess, registering or incorporating JEM,

4  and there were no operating or managing agreements.

5          And then last was the request for communications,

6  January 2018 to present, with certain individuals.  He said

7  there are a number of WhatsApp and iMessages.

8          MR. SWETT:  Your Honor, I think the items that we

9  would be interested in -- many of these, we do have.  The EPCV

10  accounts information is something that we do not have, and so

11  that, certainly, we'd like a copy of.

12          The Porsche auto loan paperwork and the State Farm

13  policy documents, we think are responsive, and we don't have.

14          The Bitcoin purchase, I think we would like to see

15  that.

16          The 2019 tax returns.

17          And then whatever WhatsApp and iMessage communications

18  he has.

19          And, just to be clear, these are things that he has

20  and is ready to produce electronically?

21          THE COURT:  Yes, that's what he indicated.

22          MR. SWETT:  Okay.

23          That's it.

24          THE COURT:  I think what I said is the government

25  would follow up with him, and my understanding is he's prepared

NB6KCOS4

1    to produce the ones that he does have now.

2         MR. ANDREWS:  Great.

3         THE COURT:  I think if you ask for that subset, I

4    think he's ready to provide them.

5         MR. SWETT:  Thank you.

6         THE COURT:  Is Mr. Pagan available for allocution?

7         MR. SWETT:  I believe he's in the hallway.

8         MR. MUKASEY:  May we have one moment, Judge?

9         THE COURT:  Sure.

10         (Pause)

11         MR. MUKASEY:  Judge, just a procedural question:  Is

12    the idea that Pagan and his lawyer would try to produce this

13    stuff to the government and to us — because we don't have it,

14    we don't have some of it — before he testifies or sometime next

15    month?

16         THE COURT:  No, I think today.

17         MR. MUKASEY:  Because we don't want to put him on the

18    stand if he's going to be subject to cross with documents that

19    we don't have.

20         MR. SWETT:  This is an "if, as, and when" subpoena, so

21    this is when we can get them.  As soon as we get electronic

22    copies, we'll turn them over.  So I'm emailing with the lawyer

23    right now, and once we have them, we'll turn them over.

24         MR. MUKASEY:  If we look at these documents, we may

25    reassess whether or not we want to call him, so I think it's in

NB6KCOS4

1     everyone's interests to review the documents.

2             THE COURT:  I don't think that's how it works.  You

3     don't really have a right to them until after the direct, as I

4     understand it.

5             MR. MUKASEY:  Well, we still would have to reassess

6     whether we're going to call him knowing there are documents

7     coming in that we haven't seen.

8             MR. ANDREWS:  It sounds like defense counsel should

9     confer, then.

10            MR. MUKASEY:  Which is what we would ask to do.

11            THE COURT:  You should probably talk to his lawyer.

12            MR. MUKASEY:  Yes, among other things.

13            THE COURT:  Yes.

14            MR. ANDREWS:  Judge, might it speed up things -- sorry

15    to keep asking things of you.  I'm not sure how your

16    conversation with him ended, but what would not be ideal is if

17    we email him, and then he goes to lunch and sends it to us

18    afterwards.  Did you express, once the government tells you to

19    produce these things, you have to produce these things more

20    immediately, or might it be more helpful if you call him back

21    and say, hey, I've conferred with the parties, we really want

22    you to produce these things ASAP?

23            THE COURT:  I'm not sure exactly how I left it, but my

24    understanding was he said he was prepared to produce them.

25            MR. ANDREWS:  It might speed things up if you ask him

NB6KCOS4

1     to produce them quickly.

2              THE COURT:  Yes, I can do that.

3              MS. DEININGER:  Should we go ahead -- since counsel

4     wants time to confer, should we go ahead and break for lunch,

5     then we can try and use that to get these records?

6              THE COURT:  Yes, why don't we do that.

7              MS. DEININGER:  Okay.

8              THE COURT:  We'll see you at 2:00 o'clock.  Thank you.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nb62Cos5

```
1                      A F T E R N O O N    S E S S I O N

2                                 2:30 p.m.

3              (Jury not present)

4              THE COURT:  Be seated.

5              All right.  Where do things stand.

6              MS. DEININGER:  So for the record, we did receive

7    records from Chris DeCoste, Pagan's lawyer, over the lunch

8    break.  We have produced electronic copies of those via our

9    shared file transfer program.  I think we were able to produce

10   those at 2 p.m. to defense counsel.  We are working on trying

11   to make hard copies available, but that printing is still

12   ongoing.

13             THE COURT:  Okay.

14             MR. MUKASEY:  Sorry.  We are working on a stipulation

15   to speed up some of the presentation.

16             THE COURT:  Okay.  So the defense is still calling

17   Mr. Pagan?

18             MR. MUKASEY:  We are.

19             THE COURT:  Are there any defense witnesses after

20   Mr. Pagan?

21             MR. MUKASEY:  Your guess is as good as mine.  No.

22   Doubtful, highly doubtful, virtually impossible, but --

23             THE COURT:  Okay.

24             MR. MUKASEY:  I don't want to foreclose it, but I

25   doubt it.
```

Nb62Cos5

1        THE COURT:  All right.  Are we ready for the

2   allocution of Mr. Pagan?  Then I will bring the jury out and we

3   will start the direct, is that right?

4        MR. MUKASEY:  Yes.

5        THE COURT:  Okay.

6        (Witness present)

7        THE COURT:  Good afternoon.

8        THE WITNESS:  Good afternoon, Judge.

9        THE COURT:  I'm Judge Oetken.  You are Mr. Pagan,

10  right?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  Before you testify, I just want to advise

13  you that you have the right, under the Fifth Amendment to the

14  United States Constitution, not to give any testimony if you

15  have a well-founded fear that the testimony may tend to

16  incriminate you of a crime, whether federal or state crime.

17       Do you understand that?

18       THE WITNESS:  Yes, Judge.

19       THE COURT:  Of course it's your decision, and your

20  decision alone, whether to testify, and I am not in any way

21  suggesting that you should or should not testify.  I just want

22  to make sure you fully understand your rights and you have had

23  a chance to discuss them with your attorney.

24       Have you had a chance to talk to your lawyer about the

25  decision whether to testify?

Nb62Cos5

1            THE WITNESS:  Yes, your Honor.

2            THE COURT:  And do you need further time to speak with

3    your lawyer?

4            THE WITNESS:  No, your Honor.

5            THE COURT:  All right.  And do you wish to waive your

6    right not to incriminate yourself and testify in this case?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  And have you made that decision knowingly

9    and voluntarily?

10            THE WITNESS:  Yes, your Honor.

11            THE COURT:  And are you satisfied with your attorney's

12    representation of you in connection with this matter?

13            THE WITNESS:  Yes, your Honor.

14            THE COURT:  All right.  May I bring the jury out?

15            COUNSEL:  Yes, your Honor.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

Nb62Cos5

1            (Jury present)

2            THE COURT:  Please be seated.  Welcome back, folks.

3            MR. MUKASEY:  Judge, before we call our next witness

4    may I read a stipulation into the record?

5            THE COURT:  Yes.

6            MR. MUKASEY:  It is hereby stipulated between the

7    parties, parties hereby agree that:

8            Government Exhibit 507-2 is a corrected copy of

9    Government Exhibit 507 correcting the attributions for the

10   messages admitted pursuant to the stipulation of the parties in

11   evidence as Government Exhibit S3.

12           DX  JC 9358 is a true and accurate visual depiction of

13   an excerpt of text messages between John Costanzo, Jr. and

14   Edwin Pagan.

15           This stipulation is admissible as Government Exhibit

16   S11 signed by the parties, and we move the stipulation into

17   evidence.

18           THE COURT:  S11 is admitted.

19           (Government's Exhibit S11 received in evidence)

20           THE COURT:  Defense, call your witness.

21           MR. MUKASEY:  Defense calls Edwin Pagan.

22           THE COURT:  All right.  Mr. Pagan is in the witness

23   stand, and Mr. Hampton will swear him in.

24    EDWIN PAGAN III,

25       called as a witness by the defendant,

Nb62Cos5                          Pagan – Direct

1          having been duly sworn, testified as follows:

2              THE COURT:  Ms. Guaba.

3    DIRECT EXAMINATION

4    BY MS. GUABA:

5    Q.  Good afternoon, Officer Pagan.

6    A.  Good afternoon.

7    Q.  Officer Pagan, did you participated in a criminal

8    conspiracy with John Costanzo, Jr.?

9    A.  No.

10   Q.  Did you participate in a criminal conspiracy with Manny

11   Recio?

12   A.  No.

13   Q.  Did you participate in a criminal conspiracy with John and

14   his father?

15   A.  No.

16   Q.  Did you participate in a criminal conspiracy with John and

17   David Macey?

18   A.  No.

19   Q.  Did you participate in a conspiracy with John and Luis

20   Guerra?

21   A.  No.

22   Q.  Did you conspire to funnel bribe payments from Manny Recio

23   to John Costanzo, Jr.?

24   A.  No.

25   Q.  Did you conspire to funnel bribe payments from David Macey

Nb62Cos5                          Pagan - Direct

1    to John Costanzo, Jr.?

2    A.  No.

3    Q.  And did you conspire to funnel bribe payments from Luis

4    Guerra to John Costanzo, Jr.?

5    A.  No.

6    Q.  Officer Pagan, can you please take a look around the

7    courtroom.  Do you recognize anyone in this courtroom here

8    today?

9    A.  Yes.

10   Q.  Who do you recognize?

11   A.  John and Manny.

12   Q.  Would you please identify John by an article of clothing?

13   A.  John's wearing a black-blue suit, white shirt, purple tie.

14   Manny is wearing a gray suit, a plaid tie.

15           MR. MUKASEY:  Indicating the defendant.

16           THE COURT:  The witness identified each of the

17   defendants.

18   BY MS. GUABA:

19   Q.  Sal, can you please pull up previously admitted Exhibit 5,

20   Government Exhibit 5.

21           Officer Pagan, do you recognize this photo?

22   A.  Yes.

23   Q.  Where is this photo from?

24   A.  It's my driver's license photo.

25   Q.  You appear to look different today from this photo, why is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Nb62Cos5                      Pagan - Direct

1    that?

2    A.  I was a narcotics detective for 16 years.  That was the

3    look.  The clean shaven look didn't work.  I am now in uniform,

4    so we have to be clean shaven.

5    Q.  What kind of work were you doing when you looked like this?

6    A.  I did a lot of undercover work, surveillance, etc.

7    Q.  Thank you, Sal.  You could please take this down.

8         Officer Pagan, how old are you?

9    A.  51.

10   Q.  Where do you live?

11   A.  Miami, Florida.

12   Q.  What other real estate properties do you have, if any?

13   A.  I have two duplexes and I have an apartment where my

14   parents -- where my father lives in and I rent an apartment.

15   Q.  Where do you currently work?

16   A.  Coral Gables Police.

17   Q.  What sources of income do you have other than Coral Gables

18   Police, if any?

19   A.  My company JEM Solutions and also the rental properties

20   that I own.

21   Q.  Can you please walk the jury through your work history

22   starting from after college?

23   A.  While I was in college and after college I worked at a

24   bank.  When I graduated, I applied to the police department and

25   in 1997 I was hired.

1  Q.  Did there come a time that you were assigned to the DEA?

2  A.  Yes.

3  Q.  How long were you assigned to the DEA?

4  A.  For about ten years.

5  Q.  What position were you assigned to?

6  A.  I was a task force officer.

7  Q.  What is a task force officer?

8  A.  You are still a detective with your department, but you

9  were placed in the DEA office to assist them in their

10  investigations.

11  Q.  How did you get assigned to the DEA as a task force

12  officer?

13  A.  I don't know.  In like 2008 or '9, John asked me if I

14  wanted to be a task force officer with DEA, to help them out on

15  a case, and I was interested, so that began the process.

16  Q.  When you were working as both a DEA task force officer and

17  in the Coral Gables Police Department, what was your schedule

18  like?

19  A.  I worked 10 to 6.  I worked basically half the time in

20  Coral Gables and half the time as a task force officer.

21  Q.  Did you work any overtime?

22  A.  Yes.

23  Q.  How often?

24  A.  Very often averaged between 50 and 60 hours a week.

25  Q.  Mr. Pagan, when did you first meet John Costanzo, Jr.?

Nb62Cos5                              Pagan – Direct

1    A.  In 1997 in the police academy.

2    Q.  Can you please describe meeting John.

3    A.  If I can describe what?

4    Q.  Can you please describe meeting John.

5    A.  Sure.  I met him in the police academy and we had similar

6    interests working out, fitness.  We became friends.  A small

7    group of us started to hang out and we did study groups, and we

8    would go to his parents' house and study, work out, and

9    sometimes go upstairs and eat at his parents' house.  So that's

10   how the relationship started.

11   Q.  And have you remained friends with John since the police

12   academy?

13   A.  Yes.

14   Q.  How would you describe your friendship?

15   A.  He is my best friend.  He is like family to me.  After the

16   academy, when we graduated, he went to a small, small police

17   department.  We remained friends.  We still hang out, go out on

18   weekends, work out together.  When he went to Secret Service,

19   he introduced me to some of his friends, and I became friends

20   with them.  We would all go out together, hang out together,

21   work out together.  And in 2009, when I became a task force

22   officer, we started doing work together, traveling, doing

23   operations on the street.  I did a lot of undercover.  He was

24   like one of my security guys.  So when you work in that

25   environment, you bond with the people you work with.

1        2011 I got married.  He was my best man at the

2  wedding.  2014 I got divorced.  He helped me out there.

3        And we are still -- you know, see each other a lot,

4  hang out a lot, go out a lot, work out a lot.

5  Q.  And Sal, can you please pull up Government Exhibit 104,

6  which is already in evidence.

7        Mr. Pagan, do you recognize this document?

8  A.  Yes.

9  Q.  Can you please describe to the jury what this document is.

10  A.  It's a questionnaire when you apply for a position with

11  DEA.  It does like your background, other printed questions.

12  Q.  Who was this questionnaire for, if you could just look at

13  the top right?

14  A.  John Costanzo.

15  Q.  Sal, can we please go to page 14.

16        Mr. Pagan, can you please read the title under section

17  16.

18  A.  "People who know you well."

19  Q.  And Sal, if we can please go to the next page.

20        Mr. Pagan, can you please read who is listed as the

21  second person that knows John well?

22  A.  That would be myself.

23  Q.  What are the dates that are listed under "dates known"?

24  A.  July of '97 to present.

25  Q.  And Sal, if we can please pull up Government Exhibit 116

1    which is already in evidence.

2            Mr. Pagan, do you recognize this document?

3    A.  Yes.

4    Q.  Do you remember filling this document out?

5    A.  Yes.

6    Q.  What is this document for?

7    A.  The questionnaire and background check when you apply to

8    DEA.

9    Q.  Who is this questionnaire for?

10   A.  Myself.

11   Q.  And Sal, can we please go to page 10.

12            And Mr. Pagan, if you can read the title under section

13   13.  If you can please read the title under section 13.

14   A.  "People who know you well."

15   Q.  If we can go to the next page or just scroll, actually,

16   down to the bottom.

17            Can you please identify the second person that is

18   identified as someone who knows you well?

19   A.  John Costanzo.

20   Q.  And what are the dates listed under dates known?

21   A.  June '97 to present.

22   Q.  Mr. Pagan, do you see the first entry under "people who

23   know you well"?

24   A.  Yes.

25   Q.  Who is listed?

Nb62Cos5                    Pagan - Direct

1    A.  Frank Prieto.

2    Q.  How long have you known Mr. Prieto?

3    A.  September of 1980.

4    Q.  How do you know him?

5    A.  We went to school together, junior high school, we went to

6    high school together, we worked together, we went to college

7    together.  He went to law school.  I worked for the City of

8    Coral Gables.  He went to University of Miami, so I would

9    always see him studying and pass by.

10   Q.  Are you still friends with Mr. Prieto?

11   A.  Yes.

12   Q.  And what does he do for a living?

13   A.  He is a criminal defense attorney.

14   Q.  Where?

15   A.  Miami, Florida.

16   Q.  We can take this down.

17           Mr. Pagan, how often do you see John?

18   A.  At least five days a week.

19   Q.  Why do you see him five days a week?

20   A.  He lives right by the police department, and when I go to

21   work, I drop off my dog at his house and I go to work; and

22   then, when I get a break, I go feed the dog, walk the dog, and

23   if I can't make it, he will do it for me.

24   Q.  And when was the last time you spoke to John?

25   A.  Last week.

1    Q.  Do you know John's family?

2    A.  Yes.

3    Q.  Have you developed a relationship with them?

4    A.  I first met them while I was in the academy in '97 because

5    we would go eat dinner once or twice a week and then, from

6    there, as I became close to John, I was invited to family

7    dinners, holiday dinners.

8            I then met his sister, his brother-in-law, the nieces

9    and nephew.  I have known them since they were small and

10   became, you know, friends with them.

11           And then through family get-togethers and dinners and

12   stuff like that, we became pretty close.  I also played golf

13   with his father.

14   Q.  And what, if anything, do you know about his father's

15   career?

16   A.  He is retired DEA agent.

17   Q.  Do you know what he did after he retired?

18   A.  Yes.

19   Q.  What did he do?

20   A.  He opened up a security firm.

21   Q.  Do you know the name of the firm?

22   A.  EBCO.

23   Q.  Have you ever worked for EBCO?

24   A.  No.

25   Q.  Did there come a time when you met Manny Recio?

Nb62Cos5                          Pagan - Direct

1   A.  Yes.

2   Q.  When did you meet Mr. Recio?

3   A.  2009, when I was trying to be a task force officer, he was

4   the group supervisor of the group in Homestead.  So John

5   introduced me to him, and then we became friends and he went to

6   my department and asked if I can be assigned there.

7   Q.  And have you remained friends with Mr. Recio?

8   A.  Yes.

9   Q.  Describe your friendship with Mr. Recio.

10  A.  I consider him a good friend.  We, you know, talk a lot

11  about baseball and sports, and I met his son when he was

12  little; and his son is big now, is a big baseball player.  We

13  have done work together.  He was my group supervisor in

14  Homestead for a couple of years.  And then when I went to

15  Washington, he was one of the bigger bosses there.

16  Q.  When was the last time you spoke to Mr. Recio?

17  A.  Last week sometime.

18  Q.  Did there come a time when you met David Macey?

19  A.  Yes.

20  Q.  How do you know Mr. Macey?

21  A.  I met him through John.

22  Q.  Describe your relationship with Mr. Macey.

23  A.  I consider him a friend.  We used to go to his house for

24  dinners and barbecues and watch football.  I became close to

25  his kids.  I began to train his children, became friends with

Nb62Cos5                          Pagan - Direct

1   his wife.  His wife invited us to dinner every so often.

2   Q.  How did you train his children?

3   A.  I trained his older son in fighting.  He wanted me to

4   teach him how to fight.  But that didn't last very long.  And

5   then his younger son, who is autistic, would always come in

6   and watch and then I started to train his younger son.

7   Q.  And when was the last time you spoke with Mr. Macey?

8   A.  Couple months ago.

9   Q.  Do you have any personal knowledge of John leaking

10  confidential DEA information to David Macey?

11  A.  No.

12  Q.  Did there come a time when you met Luis Guerra?

13  A.  Yes.

14  Q.  How do you know Mr. Guerra?

15  A.  Again through John.  There was a short period of time

16  where all three of us lived in the same building.

17  Q.  Can you describe your relationship with Mr. Guerra?

18  A.  Friends, but I don't -- we don't really cross paths.  He

19  travels a lot and he got married and we used to hang out once

20  in a blue moon, but ever since he got married, I haven't seen

21  him much.

22  Q.  When was the last time you spoke with Mr. Guerra?

23  A.  A couple years ago maybe.

24  Q.  Do you have any personal knowledge of John leaking

25  confidential DEA information to Luis Guerra?

1    A.  No.

2    Q.  Officer Pagan, let me direct your attention to

3    January-February of 2019.  What, if any, financial transaction

4    did you engage in at that time?

5    A.  Can you be more specific?  I'm sorry.

6    Q.  Did there come a time when you invested money in a property

7    that was purchased by John Costanzo, Jr.?

8    A.  Yes.

9    Q.  And are you familiar with the property located at 261

10   Navarre Avenue?

11   A.  Yes.

12   Q.  When did you first become familiar with that property?

13   A.  I believe it was towards the end of 2018, John had been

14   looking for a property to buy.  He was tired of renting.  So

15   his girlfriend at the time was a realtor, and she knew the area

16   of where he wanted to buy, and they found a townhouse in the

17   City of Coral Gables.

18   Q.  And when did you first see that townhouse?

19   A.  I believe it was towards the end of '18.  I'm not sure.

20   Q.  And Sal, if we can please put up Government Exhibit 6,

21   which is already in evidence.

22        Officer Pagan, is this a photo of the condo John ended

23   up buying in early 2019?

24   A.  No.

25   Q.  What is this a photo of?

1  A.  That's a photo of the townhouses that face south.  His is

2  not in that row.  His is on the north side.

3  Q.  Is this the building where John lives?

4  A.  Yes.

5  Q.  And is his apartment depicted in this picture?

6  A.  No.

7  Q.  Thank you.

8       And Sal, if you can please pull up Government Exhibit

9  401B which is already in evidence.

10       Officer Pagan, do you recognize this document?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's a receipt, withdrawal receipt from the Dade County

14  Credit Union.

15  Q.  Is that your name listed on the account?

16  A.  Yes.

17  Q.  And do you see an account number with the last four digits

18  shown?

19  A.  Yes.

20  Q.  Do those numbers correspond with your bank account at Dade

21  County Federal Credit Union?

22  A.  Yes.

23  Q.  What is the amount that was withdrawn on this receipt?

24  A.  $50,003.

25  Q.  What is the previous balance on the receipt?

Nb62Cos5                          Pagan - Direct

1    A.   $113,574.38.

2    Q.   At the time that you made this withdrawal, what was the

3    source of the $113,574.38?

4    A.   This account, I opened up a savings account when I became

5    a police officer, so it was about 26 years old.  I did direct

6    debits from my paycheck into that account since, about 25, 26

7    years.  Any time I get money back from the IRS, it's directly

8    debited into that account.  If I get -- sometimes when my

9    properties have an insurance claim, once I fix what needs to

10   be fixed, if there is any money left over, I will put it in

11   there.  And sometimes I put rental income in there.

12   Q.   And did that account have any money you received from Manny

13   Recio?

14   A.   No.

15   Q.   Whose money was in that account?

16   A.   Mine.

17   Q.   Was the money in your account taxed?

18   A.   Yes.

19   Q.   How was it taxed?

20   A.   From my paycheck.  My paycheck is taxed and then some money

21   would go into that account automatically.

22   Q.   And Sal, can we please go to the next page.

23        Did there come a time when you made out a cashier's

24   check from this account for the benefit of John Costanzo?

25   A.   Yes.

Nb62Cos5                              Pagan - Direct

1   Q.  Which John Costanzo?

2   A.  Senior.

3   Q.  Why senior?

4   A.  There was talks of -- when John first saw the house, I

5   liked the house, and there was another townhouse that his

6   girlfriend at the time told me there was another house in the

7   development that was for sale, so I was interested in

8   purchasing it.  By the time I got to see it, it was already

9   under contract, so I took my money to invest in the house.

10  Q.  And did you review any mortgage documents relating to the

11  purchase of the condo?

12  A.  No.

13  Q.  And is there any formal paperwork that memorializes your

14  understanding with John about you paying his father?

15  A.  No.

16  Q.  Why not?

17  A.  Because he is my best friend, I didn't think I would need a

18  contract or any type of agreement.

19  Q.  And did Manny Recio give you any money to reimburse you for

20  that $50,000?

21  A.  No.

22  Q.  And did David Macey give you any money to reimburse you for

23  that $50,000?

24  A.  No.

25  Q.  And did Luis Guerra give you any money to reimburse you for

1    that $50,000?

2    A.  No.

3    Q.  Did anyone give you any money to reimburse you for that

4    $50,000?

5    A.  No.

6    Q.  What would your position have been if John doesn't pay you

7    back ever the $50,000?

8    A.  I'm sure there would have been a good reason.  It's fine.

9    It's an investment.  Sometimes you don't make any money off

10   your investment.

11   Q.  And why would it be fine if John didn't do it?

12   A.  Because he is still one of my best friends, so I know he

13   didn't do it on purpose.

14   Q.  Okay.  Sal, if we can please take that down.

15          Officer Pagan, have you heard of a company called JEM

16   Solutions?

17   A.  Yes.

18   Q.  What is JEM Solutions?

19   A.  A company that opened up in January of 2019.

20   Q.  What was the company for?

21   A.  At first it was going to be a consulting firm for athletes,

22   someone who would be professional, whether it was basketball or

23   baseball.  We were going to provide services to help them with

24   security, finance, social media, etc.  John had a good friend

25   who was a personal trainer that trained high-end athletes, and

1   one of those athletes wanted to open up a firm, and we were

2   going to do the work for him.

3   Q.   And why did you call it JEM Solutions?

4   A.   Because John, Manny, and I had this -- several

5   conversations, once everyone retired, to have a company

6   together.

7   Q.   So what does the J-E-M in JEM stand for?

8   A.   John, Eddie, and Manny.

9   Q.   And how did you see John's role, if any, in JEM Solutions?

10  A.   Well, he didn't really have a role.  I think in 2019 he

11  was -- he knew his time in D.C. was coming up, so he was

12  talking about retirement and he wasn't sure if he was going to

13  go to D.C., so . . .

14  Q.   So when did you anticipate that John would join JEM

15  Solutions?

16  A.   When he retired.

17  Q.   And what role did he have in 2019?

18  A.   He didn't have a role.

19  Q.   Sal, if you can please pull up GX 507, which is already in

20  evidence.  My apologies, Government Exhibit 502.  Take it off.

21  It's 502.  The articles of incorporation.  Sorry.

22          Officer Pagan, can you please review the document.

23  What is this document?

24  A.   The articles of incorporation for JEM Solutions.

25  Q.   And when was JEM Solutions incorporated?

1    A.   January 31, 2019.

2    Q.   Why did you incorporate JEM Solutions in January of 2019?

3    A.   I had already begun to teach classes, whether it was

4    shooting or combaters classes, so I thought it was time to

5    finally start opening up the company, the training side of the

6    company that I wanted to do.

7    Q.   Can you clarify what you mean by training?

8    A.   Yes.  I teach other -- I recertify certain officers in OC

9    spray, baton, CPR, defensive tactics.  I used to do

10   recertifications for taser also.  I do seminars for police

11   jiu-jitsu.  I teach at my gym twice a week.  I teach shooting.

12   I teach room clearing.  I have been in S.W.A.T. for 23 years.

13   I've been practicing jiu-jitsu for 16 years.  I teach entries,

14   shield work.

15   Q.   And who are the registered agents of JEM Solutions?

16   A.   Just me.

17   Q.   And who are the officers and directors of JEM Solutions?

18   A.   Just me.

19   Q.   Does JEM Solutions have any employees?

20   A.   When I am not teaching a class, I hire contractors to help

21   me.

22   Q.   Is John Costanzo one of those contractors?

23   A.   No.

24   Q.   Is John Costanzo an employee of JEM Solutions?

25   A.   No.

Nb62Cos5                        Pagan - Direct

1    Q.  Was John Costanzo ever paid by JEM Solutions a salary?

2    A.  No.

3    Q.  Was John Costanzo ever paid a commission by JEM Solutions?

4    A.  No.

5    Q.  Was he ever paid any wages by JEM Solutions?

6    A.  No.

7    Q.  Mr. Pagan, how informal were the operations of JEM

8    Solutions in January-February of 2019?

9    A.  All I had was the company was opened, I started to

10   purchase equipment that I needed to teach classes, but I wasn't

11   really up and running.

12   Q.  And was JEM Solutions created to pay bribes to John

13   Costanzo, Jr.?

14   A.  No.

15   Q.  When you founded JEM Solutions, were you still working

16   full-time at Coral Gables PD?

17   A.  Yes.

18   Q.  And how much time were you devoting to JEM when you formed

19   it?

20   A.  Not a lot.  I was teaching maybe once a week.

21   Q.  And does the Coral Gables Police Department have a policy

22   with regards to outside employment?

23   A.  Yes.

24   Q.  Sal, you can please pull up JC 1040 only for the witness,

25   counsel, and the Court.

Nb62Cos5                              Pagan - Direct

1              Officer Pagan, do you recognize this document?

2    A.   Yes.

3    Q.   Without reading anything on it, what is this document?

4    A.   This is a form you have to fill out.  If you have outside

5    employment, it has to be approved by the chief and by human

6    resources.

7    Q.   And how do you recognize this form?

8    A.   I have to fill one out for JEM Solutions every year.

9              MS. GUABA:  The defense offers JC 1040 into evidence.

10             MR. ANDREWS:  Judge, may we have a sidebar?

11             THE COURT:  Yes.

12             MR. ANDREWS:  Thank you.

13             (Continued on next page)

Nb62Cos5                    Pagan - Direct

1          (At the sidebar)

2          MR. ANDREWS:  So, Judge, what they are about to

3     introduce is a document filed by the witness with Coral Gables

4     Police Department.  I imagine the argument is going to be that

5     this is a business record.  The business record rule applies to

6     records created by a business.  So, for example, if I sent an

7     e-mail as an employee to the Coral Gables Police Department,

8     that doesn't necessarily qualify as a business record because

9     that's just my self-serving hearsay.  What's on this document

10    is hearsay stating what the purpose of JEM Solutions was, and

11    it's clearly being offered for its truth because they are

12    trying to say that this is the purpose and you can take this

13    statement for its truth.  They can elicit that he filed the

14    documents; however, I don't think that they can get in the

15    hearsay just by virtue of the fact that he decided to submit it

16    to Coral Gables Police Department.

17         MR. MUKASEY:  But if the Coral Gables Police

18    Department requests the information and keeps it on file, then

19    they keep it in the ordinary course of business and it's filled

20    out at or about the time of the events at issue by a person

21    with knowledge, so the Coral Gables Police Department treats it

22    as a business record.  I don't see why the Court shouldn't --

23         MR. ANDREWS:  But then anything submitted to any type

24    of government entity -- or any type of entity would qualify as

25    a business record.  The idea is it is maintained by the

Nb62Cos5                          Pagan - Direct

 1    business, not that it is just sent there by somebody.

 2              MR. MUKASEY:  It is maintained by the business, not

 3    fully created by the business, maintained by the business is

 4    the language.

 5              THE COURT:  So is the objection that we don't have

 6    anybody confirming that they maintained it in the ordinary

 7    course of business?

 8              MR. ANDREWS:  No, we don't know the circumstances in

 9    which this was created, the due diligence that was gone into.

10    At this point we would not be -- we -- they have not

11    established a basis for this business record.  We don't believe

12    that it qualifies.  They can elicit testimony through the

13    witness, but they can't put in the record.

14              MS. GUABA:  You received this record from the Coral

15    Gables Police Department with a certification from the

16    custodian?

17              MR. ANDREWS:  We received the record, however, we

18    don't know the circumstances in which this particular record

19    was created.

20              MR. MUKASEY:  We got it from them, and they are the

21    ones who got the business record.

22              MR. ANDREWS:  Because we sent the subpoena to

23    Coral Gables.  But the point is, this specific record doesn't

24    qualify as a business record.  It doesn't matter if

25    Coral Gables was sent a custodian of record form saying

Nb62Cos5                        Pagan - Direct

1    generally these are custodian of record forms.  Anyone who ever

2    sent a subpoena, that's what any entity does.  There are

3    limitations to what extent you get self-serving hearsay just by

4    virtue of the fact that you submitted to a company.  So, for

5    example, if I mail AT&T and say my company X, Y, and Z does A,

6    B, and C, it doesn't become a business record just because a

7    telecom company maintains it in the ordinary course.

8           THE COURT:  But if it's a form that's filled out, if

9    it's a standard form that he fills out, then I think that's

10   probably different.  And I'm not sure -- I think you could get

11   a foundation for business record by saying this was a form that

12   was filled out.

13          MS. GUABA:  Which is what I asked.

14          MR. MUKASEY:  Submitted in the ordinary course of

15   business for people who wanted to get outside employment to the

16   Coral Gables Police Department.

17          MS. GUABA:  It's no different than the FS85 that was

18   already in evidence for Mr. Pagan that he filled out for his

19   national security clearance and submits to the DEA.  There is

20   yet another form that he fills out for his employment to the

21   Coral Gables Police Department and submits.

22          THE COURT:  I will allow it as a business record.

23          MR. ANDREWS:  Okay.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            (In open court)

2    BY MS. GUABA:

3    Q.  Mr. Chan, can you please pull up JC 1040.

4            THE COURT:  JC 1040 is admitted.

5            (Defendant's Exhibit JC 1040 received in evidence)

6            MS. GUABA:  Can it please be published to the jury.

7    BY MS. GUABA:

8    Q.  Officer Pagan, can you please look at the section called

9    "proposed outside employment."  What is the name of the company

10   that is listed?

11   A.  JEM Solutions.

12   Q.  What is the nature of the company that is listed?

13   A.  Private protection/consulting, private security in

14   consultation regarding security/protection.

15   Q.  I just want to hold up, because we were interrupted, if you

16   could just remind us what is this form for?

17   A.  You have to fill it out any time you have -- receive

18   outside employment.  So when I opened the company, I had to

19   have the company approved by my chief and by human resources.

20   Q.  Okay.  And what are the responsibilities that are listed?

21   A.  Consulting, private protection, private security, and

22   consultations regarding security/protection.

23   Q.  And what are the proposed hours that are listed?

24   A.  Sporadic, but usually during the weekend.

25   Q.  And if we can just scroll out, and when did you get

1   approval for this request from your department?

2   A.  The chief signed it February 4, 2019.  And the HR director

3   signed it February 5, 2019.  And the city manager signed it

4   February 8, 2019.

5   Q.  Okay.  We can take that down.

6           Where were JEM's offices located?

7   A.  We didn't have an office.

8   Q.  Were you looking for one?

9   A.  Yes.

10  Q.  Sal, if you can please pull up GX 503 which is already in

11  evidence.

12          Officer Pagan, do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is an invoice I wrote out to Manny for $10,000 which

16  was the investment of the Risk Management Company we were going

17  to start, specifically office space.

18  Q.  And did you create this invoice?

19  A.  Yes.

20  Q.  Where did you get this sheet from, this invoice sheet?

21  A.  Office Depot.

22  Q.  And why is most of it blank?

23  A.  A lot of things on there don't pertain to what it was for,

24  plus I'm not -- I'm not a big company.  I do everything.  So I

25  didn't have any professional invoices made yet.

1   Q.  And did you give this invoice to anyone?

2   A.  I gave a copy to Manny.

3   Q.  How did you give it to him?

4   A.  I handed it to him.

5   Q.  And did Manny ultimately end up paying $10,000 to JEM

6   Solutions?

7   A.  Yes.

8   Q.  And did you create a contract or written agreement with

9   Manny for this investment?

10  A.  No.

11  Q.  Why not?

12  A.  Because this is something we talked about and he is a good

13  friend of mine, so I didn't think it was necessary.

14  Q.  Was the $10,000 payment a bribe for John Costanzo, Jr.?

15  A.  No.

16  Q.  Was this the only payment that Global Legal Consulting made

17  to JEM Solutions?

18  A.  No.

19  Q.  Sal, if you can please pull up GX 504 which is already in

20  evidence.

21          Officer Pagan, do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's an invoice for work I did, addressed to Manny, that I

25  did for Manny.

Nb62Cos5                    Pagan - Direct

1    Q.   And who created this invoice?

2    A.   I did.

3    Q.   What was this invoice for?

4    A.   It was for a case that Manny was working that he had.  It

5    was a bribery case, and he had a lot of documents to go

6    through, so he asked me to help him.

7    Q.   When you say a case, was this when Manny was at DEA or when

8    he was retired?

9    A.   No, he was retired.

10   Q.   And working as -- and what was he doing after he retired?

11   A.   He opened up Global Legal and he was doing investigations

12   and . . .

13   Q.   And can you please explain what work you did on the Johnny

14   Grobman matter?

15   A.   Manny had a bunch of documents he had to go through, text

16   messages, e-mails, and so I -- he gave me several months to

17   complete it, so I -- he gave me a hard drive and paper, like a

18   stack, large stack of paper with text messages, and I had to

19   review it and look for anything important.

20   Q.   Did you take any notes as you were doing that review?

21   A.   I wrote -- he didn't want me to write on the actual

22   documents, so anything that looked important, I would mark it

23   with a, I guess, sticky note.

24   Q.   And what did you do with those documents after you finished

25   your review?

Nb62Cos5                       Pagan - Direct

1   A.  I gave them back to Manny.

2   Q.  Did you meet any of the lawyers on the Johnny Grobman

3   matter?

4   A.  No.

5   Q.  Did you meet any of the paralegals on the Johnny job

6   matter?

7   A.  No.

8   Q.  Did you meet anyone else on the Johnny Grobman matter other

9   than Manny?

10  A.  No.

11  Q.  Do you have any records from your work on the Johnny

12  Grobman matter?

13  A.  No.

14  Q.  And why didn't you create a contract or written agreement

15  with Manny for this work?

16  A.  Again, a friend.  He was a friend of mine.  I didn't think

17  I needed it.

18  Q.  And approximately how many hours did you spend doing this

19  work on this case?

20  A.  About 80 -- 80 something hours.

21  Q.  Did John Costanzo have anything to do with the Johnny

22  Grobman matter or your work?

23  A.  No.

24  Q.  Who did you send this invoice to?

25  A.  I gave it to Manny.

Nb62Cos5                        Pagan – Direct

1    Q.   And did Manny pay the invoice?

2    A.   Yes.

3    Q.   How much did he pay?

4    A.   $10,750.

5    Q.   And was that $10,750 a payment for a bribe to John

6    Costanzo, Jr.?

7    A.   No.

8    Q.   You can take that down.

9            Officer Pagan, did there come a time when John sold

10   you his car?

11   A.   Yes.

12   Q.   What kind of car was it?

13   A.   A 2012 Porsche Panamera.

14   Q.   How did that come about?

15   A.   At that time he was close to going to D.C.  Group

16   supervisors have to go to D.C. for a year and a half, two

17   years, whatever the time frame is, so he couldn't take that car

18   to D.C. because of the weather and the snow or whatever, so I

19   told him I would buy it from him.

20   Q.   And he never had a Mercedes Benz, did he?

21   A.   No.

22   Q.   And Sal, if we can please pull up previously admitted

23   Defense Exhibit JC 1316.

24            Mr. Pagan, do you recognize this document?

25   A.   Yes.

Nb62Cos5                    Pagan - Direct

1    Q.  What is it?

2    A.  It's the certificate of title.

3    Q.  And was this the certificate of title for the car you

4    purchased for John?

5    A.  Yes.

6    Q.  And was it a new or used car?

7    A.  It was a used car.

8    Q.  If we can just zoom out.

9            And approximately how many miles did the car have?

10   A.  When I bought it?

11   Q.  Just zoom in on the bottom.

12   A.  62,047.

13   Q.  And what was the total amount that you paid for the car?

14   A.  The total was $35,000.  I don't remember the exact amount.

15   Q.  Now, what amount does the form say was the seller's selling

16   price?

17   A.  $29,000.

18   Q.  Was that the total amount that you paid for the car?

19   A.  No.  I told John that -- I gave him 6,000 plus dollars to

20   pay the note down as a down payment because I didn't want my

21   payments over a certain amount, because I wanted to pay the

22   principal down and get a loan for $29,000.

23   Q.  And Sal, if we could please pull up previously admitted

24   Government Exhibit 412 at page 66.

25           Mr. Pagan, what is this?

1    A.  It's a check that I wrote for John for the down payment of

2    the car.

3    Q.  And who took possession of the car after you wrote this

4    check?

5    A.  I had possession of the car.

6    Q.  And was the car insured?

7    A.  Yes.

8    Q.  When, if at all, did you take over the insurance payments

9    for the car?

10   A.  Whenever my loan went through, which I don't recall exactly

11   what month, but I was using the car for a couple of months

12   while John -- while I was getting the loan and John was still

13   paying the car and the insurance.

14   Q.  So John was paying the insurance while you were waiting for

15   the loan?

16   A.  Yes.

17   Q.  And did there come a time when John purchased new tires for

18   the car?

19   A.  Yes.

20   Q.  Was that before or after you bought it?

21   A.  I believe that was before the loan actually went through.

22   Q.  And do you know how much approximately those tires cost?

23   A.  Yes.

24   Q.  And between insurance payments and the tires, what was the

25   total amount, to the best of your knowledge, that John paid

Nb62Cos5                        Pagan - Direct

1    while you had the car?

2    A.  So he was paying for the actual car, plus insurance, plus

3    three tires, it was about 34, $3500, around there.

4    Q.  Was that money paid back at all?

5    A.  Yes.

6    Q.  Sal, can you please pull up Government Exhibit 705, which

7    is already in evidence.  Mr. Pagan, what is the title of this

8    chart?

9    A.  "Schedule for JEM Solutions bank account from account

10   inception to November 18, 2019."

11   Q.  And is this a summary of the transactions from your JEM

12   Solutions bank account?

13   A.  Yes.

14   Q.  And do you see three line items for flights from American

15   Air Lines?

16   A.  Yes.

17   Q.  Who purchased those flights?

18   A.  We had a conversation because I owed him money for the car

19   and for the tires and I said I'll -- just whenever you come

20   down, I'll take care of your flights.

21   Q.  Who did you have that conversation with?

22   A.  John.

23   Q.  And did you have an understanding of why John was

24   purchasing these flights?

25   A.  Yes.

Nb62Cos5                           Pagan - Direct

1    Q.  Why was he purchasing them?

2    A.  It was repaying for the car, the insurance, and the tires.

3    Q.  And how does the total cost of the flights compare to the

4    value of the insurance and the tires that John covered while

5    you were driving the car?

6    A.  It's pretty much even.

7    Q.  And were these flights money for a bribe that you were

8    paying to John?

9    A.  No.

10   Q.  Sal, can you please pull up previously admitted Defense

11   Exhibit JC 9358.

12           Officer Pagan, can you please read the names of the

13   people on this text chain?

14   A.  Gio Costanzo and Eddie.

15   Q.  Who was Gio Costanzo?

16   A.  John.

17   Q.  And I would like to read through some of these messages, if

18   we can go to the third page.  Officer Pagan, if we can read

19   through these messages together, you reading the blue messages

20   and I will read the green for John.  And if you could start

21   with the message on the top left.

22   A.  "Were in his apartment talking.  He's admitting to money

23   but not dope."

24   Q.  "10-4."

25   A.  "Going to gables to interview."

Nb62Cos5                         Pagan - Direct

1   Q.  "Okay.  I am here.  You on the move?"

2   A.  "Just left."

3   Q.  "K."

4   A.  "Deposit made.  Done with banks.  100,000 Wells.  100,000

5   Bank of America.  He only had 40,000 at Citibank."

6   Q.  "Nice."

7           If we could just go to the top.

8           Officer Pagan, what does 10-4 mean here at the top?

9   A.  That he acknowledges what I said.

10  Q.  Do you remember these messages?

11  A.  Yes.

12  Q.  What are they about?

13  A.  We were following a target, a bad guy, and we approached

14  him at his apartment and we seized money off of him.  We

15  interviewed him at his apartment, then we took him to

16  Coral Gables where I worked to interview him, and then we took

17  him to the banks that he claimed that he had money in.

18  Q.  And is that what you are referring to when you say "deposit

19  made"?

20  A.  Yes.

21  Q.  So this was related to your job.

22  A.  Yes.

23  Q.  Why were you texting John about it?

24  A.  Because he was our boss.

25  Q.  Do you have a bank account at Bank of America?

Nb62Cos5                        Pagan - Direct

1    A.  No.

2    Q.  Do you have a bank account at Citibank?

3    A.  No.

4    Q.  Okay.  We can take that down.

5            Oh, sorry, if we could just go back to that just one

6    more thing.  On the third page, what is the date of these

7    messages?

8    A.  4/22/19.

9    Q.  Okay.  Thank you.

10           We could take that down.

11           Officer Pagan, drawing your attention back to

12   January -- drawing your attention to January of 2020, did there

13   come a time when you made a $20,000 payment on behalf of John

14   to Susana Rueda?

15   A.  Yes.

16   Q.  Who is Susana Rueda?

17   A.  That's John's ex-girlfriend.

18   Q.  What do you know about John's relationship with Susana

19   Rueda?

20   A.  It was a very long, on-and-off relationship.

21   Q.  And, Sal, if you could please pull up GX 415 which is

22   already in evidence.

23           Officer Pagan, can you please review the document.  Do

24   you recognize it?

25   A.  Yes.

Nb62Cos5                          Pagan - Direct

1   Q.  What is this?

2   A.  Withdrawal receipt from Dade County Credit Union.

3   Q.  If we go to the next page, is this the check that you gave

4   Ms. Rueda for the $20,000?

5   A.  Yes.

6   Q.  Why did you give this check to Ms. Rueda?

7   A.  Ms. Rueda paid a portion of John's attorney's fees, the

8   first attorney he had.  And then shortly thereafter, they had a

9   big fight, and he was very stressed out about it because she

10  wanted her money back, so I told him I would take care of it.

11  Q.  And what was the source of the funds for this payment?

12  A.  From my savings account.

13  Q.  And did John ever pay you back?

14  A.  No.

15  Q.  Was that $20,000 payment to Ms. Rueda a bribe payment to

16  John from Mr. Pagan?

17  A.  No.

18  Q.  Was that $20,000 payment a bribe payment from -- to John

19  from Mr. Guerra?

20  A.  No.

21  Q.  Was that $20,000 payment a bribe payment to John from David

22  Macey?

23  A.  No.

24  Q.  Officer Pagan, $20,000 is a lot of money, fair?

25  A.  Fair.

Nb62Cos5                        Pagan - Direct

1    Q.   Why did you pay Ms. Rueda back on John's behalf?

2    A.   Because I didn't want him to be stressed out about it.

3    Q.   And at the time you gave the check to Susana Rueda, how did

4    you understand that you would be paid back?

5    A.   We didn't talk about it.  He pays me back when he pays me

6    back.

7    Q.   Officer Pagan, have you discussed your testimony today with

8    John Costanzo, Jr.?

9    A.   No.

10   Q.   And have you discussed your testimony today with Manny

11   Recio?

12   A.   No.

13   Q.   Officer Pagan, just one more question about the $20,000.

14   Was that -- the $20,000 you gave to Ms. Rueda, was that $20,000

15   a bribe payment from Manny Recio to John?

16   A.   No.

17             MS. GUABA:  No further questions.

18             THE COURT:  All right.  Should we take a ten-minute

19   break or do we --

20             MR. ANDREWS:  Maybe we should check if Recio's counsel

21   has questions.

22             THE COURT:  Oh, I'm sorry.

23             MR. GAINOR:  Can we take a ten-minute break, your

24   Honor?

25             THE COURT:  We will take a break.  Folks.  Please

Nb62Cos5                          Pagan - Direct

1    leave your notepads on your chairs.

2              (Continued on next page)

NB6KCOS6                          Pagan

1          (Jury not present)

2          THE COURT:  You may step down.

3          I wanted to address an evidentiary issue that we had

4    talked about before.

5          MR. SWETT:  Sure.

6          THE WITNESS:  Do you want me to leave, sir?

7          THE COURT:  Yes, if you can step out.  Thanks.

8          (Witness temporarily excused)

9          MR. ANDREWS:  Judge, we might be able to streamline

10   it.  I think we can just moot the issue.  We were planning on

11   asking -- I think the witness has left the courtroom; is that

12   correct?

13         THE COURT:  One second.

14         MR. ANDREWS:  Okay.

15         (Pause)

16         THE COURT:  Okay.

17         MR. ANDREWS:  We were planning on just asking the

18   witness about how, in January of 2019, he was approached by --

19   2021, my apologies -- of 2021, he was approached by two special

20   agents in the case who asked to speak with him, and he refused

21   at that time to speak with them.

22         We think that gets the point across without having to

23   go into any of this grand jury stuff and seems totally fair

24   game under the case law.

25         THE COURT:  Okay.

NB6KCOS6                    Pagan

1          MR. MUKASEY:  Let me take the break to think about it.

2    I'm not as opposed to this form as I was to the prior form, but

3    let me take the break to think about it.

4          THE COURT:  Okay.  I did have my law clerks do a whole

5    bunch of great research on the grand jury question, so I was

6    going to rule that it's inadmissible under 403.  There are a

7    bunch of other circuit decisions on the question whether you

8    can impeach a witness specifically about refusal to speak to

9    the grand jury, not explicitly asking about invocation of the

10   Fifth Amendment, where the courts have said that it should not

11   be allowed under Rule 403.  And there's Second Circuit case law

12   that's from the 1970s that generally supports that principle.

13         But I don't think there's anything that precludes a

14   question just about being approached to speak with an agent, as

15   far as I know.

16         MR. MUKASEY:  Just an unrelated procedural question:

17   To the extent we have some larger and smaller issues with

18   respect to the charge that the Court sent around, the revised

19   charge the Court sent around, I think, last night, when did you

20   want to handle that, after court today, before court tomorrow,

21   before summations?

22         THE COURT:  If we have time, we can do it after court

23   today maybe, or in the morning tomorrow.

24         MR. MUKASEY:  I just want to make sure it doesn't go

25   unaddressed.

NB6KCOS6                    Pagan

1           MS. DONNER:  I would appreciate tomorrow morning.

2           THE COURT:  Tomorrow morning?  That's okay.

3           If that's okay with everyone, tomorrow morning is fine

4    with me.

5           MR. MUKASEY:  Sure.

6           MR. ANDREWS:  Mr. Mukasey is undoubtedly going to yell

7    at me for the length of my cross, so why don't we do it for

8    tomorrow.

9           THE COURT:  All right.  We'll resume in five or

10   ten minutes.

11          (Recess)

12          THE COURT:  Is everyone ready?

13          MR. ANDREWS:  Yes.

14          MR. GAINOR:  Can I have a moment, your Honor?

15          THE COURT:  Yes.

16          (Pause)

17          THE COURT:  Ready?

18          MR. GAINOR:  Yes, your Honor.

19          THE COURT:  Will you have questions?

20          MR. GAINOR:  Yes, just a few.

21          THE COURT:  Okay.  We'll get the jury.

22          Bring in the witness.

23          (Continued on next page)

24

25

NB6KC0S6                          Pagan - Direct

 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              Mr. Gainor?

 4              MR. GAINOR:  Yes, your Honor.  Thank you.

 5   DIRECT EXAMINATION

 6   BY MR. GAINOR:

 7   Q.  Mr. Pagan, good afternoon.

 8   A.  Good afternoon.

 9   Q.  I wanted to ask you some questions that you were asked

10   about on direct on the Grobman case.  Okay?

11   A.  Yes.

12   Q.  This was the case that you worked with Manny Recio on?

13   A.  Yes.

14   Q.  This was the fraud case involving baby formula?

15   A.  Yes.

16   Q.  And you were aware that Manny Recio was originally hired by

17   a law firm as an investigator in this case?

18   A.  Yes.

19   Q.  The law firm was Greenspoon Marder?

20   A.  Yes.

21              MR. ANDREWS:  Objection; leading.

22              THE COURT:  Sustained.

23   BY MR. GAINOR:

24   Q.  Did you have discussions with Manny Recio about this case?

25   A.  Yes.

NB6KC0S6                          Pagan - Direct

1   Q.  Were they face to face?

2   A.  Yes.

3           MR. ANDREWS:  Objection; leading.

4           THE COURT:  Overruled.

5   BY MR. GAINOR:

6   Q.  I'm sorry, were they face to face, for the most part?

7   A.  Yes.

8   Q.  What type of materials were you given, Mr. Pagan, in your

9   work on the Grobman case?

10  A.  It was emails and text messages, mostly.

11  Q.  Can you tell the ladies and gentlemen of the jury, were you

12  given a hard drive, were you given some other form of these

13  documents?

14  A.  I was given a hard drive, and I was given a stack of -- a

15  large stack of papers, documents, text messages.

16  Q.  Can you give us an idea how many documents were on this

17  hard drive?

18  A.  A great deal of information, and the documents was a very

19  tall stack of papers.

20  Q.  And this was at a time when Manny Recio was in private

21  practice, after he left the DEA?

22  A.  Yes.

23  Q.  When he worked for Global Legal Consulting?

24  A.  Yes.

25  Q.  Can you tell the ladies and gentlemen of the jury how many

NB6KCOS6                          Pagan – Cross

1   months you worked on this project for?

2   A.  Oh, for four months.

3   Q.  Can you tell us how many hours exactly?  I think you

4   mentioned 80.  Was it in that vicinity?

5   A.  Eighty-something.

6   Q.  What hourly rate were you paid?

7   A.  125 an hour.

8   Q.  Did you have multiple discussions with Mr. Recio about

9   this, about your work on the Grobman case?

10  A.  Not many.  He told me what he needed done.

11          MR. GAINOR:  Just a moment, your Honor?

12          THE COURT:  Yes.

13          (Pause)

14          MR. GAINOR:  Nothing further, your Honor.

15          THE COURT:  All right.

16          Mr. Andrews.

17  CROSS-EXAMINATION

18  BY MR. ANDREWS:

19  Q.  Mr. Pagan, you've been a law enforcement officer for over

20  20 years; is that correct?

21  A.  Yes, sir.

22  Q.  As part of your job, you speak with prosecutors, correct?

23  A.  I speak with?

24  Q.  With prosecutors?

25  A.  Yes.

NB6KCOS6                            Pagan - Cross

1   Q.  As part of your job, you speak with other law enforcement

2   officers, correct?

3   A.  Yes.

4   Q.  That's what you do every day, day in and day out, correct?

5   A.  Yes.

6   Q.  Now, in January of 2021, two special agents in this case

7   asked to speak with you, didn't they?

8   A.  Yes.

9   Q.  To get your side of the story; is that right?

10  A.  I didn't know what they wanted.

11  Q.  Did you ask what they wanted?

12  A.  I asked what it was about.

13  Q.  And then the investigators told you what it was about,

14  correct?

15  A.  They told me what it was about, yes.

16  Q.  And they told you this was about Costanzo, John Costanzo,

17  and Manuel Recio, right?

18  A.  Yes.

19  Q.  And at that time, you could have told the entire story that

20  you told today, correct?

21  A.  Yes.

22  Q.  But, instead, you refused to say anything, right?

23  A.  Correct.

24  Q.  And despite the fact that you refused to speak with those

25  law enforcement officers in January of 2021, you continued to

1    speak with Costanzo and Recio, right?

2    A.  Yes.

3    Q.  You spoke with them in 2020, correct?

4    A.  Yes.

5    Q.  2021?

6    A.  Yes.

7    Q.  2022?

8    A.  Yes.

9    Q.  In fact, all the way until last week, correct?

10   A.  Yes.

11   Q.  In the middle of this trial, right?

12   A.  Yes.

13   Q.  You spoke with both John Costanzo — correct?

14   A.  Yes.

15   Q.  — and you spoke with Manuel Recio, right?

16   A.  Yes.

17   Q.  Now, to be clear, after you refused to speak with those law

18   enforcement officers in January 2021, law enforcement had to

19   serve you with a subpoena to JEM Solutions, correct?

20   A.  Yes.

21   Q.  And that subpoena required JEM Solutions to turn over

22   documents, right?

23   A.  Yes.

24   Q.  So even though you refused to speak with those officers in

25   January of 2021, you had no choice to comply with the subpoena;

NB6KCOS6                          Pagan - Cross

1    is that right?

2    A.  Correct.

3    Q.  And you produced all the records that you had in response

4    to that subpoena, right?

5    A.  I believe so.

6    Q.  Well, you believe so or you did?

7    A.  I believe I did.

8    Q.  Are you confident that you did?

9    A.  Yes.

10   Q.  Did you comply with the subpoena?

11   A.  Are you talking about the one in 2021?

12   Q.  I'm talking about the one to JEM Solutions.

13   A.  I'm pretty sure I complied with most of it.

14   Q.  You're pretty sure you complied with most of it.

15           So when you say you're pretty sure you complied with

16   most of it, you think you didn't turn over all the documents,

17   that's your statement?

18   A.  I turned over everything I had to my attorney.

19   Q.  Now you're not pretty sure, now you're sure?

20   A.  Everything I was asked for in the original subpoena, yes.

21   Q.  So your production was complete, right?

22   A.  I believe so.

23   Q.  Okay.  So, then, let's talk about first this $50,000

24   payment.

25           So in January of 2019, you wrote a $50,000 cashier's

NB6KCOS6                          Pagan - Cross

1    check to John Costanzo, Sr., right?

2    A.  Yes.

3    Q.  That's John Costanzo's father, right?

4    A.  Yes.

5    Q.  And this money, though, was intended for John

6    Costanzo, Jr.; is that right?

7    A.  It was an investment in a house.

8    Q.  Yes, and that was an investment in a house being bought by

9    John Costanzo, Jr.; is that right?

10   A.  Yes.

11   Q.  So your agreement with John Costanzo, Jr. was to give him

12   this money, correct?

13          MS. GUABA:  Objection; characterization of the

14   evidence.

15          THE COURT:  Rephrase, please.

16   BY MR. GAINOR:

17   Q.  So you had an agreement to pay John Costanzo, Jr., correct?

18   A.  A written agreement or a verbal agreement?

19   Q.  Any type of agreement.

20   A.  I was going to invest in the house, yes.

21   Q.  And, to be clear, this money was not a gift to John

22   Costanzo, Jr., correct?

23   A.  Correct.

24   Q.  This money was not a gift to John Costanzo, Sr., correct?

25   A.  Correct.

NB6KCOS6                          Pagan – Cross

1    Q.  This was what you call an investment, right?

2    A.  Yes.

3    Q.  An investment into the house, right?

4    A.  Right.

5    Q.  So before you invested this $50,000 into the house, you and

6    Costanzo discussed the terms of the investment, right?

7    A.  Yeah.

8    Q.  So you discussed how much of the house you would own,

9    right?

10   A.  No, I didn't have any formal conversations about anything.

11   It was basically an investment, and --

12           MS. GUABA:  Objection.  Can you just clarify if it's

13   Senior or Junior?

14           MR. ANDREWS:  It's Junior.

15   BY MR. GAINOR:

16   Q.  You can continue.

17   A.  Yep.

18           So there was no formal agreement.  It was an

19   investment, and once the house was sold, we'll figure it out

20   then.

21   Q.  So my question, though, wasn't whether there was a formal

22   agreement.  I just want to know what you and Costanzo

23   discussed.

24           So you didn't discuss how much of the house you would

25   own, correct?

NB6KCOS6                    Pagan - Cross

1   A.  Correct.

2   Q.  You didn't discuss how much you would make if the house was

3   sold, correct?

4   A.  Correct.

5   Q.  You didn't discuss what would happen if Costanzo sold the

6   property, right?

7   A.  Correct.

8   Q.  You just gave $50,000, correct?

9   A.  Correct.

10  Q.  And, to be clear, you gave this money to Costanzo, Sr.

11  rather than Costanzo, Jr.; is that right?

12  A.  Yes.

13  Q.  So we'll get back to that in a moment.

14          But I think you mentioned before that you have a

15  couple of different properties, right?

16  A.  Yes.

17  Q.  And when you got a mortgage on those properties, were you

18  ever told about something called a gift letter?

19  A.  No.

20  Q.  Okay.  So you never heard of a gift letter before?

21  A.  I've heard of it.

22  Q.  All right, so you've heard of it; is that right?

23  A.  Yes.

24  Q.  And did you hear about it because you were getting a

25  mortgage?

1    A.  No.

2    Q.  How did you hear about it?

3    A.  I don't recall when I heard about it, but you're talking

4    about previous mortgages I have where I have a gift letter.

5    Q.  So John Costanzo never told you about a gift letter, is

6    that your testimony?

7    A.  I don't remember who spoke about it, but I have heard of a

8    gift letter before.

9    Q.  So you don't remember now who told you about a gift letter;

10   is that correct?

11   A.  No.  The first time?  No.  I've heard of gift letters

12   before.

13   Q.  So you've heard of a gift letter, but you have no idea who

14   actually told you about a gift letter; is that right?

15   A.  Right.

16         MR. GAINOR:  So let's publish, then, Government

17   Exhibit 434A.

18   Q.  Could you read the title at the top of this document?

19   A.  "Gift Letter."

20   Q.  Okay.

21         MR. GAINOR:  And if we could zoom in on the very

22   bottom of the document as to who signed the gift letter.

23   Q.  Do you want to read those two names?

24   A.  John Costanzo, Sr.

25   Q.  And the other one on the right, please?

NB6KCOS6                          Pagan – Cross

1   A.  John Costanzo.

2   Q.  Junior?

3   A.  Yes.

4   Q.  Okay.

5           MR. GAINOR:  So, then, let's now zoom in on point

6   number 3.

7   Q.  So, just to be clear, you stated that you paid Costanzo the

8   $50,000 because it was an investment, right?

9   A.  Yes.

10  Q.  So why don't you read that line?

11  A.  "No repayment of the gift is expected or implied in the

12  form of cash or by future services of the recipient."

13  Q.  And the recipient of this money, the end recipient of it,

14  was John Costanzo, Jr., right?

15  A.  I paid it to Senior.

16  Q.  And then the end recipient was John Costanzo, Jr., right?

17  A.  Yes, right.

18  Q.  He's the guy getting the mortgage?

19  A.  Yes.

20          MR. GAINOR:  So we can take that down.

21  Q.  I just want to see if I can understand a little bit

22  clearer, then.

23          So the money was supposed to be invested with

24  John Costanzo, Jr., right?

25  A.  Right.

NB6KCOS6                              Pagan - Cross

1   Q.  You didn't give it directly to John Costanzo, Jr.; is that

2   right?

3   A.  Correct.

4   Q.  You gave it to John Costanzo, Sr., correct?

5   A.  Yes.

6   Q.  And then a couple of weeks later, Senior gave it to Junior,

7   right?

8   A.  Right.

9   Q.  So you knew that once you gave it to Senior, it would be

10  given to Junior, right?

11  A.  I didn't know the timing of it.  I don't know when he gave

12  it to him.

13  Q.  So you knew that the money was going to be given to Junior,

14  correct?

15  A.  I was paying Senior.  Senior was helping Junior with the

16  down payment.  So I don't know the order of when he gave the

17  money to Junior.

18  Q.  Okay.  But I think the question is actually just a little

19  bit simpler.

20        You knew that after you gave the money to

21  John Costanzo, Sr., the money was going to go to

22  John Costanzo, Jr., correct?

23        MS. GUABA:  Objection.

24        THE WITNESS:  I did not know.  I didn't know the order

25  of it.

NB6KCOS6                          Pagan - Cross

1  BY MR. GAINOR:

2  Q.  So, sorry, you just said that you now don't --

3         MR. MUKASEY:  There's a pending objection.

4         THE COURT:  Objection overruled.

5  Q.  So I think you just said one second ago that now you didn't

6  know where the money was going to go after it was paid to

7  John Costanzo, Sr.; is that correct?

8  A.  I didn't know the order, if John, Sr. paid the down payment

9  before I paid John, Sr. or after I paid John, Sr.  I don't know

10  what the order was, who gave money for the down payment or I

11  gave Senior the money first.

12  Q.  I see.

13         So you didn't know whether the $50,000 had already

14  been paid for the mortgage before or after you gave the money;

15  that's your testimony?

16  A.  Yes.

17  Q.  Okay.  Just so I can understand clearly, you could have

18  just given the money directly to John Costanzo, Jr. the entire

19  time, right?

20  A.  Not for that down payment.

21  Q.  You couldn't give it to him for that down payment, right?

22  A.  It was -- I'm sorry?

23  Q.  You couldn't give it to him for that down payment, right?

24  A.  No.

25  Q.  Let's talk about --

NB6KCOS6                          Pagan - Cross

```
 1              MR. ANDREWS:  One moment.

 2              (Pause)

 3   Q.  Just to be clear, you couldn't give it to him because you

 4   knew that friends were not allowed to make a down payment,

 5   right?

 6   A.  I knew a third party couldn't make a down payment, yeah.

 7   Q.  And you are a third party, correct?

 8   A.  Right.

 9   Q.  And you also knew you couldn't give it to him directly

10   because you knew that it was an investment, correct?

11   A.  Right.

12   Q.  And John Costanzo, Jr. said it was a gift, correct?

13              MS. GUABA:  Objection.

14              THE COURT:  Overruled.

15              THE WITNESS:  According to the letter, yes.

16   BY MR. GAINOR:

17   Q.  So, just to be clear, that's mortgage fraud, right?

18              MS. GUABA:  Objection.

19              THE COURT:  Sustained.

20   Q.  So, just to be clear, that was a false statement to the

21   bank, correct?

22              MS. GUABA:  Objection.

23              THE COURT:  Sustained.

24   Q.  And you discussed all of this with John Costanzo, Jr.,

25   right?
```

NB6KCOS6                        Pagan - Cross

1   A.  Yes.

2   Q.  So let's also talk about this $20,000 payment to

3   Susana Rueda, then.

4           So in November of 2019, you learned that Costanzo had

5   been interviewed by law enforcement, right?

6   A.  Yes.

7   Q.  And that's when you learned that there was an investigation

8   into Costanzo, correct?

9   A.  Yes.

10  Q.  And afterwards, Costanzo told you that he needed money for

11  a defense attorney; is that correct?

12  A.  No.

13  Q.  Costanzo never told you that he needed money for a defense

14  attorney?

15  A.  He paid $50,000 to his first lawyer, and his girlfriend

16  paid 20 of it.

17  Q.  Okay.  But you said at some point, you repaid the

18  girlfriend $20,000, right?

19  A.  Right.

20  Q.  And I assume Costanzo told you why he needed you to repay

21  the girlfriend, correct?

22  A.  He didn't tell me to repay.  I offered to repay.

23  Q.  Okay.  So you offered to repay after he told you that he

24  needed the money for an attorney; is that right?

25  A.  Yes.

NB6KCOS6                          Pagan - Cross

1   Q.  But it's your testimony that he never came to you first

2   before he paid Susana Rueda; that's your testimony?

3   A.  I don't understand the question.

4   Q.  Let me rephrase.

5        Your testimony is that John Costanzo never came to you

6   to ask for money before he first got it from Susana Rueda; is

7   that right?

8   A.  He didn't ask me for money, no.

9   Q.  And, to be clear, John Costanzo didn't repay you the

10  $50,000 investment, correct?

11  A.  Correct.

12  Q.  And he didn't repay you the $20,000 payment that you made

13  to Susana Rueda, correct?

14  A.  Correct.

15  Q.  I think you said it was because you didn't want to stress

16  him out about it; is that right?

17  A.  Right.

18  Q.  So, while we're talking about stressing out about finances,

19  I want to talk a little bit more about your finances.

20        In June of 2010, your house was foreclosed on,

21  correct?

22  A.  In what?

23  Q.  In June of 2010, your house was foreclosed on, correct?

24  A.  A condo, yes.

25  Q.  And in June of 2016, you were more than six months'

NB6KCOS6                          Pagan - Cross

1    delinquent on your next mortgage; isn't that right?

2    A.   Which one?

3    Q.   Well, you tell me.  How many mortgages do you have?

4    A.   I have a couple, but --

5    Q.   Well, were you delinquent in June of 2016 on a mortgage for

6    more than six months?

7    A.   Yes.  I was doing a modification.

8    Q.   And afterwards, you had a total of four mortgages between

9    2016 and 2020; is that right?

10   A.   Right.

11   Q.   So by 2020, you have two mortgages with Select Portfolio

12   Servicing; is that correct?

13   A.   Right.

14   Q.   And by 2020, let's say October of 2020, you owed Select

15   Portfolio Servicing approximately 268,000 on the first

16   mortgage; is that right?

17   A.   I don't know the numbers.

18   Q.   Well, by 2020, you owed at least -- above $250,000 on the

19   first mortgage; is that correct?

20   A.   Yeah.

21   Q.   And by 2020, you also owed at least another 374,000 on the

22   other mortgage; is that correct?

23   A.   I don't know the exact numbers, but, okay.

24   Q.   But is it in the ballpark?

25   A.   Yes.

NB6KCOS6                        Pagan - Cross

1    Q.   Okay.  So those are the first two mortgages, and you also

2    had another two mortgages, correct?

3    A.   On my house, my personal house?

4    Q.   Right.

5            So you have the $268,000 owed for Select Portfolio

6    Servicing, the $374,000 owed for the second Select Portfolio

7    Servicing, and then you have a Bank of America mortgage; is

8    that correct?

9    A.   I don't recall Bank of America unless they sold it, sold

10   the mortgage, to someone else.

11   Q.   You don't recall having a mortgage with Bank of America in

12   2020?

13   A.   Was that a primary residence?

14   Q.   You, sir, would know better than me, but is it your

15   testimony that you can't even remember who services your

16   mortgage?

17   A.   They've been sold many times to different companies.

18   Q.   Well, do you remember owing about $140,000 on yet a third

19   mortgage by 2020?

20   A.   You're talking about the apartment, yes.

21   Q.   And on a fourth mortgage, you owed Union Home Mortgage

22   another $252,000 by 2020, right?

23   A.   I don't know which mortgage that is.

24   Q.   You can't even remember, right?

25   A.   I don't remember which mortgage.

NB6KCOS6                        Pagan - Cross

1    Q.  Well, so it's a fourth mortgage, let's say, that you owe

2    another approximately $250,000; is that correct?

3    A.  Okay.

4           MS. GUABA:  Objection; relevance.

5           THE COURT:  Overruled.

6    BY MR. GAINOR:

7    Q.  Sorry, was that a yes?

8    A.  Yes.

9    Q.  And then there was also a loan from USAA Federal Savings

10   Bank that you owed approximately $24,000 on; is that right?

11   A.  For the car?

12   Q.  Yes.

13   A.  Yes.

14   Q.  So you know that adds up to about $1,060,000 in debt?

15   A.  Okay.

16   Q.  Well, does that sound about right, about the amount of debt

17   you had in 2020?

18   A.  Yeah.

19   Q.  I mean, you owed so much money on your mortgages, you

20   couldn't even pay down the principal on them, correct?

21   A.  They were rented out, they were being paid.

22   Q.  Well, to be clear, were you paying the principal on every

23   single mortgage?

24   A.  Whatever the mortgage was, I was paying.  I can't tell you

25   how much I was paying on the principal.

NB6KCOS6                              Pagan - Cross

1   Q.  So it's your testimony that for every single one of those

2   mortgages, you were paying down the principal in 2020 and 2019?

3   A.  I can't tell you how much I was paying down the principal.

4   I don't know.

5   Q.  But the question wasn't how much you were paying it down,

6   the question was, were you paying it down?

7   A.  I don't recall the specifics of the loan I had.

8   Q.  Okay.  So you don't recall whether you were paying down

9   your principal on all of these four mortgages, correct?

10  A.  Correct.

11  Q.  Am I correct to say that for two of those mortgages, you

12  actually owed more money than the mortgage was worth?

13  A.  No, not -- the properties were worth more than that.

14  Q.  Well, let me just clarify the question, then.

15          What I mean is, you took out a mortgage for a certain

16  amount, and then you actually owed more than that amount

17  because of the interest?  You understand what I'm getting at?

18  A.  Well, I mean, when you buy a house, yes, you buy it for X

19  amount of dollars, and then you finance it.  Yes, you're paying

20  more interest.

21  Q.  And if you don't pay off the principal, the interest causes

22  you to owe even more money, correct?

23  A.  Yes.

24  Q.  Are you aware — I assume you are — that in 2020 for two of

25  the mortgages, the amount you owed on the mortgage was more

NB6KCOS6                         Pagan - Cross

1  than you actually took out originally?

2           MS. GUABA:  Objection as to what the witness knows.

3  It's assuming.

4           THE COURT:  Don't answer -- don't assume.  Just if you

5  know, you can answer.

6           THE WITNESS:  No, I don't know the specifics.

7  BY MR. GAINOR:

8  Q.  You can't remember.

9           So with all this debt, you were totally fine losing

10  70,000 thousand bucks?

11  A.  Yes.  The properties were rented out.

12  Q.  Just to be clear, your posttax, postdeduction income in

13  2019 was about $60,000, right?

14  A.  If you say so.  I don't know, sir.

15           MR. GAINOR:  Here, why don't we publish Government

16  Exhibit 709.

17  Q.  So do you want to read the top line there?

18  A.  "Edwin Pagan, III available net income per 2019 F1040 tax

19  return filing."

20  Q.  I want you to take a look at this chart.  Let me know

21  whether this looks about right to you for 2019.

22  A.  It looks right.

23  Q.  It looks right.

24           So your net income after deductions was about $61,792;

25  is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NB6KCOS6                          Pagan - Cross

1    A.  Yes.

2    Q.  So if you owed approximately $1,060,000, and your net

3    income after deductions was $61,792, do you know how long it

4    would take for you to pay off all that debt if you didn't use

5    any money to eat, pay utilities, or any other life expenses?

6    A.  No, I don't.

7    Q.  It would take 17 years.

8            So let's now, then, talk about JEM Solutions.

9            MR. ANDREWS:  And we can take that down.

10   Q.  So you testified on direct that JEM is an acronym; is that

11   correct?

12   A.  A what?

13   Q.  That JEM is an acronym, correct?

14   A.  Yes.

15   Q.  J is for John?

16   A.  Yes.

17   Q.  John Costanzo.

18           E is for Eddie?

19   A.  Yes.

20   Q.  Eddie Pagan?

21   A.  Correct.

22   Q.  And M is for Manny, right?

23   A.  Yes.

24   Q.  Manuel Recio, correct?

25   A.  Yes.

NB6KCOS6                          Pagan - Cross

1   Q.  And when you started JEM Solutions, Costanzo texted you

2   that this was "our company," right?

3   A.  Correct.

4   Q.  And he sent you a picture of the debit card, right?

5   A.  I sent him a picture.

6   Q.  You sent him the picture; that's exactly right.

7          And then you sent him pictures of the checks,

8   checkbook as well, correct?

9   A.  Correct.

10  Q.  And you also sent him log-in information for the account,

11  right?

12  A.  Yes.

13  Q.  But it's your testimony that even though you sent him the

14  debit card, the checkbook, the log-in information, Costanzo had

15  no role in JEM in 2019, correct?

16  A.  Correct.

17  Q.  So let's talk about some of these payments to JEM, then.

18         You testified on direct that Manuel Recio paid about

19  $20,000 to JEM Solutions; is that right?

20  A.  Yes.

21  Q.  Now, you received a subpoena to JEM Solutions, correct?

22  A.  Yes.

23  Q.  And I think you testified, at the beginning of your

24  testimony, that you complied with that subpoena, right?

25  A.  Yes.

NB6KCOS6                          Pagan - Cross

1   Q.  You turned over all the documents in your possession,

2   correct?

3   A.  Yes.

4   Q.  And you turned over no contracts to Global Legal Consulting

5   for 2019, correct?

6   A.  Correct.

7   Q.  You turned over no agreements with Global Legal Consulting

8   in 2019, correct?

9   A.  Correct.

10  Q.  You turned over no emails with Global Legal Consulting in

11  2019, correct?

12  A.  Correct.

13  Q.  You turned over no text messages with Global Legal

14  Consulting in 2019, right?

15  A.  No text messages?

16  Q.  Yes.  In 2019.

17  A.  With Manny or with --

18  Q.  With Manny.

19  A.  I turned over what I had.

20  Q.  You turned over what you had?

21      You remember you didn't have any text messages that

22  you turned over with Manny in 2019?

23  A.  No, I don't recall that.

24  Q.  You turned over no investigative reports in 2019, right?

25  A.  No.

NB6KCOS6                          Pagan – Cross

1   Q.  And you turned over no expenses that you had in 2019,

2   correct?

3   A.  I don't think I turned over, no.

4   Q.  Because you didn't have any, correct?

5   A.  I had expenses.

6   Q.  You didn't have any documentation of any of those expenses?

7   A.  Well, I mean, the IRS says I can -- after three years I

8   don't have to hold it anymore, so...

9   Q.  To be clear, though, when you got the subpoena in 2021,

10  2019 was still within that three-year period, right?

11  A.  Right.

12  Q.  But, still, you turned over no documentation of your

13  expenses in 2019, right?

14  A.  If you say so.  I don't know what my lawyer sent you, I'm

15  sorry.

16  Q.  Well, let me be clear, you gathered the documents that were

17  turned over, correct?

18  A.  Correct.

19  Q.  And then you gave those documents to your attorney?

20  A.  Yes.

21  Q.  And then your attorney, to your understanding, gave them to

22  the U.S. Attorney's Office, correct?

23  A.  Yes.

24  Q.  And I assume you have no reason to think that your attorney

25  decided to take documents out of the production, right?

NB6KCOS6                          Pagan - Cross

1    A.  Right.

2    Q.  So let's just take a look, then, at your bank account.

3             MR. ANDREWS:  So if we could publish Government

4    Exhibit 705.

5    Q.  I think you saw this on direct, right?

6    A.  Right.

7    Q.  This is a summary of all the financial transactions done by

8    JEM from inception through November 18th of 2019, right?

9    A.  What was the 18 part?  I'm sorry.

10   Q.  This is a summary of all the financial transactions done by

11   JEM Solutions from its inception to November 18th of 2019,

12   correct?

13   A.  I'm sorry, I thought you said 2018.  Excuse me.

14             Yes, sir, that's correct.

15   Q.  Is okay.  Now, to be clear, November 18th of 2019 is when

16   law enforcement interviewed Costanzo and Recio, correct?

17   A.  Correct.

18   Q.  Are you aware of whether Costanzo and Recio lied during

19   those interviews?

20   A.  If they lied?

21             MS. GUABA:  Objection.

22             THE COURT:  Sustained.

23   Q.  Now, there are only 11 transactions on this schedule,

24   correct?

25   A.  Yes.

NB6KCOS6                           Pagan - Cross

1    Q.  No expenses that we see here, right?

2    A.  Correct.

3    Q.  So no charges for advertising, right?

4    A.  Not on this statement, no.

5    Q.  Oh, not on this statement?

6    A.  No.

7    Q.  So from the account's inception to November 18th of 2019,

8    are you saying that there's some other bank account that exists

9    for JEM Solutions that has all of the expenses?

10   A.  No, sir.  I'm just saying I sometimes used a credit card to

11   purchase.

12   Q.  But you didn't use a credit card for JEM Solutions, then,

13   right?

14   A.  I used basically one credit card.

15   Q.  And that credit card was not JEM Solutions', right?

16   A.  Correct.

17   Q.  To be clear, you didn't use any of the money from JEM

18   Solutions to pay the expenses on that credit card, right?

19   A.  No.

20   Q.  You just let all the money sit inside JEM Solutions' bank

21   account?

22   A.  Yes.

23   Q.  And you did that from February to November of 2019, right?

24   A.  Right.

25   Q.  And this is the same time that you had almost a million

1    dollars in debt, right?

2    A.  Right.

3    Q.  You didn't want to touch this money, correct?

4    A.  That's money that had nothing to do with my rentals.  I had

5    another account that dealt with the rentals.

6    Q.  Well, I just want to be clear, though:  What I was asking

7    you about were expenses by JEM Solutions.

8    A.  Okay.

9    Q.  You didn't use any of the money in JEM Solutions' account

10   to pay the alleged expenses, correct?

11   A.  Correct.

12   Q.  And, by the way, these airplane tickets, those are airplane

13   tickets purchased by John Costanzo, right?

14   A.  Right.

15   Q.  And you then reported on your tax returns that these

16   airplane tickets were business expenses?

17   A.  I would need to see them, but I take your word for it.

18            MR. ANDREWS:  Well, why don't we do this, why don't we

19   publish Government Exhibit 604, and if we want to go down to

20   page -- I think it might be 12, to give it a guess.  Keep going

21   down, and let's zoom in on expenses.  And let's just look at

22   travel for a moment.

23   Q.  I just want do a little memory test.  The number -- or,

24   rather, the amount that Costanzo paid for the airplane tickets

25   was about 3,400 bucks, right?

NB6KCOS6                            Pagan - Cross

1    A.  Right.

2    Q.  And here we see, under travel, the number is about 3,010

3    bucks, right?

4    A.  Right.

5    Q.  You expensed the airplane tickets, didn't you?

6    A.  I what?

7    Q.  You expensed the airplane tickets, didn't you?

8    A.  Yes.

9    Q.  You claimed that John Costanzo's travel was a JEM business

10   expense, correct?

11   A.  I told my accountant that I spent X amount of money on the

12   account for travel, and my accountant put it where he put it.

13   Q.  Oh, so you're blaming your accountant, then, for the fact

14   that John Costanzo's travel is expensed as a JEM expense?

15   That's your testimony?

16   A.  I gave my accountant the information that he does.  I'm not

17   an accountant, sir, I'm sorry.

18   Q.  Well, sir, you spoke with your accountant about your

19   expenses, right?

20   A.  Yes.

21   Q.  Because you wanted to make sure they were accurate, right?

22   A.  Right.

23   Q.  Because you have to certify that the tax return is

24   accurate, correct?

25   A.  Right.

NB6KCOS6                         Pagan - Cross

1    Q.  It's your name on the line if it's not correct, correct?

2    A.  Right.

3    Q.  So when you gave the documents to the accountant, you were

4    very careful with making sure that this tax return was right?

5    A.  Right.  And I relied on him to make sure it's right also.

6    Q.  So then let's now talk about your explanations for these

7    payments.

8              MR. ANDREWS:  So we can take down Government Exhibit

9    604.

10   Q.  So you testified that you don't have any contracts or

11   agreements with Global Legal Consulting because you were so

12   close with Manuel Recio, right?

13   A.  Not in those words, but yes.

14   Q.  You guys were really close buddies, correct?

15   A.  Yes.

16   Q.  Now, Mr. Pagan, you never called Manuel Recio once between

17   October 2018 and December 2019, did you?

18   A.  It doesn't seem right, but I'll take your word for it.

19   Q.  Let's just double-check.

20             MR. ANDREWS:  So let's publish Government Exhibit 360.

21   And let's do it outside of TrialDirector, please.

22             So if we can scroll down a little bit.  We can stop

23   right there.

24   Q.  Focusing your attention on number 3, do you recognize Recio

25   Lilly Recio?  Do you recognize that name?

NB6KCOS6                         Pagan - Cross

1    A.  I'm sorry?

2    Q.  Do you recognize the name Lilly Recio?

3    A.  Yes.

4    Q.  Okay.  That's Manuel Recio's what?

5    A.  Ex-wife.

6    Q.  What relation between Manuel Recio and Lilly Recio?

7    A.  That's his ex-wife, I believe.

8    Q.  And these are call records for Manuel Recio, correct?

9    A.  Okay, yes.

10   Q.  Let's just do a control-F to see whether your phone number

11   ever shows up on them.  Remind me, what's your phone number?

12   A.  (305)218-1251.

13   Q.  So let's do 1251.

14           Do you see it's searching, searching, searching?

15           And if you could read the box.

16           MS. GUABA:  Objection.

17           MR. GAINOR:  Objection, your Honor.

18           MS. GUABA:  I don't even know what this is.

19           MR. ANDREWS:  Maybe this will clarify.  Could we pull

20   up stipulation -- one moment.

21           (Pause)

22           MR. ANDREWS:  And if we could scroll down.

23   Q.  So if we keep on scrolling down — I'll tell you when to

24   stop, thank you; keep going, there we go — so the parties'

25   stipulation S8 an agreement between the parties.

NB6KCOS6                        Pagan - Cross

1              "Government Exhibit 360 is a call log from the Recio

2      phone from October 9, 2018, to November 17, 2019."

3              Do you remember the exhibit number that we looked at?

4      Do you remember that number?

5      A.  No.  I'm sorry.

6      Q.  Okay, totally fine.

7              MR. ANDREWS:  Let's just click over to the left side

8      so we can take a look at what that exhibit is again.

9              And why don't we just show the witness the exhibit

10     number on this exhibit.

11     Q.  Government Exhibit 360, right?

12     A.  Right.

13     Q.  We're looking at the call log from Manuel Recio's phone

14     from October of 2018 to November of 2019.

15             And your name was nowhere on there, correct?

16     A.  Correct.

17     Q.  So do you still think you might have called Manuel Recio

18     between October 2018 and 2019?

19             MR. GAINOR:  Objection, your Honor; he's not familiar

20     with this document.

21             THE COURT:  Overruled.

22     A.  I don't know if I called him from another phone that I had

23     at the time.

24     Q.  Oh, so you had another secret phone?

25             What's your secret phone number?

1           MS. GUABA:  Objection.

2           THE COURT:  Sustained.

3  Q.  What's your other phone?

4  A.  It was a DEA phone.  I believe it was (786)269-4 --

5           MS. GUABA:  Objection to this form.

6  A.  4046 maybe.

7  Q.  So that was 4046?

8           MS. GUABA:  Judge, objection to this.

9           THE COURT:  Overruled.

10 Q.  So we just looked up 4046 through the call log.

11          Did your other DEA phone show up here?

12 A.  No.

13 Q.  Okay.

14          But you did have some text messages with Manuel Recio,

15 correct?

16 A.  Correct.

17 Q.  Now, those text messages were about sports and a

18 double-dating, correct?

19 A.  Correct.

20 Q.  And, to be clear, you didn't text Manuel Recio a single

21 time in April of 2019, when Recio paid you the $10,000, right?

22 A.  I don't remember the dates of the text messages for the

23 double date, no.

24 Q.  Let's do this instead, let's publish Government Exhibit

25 1036.  We can do it outside of TrialDirector still.

1          MR. ANDREWS:  Let's scroll down until we get to the

2     April time period, April 2019.

3          All right, so let's zoom in on these two messages.

4     Q.  You see this first message on the top from you?

5     A.  The blue one?

6     Q.  The blue one.

7     A.  I just see Manny's number.

8     Q.  Do you see, the very top, it says "From"?

9     A.  Right.

10    Q.  Okay.  You're Edwin Pagan, right?

11    A.  Yes.

12    Q.  Okay.  Now, this is sent on March 8th of 2019, correct?

13         MR. ANDREWS:  Why don't we highlight it for the

14    witness.

15    A.  Yes.

16    Q.  And then the next message is sent from Manuel Recio to you,

17    and that is not sent until June 7th of 2019, correct?

18    A.  Correct.

19    Q.  So you had no text messages between you and Manuel Recio in

20    April of 2019, when the $10,000 payment happened, correct?

21    A.  Correct.

22    Q.  And you also had no text messages in May, before the

23    $10,750 payment, correct?

24    A.  Correct.

25    Q.  And then you also had no text messages in June, before the

NB6KCOS6                        Pagan – Cross

1    $10,750 payment, correct?

2    A.  Correct.

3    Q.  So then let's now talk about these invoices that you

4    mentioned before.

5            MR. ANDREWS:  We can take down that exhibit.

6    Q.  So the only documentation you turned over for the $10,000

7    payment from Manuel Recio in April 2019 was a single invoice,

8    correct?

9    A.  Correct.

10           MR. ANDREWS:  If we can publish Government Exhibit

11   503.

12   Q.  That's the invoice, correct?

13   A.  Yes.

14   Q.  A handwritten document, right?

15   A.  Yes.

16   Q.  And I think you testified you gave a copy of this invoice

17   to Global Legal Consulting, correct?

18   A.  Correct.

19   Q.  And you don't know whether Global Legal Consulting still

20   had a copy of this invoice, do you?

21           MS. GUABA:  Objection.

22           THE COURT:  Overruled.

23   A.  I don't know.

24           MR. ANDREWS:  If we could put up Government Exhibit

25   504.

NB6KCOS6                          Pagan - Cross

1    Q.  This is a handwritten invoice for $10,750 payment, right?

2    A.  Right.

3    Q.  And you claim that you also gave this one to Global Legal

4    Consulting, correct?

5    A.  Correct.

6    Q.  And, by the way, is it your normal practice to handwrite

7    invoices for JEM Solutions?

8    A.  No.  Manny agreed to do my admin stuff, but he was

9    traveling out of the country a lot, so I just did it on my own.

10   Q.  So it's not your normal practice to handwrite invoices,

11   correct?

12   A.  Right.  That's when the company was first developed, so I

13   had no documentation, and I didn't have any invoices or any

14   logs or anything typed up.

15   Q.  Well, to be clear, this was four months after the company

16   was opened, right?

17   A.  Right.

18   Q.  After you had done all of this work that you just talked

19   about on direct, right?

20   A.  Right.

21   Q.  And you said it even wasn't your normal practice to

22   handwrite invoices, correct?

23   A.  Correct.

24   Q.  You decided to handwrite these invoices, correct?

25   A.  I didn't have a computer-generated invoice at the time.

NB6KCOS6                          Pagan - Cross

1              MR. ANDREWS:  So let's take down that document.

2     Q.  I just want to understand then — this $10,000 payment from

3     Manuel Recio to your company, it was an investment in risk

4     management, I think was what you put on the invoice, correct?

5     A.  Correct.

6     Q.  You must have discussed with Recio all the terms of that

7     investment, correct?

8     A.  It was basically for office space.

9     Q.  It was basically for office space?  But you didn't have an

10    office in 2019, right?

11    A.  No.  I was looking for one.

12    Q.  So just let me make sure, then -- so you and Recio

13    discussed what percentage Recio would get of the company for

14    investing $10,000, correct?

15    A.  No.

16    Q.  So you and Recio discussed how much you'd have to repay

17    Recio for investing $10,000 in your company, right?

18    A.  No.

19    Q.  And you discussed with Recio how long you'd have to repay

20    the $10,000, correct?

21             MR. GAINOR:  Objection, your Honor.

22             THE COURT:  To repay; sustained.

23    Q.  You discussed with Recio how long you would have to -- let

24    me rephrase.

25             At some point, you discussed with him that you would

NB6KCOS6                        Pagan - Cross

1  have to give him money back, correct?

2  A.  Well, that money was going to look for an office, but the

3  risk management idea that we had didn't go through.

4  Q.  But you didn't discuss with him any of the terms of

5  repayment; that's your testimony?

6  A.  Correct.

7  Q.  And then there's also this $10,750 payment from Manuel

8  Recio to you, correct?

9  A.  Correct.

10 Q.  Those are the services you were doing with the Johnny

11 Grobman case, correct?

12 A.  Right.

13 Q.  Just to be clear, I think when you were being asked by

14 Ms. Guaba, you said that that was a bribery case, correct?

15 A.  Right.

16 Q.  But when Mr. Gainor asked you, you said it was a fraud

17 case?

18 A.  Right.

19 Q.  So was it a bribery case or a fraud case?

20         MS. GUABA:  Objection.

21         THE COURT:  Overruled.

22 A.  It was a bribery and a fraud case, if you look at the case.

23 Q.  Oh, so it's a bribery-fraud case?

24 A.  I believe it's both.

25 Q.  So when Ms. Guaba asked you, you just forgot about this

NB6KCOS6                        Pagan - Cross

 1  whole fraud angle, correct?

 2              MS. GUABA:  Objection.

 3              THE COURT:  Sustained.

 4  Q.  Just so I understand correctly, you said that when you

 5  started JEM, it was supposed to be for consulting for athletes,

 6  correct?

 7  A.  Right.

 8  Q.  But this wasn't consulting for athletes, correct?

 9  A.  Correct.

10  Q.  So this was not the purpose that you -- this was not part

11  of the purpose of you creating JEM, correct?

12  A.  Yes, it is.

13  Q.  And just so I also understand, at the time that you were

14  doing these alleged services, you were a task force officer

15  with the DEA, correct?

16  A.  At the time what?

17  Q.  At the time that you were doing these alleged services, you

18  were a task force officer at the DEA, correct?

19  A.  2019?  Yes.

20  Q.  You were also a detective with the Coral Gables Police

21  Department, right?

22  A.  Righted.

23  Q.  So your sworn mission was to assist in the investigation

24  and prosecution of crimes, correct?

25  A.  Correct.

NB6KCOS6                        Pagan - Cross

1    Q.  But you want the jury to believe that you were

2    simultaneously being paid to help a criminal defendant beat his

3    case; that's your testimony?

4             MS. GUABA:  Objection.

5             THE COURT:  Sustained as to how it's phrased.

6    Q.  But you were simultaneously being paid to help a criminal

7    defendant beat his case; that's your testimony?

8    A.  I was looking for documentation that Manny requested me to

9    look for, important documents and text messages.

10   Q.  Well, just to be clear, you knew that Manuel Recio was

11   working for defense attorneys, right?

12   A.  Yes.

13   Q.  So is your testimony that you were helping Manuel Recio and

14   the defense attorneys in the defense of somebody charged, at

15   the same time that you were responsible for investigating and

16   prosecuting crimes?

17   A.  Yes, drug crimes.

18   Q.  Just so I understand correctly, then, you were being paid

19   to help a man who was convicted at trial of cheating U.S.

20   manufacturers out of baby formula, at the same time that you

21   were working for both the DEA and Coral Gables Police

22   Department?  That's your testimony?

23            MR. GAINOR:  Objection; asked and answered.

24            THE COURT:  Overruled.

25   Q.  You may answer.

1    A.  Yes.

2    Q.  Now, you never spoke with Grobman's defense attorneys,

3    right?

4    A.  I'm sorry?

5    Q.  You never spoke with Grobman's defense attorneys, correct?

6    A.  No.

7    Q.  And you also never told Coral Gables about this work you

8    were doing for defense attorneys, right?

9    A.  Correct.

10   Q.  In fact, when you signed that form that you gave to Coral

11   Gables, you didn't mention anything about doing work for

12   defense attorneys, right?

13   A.  Right.  The form changed after the next year because I got

14   different work.

15   Q.  Well, to be clear, if we want to publish DX 1040 again --

16          THE COURT:  JC 1040.

17          MR. ANDREWS:  JC 1040, thank you.

18   Q.  -- this is the form you were asked about on direct,

19   correct?

20   A.  Right.

21   Q.  This is the form that you used to tell the City of Coral

22   Gables about your outside employment, right?

23   A.  Yes.

24   Q.  And you knew you had to be truthful on the form, right?

25   A.  Yes.

NB6KCOS6                          Pagan - Cross

1    Q.   Because this is how Coral Gables decides about whether

2    they're going to allow you to get outside employment, right?

3    A.   Right.

4    Q.   And you were truthful on the form; that's your testimony?

5    A.   Yes.

6    Q.   And in responsibilities, is there anything about doing work

7    for criminal defense attorneys?

8    A.   No.

9    Q.   So we can take down this document because I just want to

10   understand, then, the work you were doing.

11          So you stated that Manuel Recio gave you documents,

12   correct?

13   A.   Right.

14   Q.   What type of documents did he give you?

15   A.   It was a hard drive, and it was a stack of papers.

16   Q.   How big was the hard drive?

17   A.   How big?

18   Q.   Yes.  How many terabytes?

19   A.   I don't know.

20   Q.   How many documents were on the hard drive?

21   A.   How many documents on the hard drive?  I don't know.

22   Q.   You can't remember?

23   A.   He told me he terabytes of information that he had to go

24   through.  I don't know how big the drive was, how many

25   documents.

1   Q.  So he told you there were terabytes of documents on the

2   hard drive, right?

3   A.  Of information that he had to go through.

4   Q.  Okay.  And I think you said that he gave you a big stack of

5   papers; is that right?

6   A.  Yes.

7   Q.  And I think your testimony was that he told you not to make

8   reports, correct?

9   A.  He said, don't mark the papers.

10  Q.  Don't mark the papers?  So, instead, you'd use sticky

11  notes; is that correct?

12  A.  Yes.

13  Q.  So how did you use a sticky note on a hard drive?

14  A.  Well, I didn't use a sticky note on a hard drive.  The hard

15  drive, I marked the page and the line that I wanted him to look

16  at.  The sticky note was for the text messages, which was a

17  stack of papers.

18  Q.  So there are terabytes of documents on the hard drive, and

19  you go one document by one document and just make a note on the

20  document?

21  A.  Yes.  A lot of it was in a different language, too, so

22  there was a lot of stuff I couldn't read.

23  Q.  So Manuel Recio had you review terabytes of materials in a

24  different language; that's your testimony?

25  A.  No, I didn't say that.  I said a lot of the stuff on the

NB6KCOS6                      Pagan - Cross

 1  hard drive was in Dutch, and I couldn't read it.

 2  Q.  To be clear, you're a narcotics cop, correct?

 3  A.  What's that?

 4  Q.  You're a narcotics officer, correct?

 5  A.  Right.

 6  Q.  You're not a specialist in bribery, correct?

 7  A.  Correct.

 8  Q.  You're not a specialist in fraud, correct?

 9  A.  Correct.

10  Q.  As part of your responsibilities, you don't review

11  documents for bribery, correct?

12  A.  Correct.

13  Q.  Or fraud, correct?

14  A.  Correct.

15  Q.  But Manuel Recio went to you to review these terabytes of

16  documents, right?

17  A.  Yes.

18  Q.  And then you went one by one through the documents; is that

19  your testimony?

20  A.  Yes.

21  Q.  And you made, like, notations on the documents?

22  A.  Yes.

23  Q.  And these are -- sorry, these are emails?  PDFs?  What are

24  these things?

25  A.  The papers or text messages?

NB6KCOS6                          Pagan - Cross

1    Q.  I'm talking about the hard drive with the terabytes of --

2    A.  Oh, they were emails, mostly.

3    Q.  So you make notations on electronic emails?  I mean, did

4    you just bold them or highlight them?

5    A.  No, I wrote the page numbers down and the line that I

6    wanted him to look at.

7    Q.  Oh, so you did make reports on them?

8    A.  I put notes of pages and line numbers.

9    Q.  And that was put on a page, right?  That was put in a

10   document?

11   A.  Yeah.

12   Q.  So you wrote down the page numbers of all the documents in

13   this terabytes of material, correct?

14   A.  I wrote on paper.

15   Q.  You wrote on paper?

16           And then you gave that paper to Manuel Recio, correct?

17   A.  Right.

18   Q.  How many pages did you end up having to turn over to Manuel

19   Recio?

20   A.  Of notes?

21   Q.  Yes.

22   A.  I don't know, like 20 pages.

23   Q.  So you went through terabytes of documents, writing, by

24   hand, one by one, document numbers, correct?

25   A.  Yes.

NB6KCOS6                          Pagan - Cross

1    Q.  How did you figure out the document numbers?

2    A.  They were numbered.

3    Q.  The documents were numbered just 1 to what?

4    A.  They were -- they had their own little, I don't know, an

5    exhibit number, I don't know, some kind of number on it.

6    Q.  And how did you know what to look for?

7    A.  He told me to look for stuff that would support that

8    Johnson was not a victim of this crime.

9    Q.  And this crime was what, again?

10   A.  Bribery.

11   Q.  Not fraud this time?

12   A.  Well, I believe it was fraud, too, but that's just my

13   opinion.

14   Q.  Well, that's just your opinion.  So just so I understand

15   correctly, was it a bribery fraud case or was it a bribery case

16   but it's your opinion that it was --

17              MS. GUABA:  Objection.

18              THE COURT:  Sustained.

19   Q.  Just to be clear, you were paid when you completed the

20   work, right?

21   A.  Correct.

22   Q.  And it took you about four months to do the work, right?

23   A.  Right.

24   Q.  So then you started the work around when?

25              MS. GUABA:  Objection; this was asked.

NB6KCOS6                          Pagan - Cross

1          THE COURT:  Overruled.

2   A.  February or March.

3   Q.  Well, four months before you were paid would be the

4   beginning of February, correct?

5   A.  I don't recall the date I was paid.

6   Q.  But you're pretty confident it was four months before that

7   you started the work, right?

8   A.  The period of time that I worked on the case was about four

9   months.

10  Q.  So about the same time you filed that document with the

11  Coral Gables Police Department that didn't mention anything

12  about doing work for defense attorneys, correct?

13  A.  Correct.

14  Q.  So I now just want to go to a final topic, which are these

15  USAA payments that you discussed.

16          Now, you testified that Costanzo paid your car

17  insurance until your loan from USAA came through; is that

18  right?

19  A.  No.  John was paying -- he was still paying his car loan,

20  and he was still paying for his insurance --

21  Q.  Right.  But once --

22  A.  -- while I had the car.

23  Q.  My apologies; I didn't mean to cut you off.

24          Once the loan from USAA came through, you got your own

25  insurance, right?

NB6KCOS6                          Pagan - Cross

```
 1    A.   Yes.

 2    Q.   And do you remember when your loan from USAA came through?

 3    A.   June '19 maybe.

 4    Q.   Was it maybe May of 2019?

 5    A.   It could have been; I don't know the exact date, sir.

 6    Q.   Let's publish JC 1018.

 7              Could you please read the name at the top?

 8    A.   "Credit Profile from Experian."

 9    Q.   The name we see on here, is that you?

10    A.   Yes.

11    Q.   So then if we want to go to page 2, the bottom entry, do

12    you see where it says, "USAA Federal Savings"?

13    A.   Yes.

14    Q.   And then you see right next to it, it says 5/19?

15    A.   Yes.

16    Q.   May 2019, right?

17    A.   5/19, yes.

18    Q.   That was your car loan, right?

19    A.   Yes.

20    Q.   And is it your testimony that you only gave Costanzo the

21    debit card and checkbook photos after he was paying for your

22    insurance?

23    A.   I don't recall the date that I sent him picture.

24    Q.   Well, did you give him the photos of the debit card and

25    checkbook before or after?
```

1    A.  I believe it was early in '19; I don't recall.

2    Q.  So he already had the banking information before you guys

3    even had any alleged agreement for him to pay your insurance,

4    correct?

5    A.  He had a picture of the card, yeah.

6    Q.  He also had a picture of the checkbook, correct?

7    A.  Right.

8            MR. ANDREWS:  One moment?

9            (Pause)

10           MR. ANDREWS:  No further questions.

11           THE COURT:  Ms. Guaba.

12   REDIRECT EXAMINATION

13   BY MS. GUABA:

14   Q.  Mr. Pagan, Mr. Andrews just asked you some questions about

15   mortgages.

16           What does John Costanzo have to do with any of your

17   mortgages?

18   A.  He doesn't have anything to do with them.

19   Q.  Did your mortgages have anything to do with paying bribes

20   to John Costanzo?

21   A.  No.

22   Q.  Did your mortgages have anything to do with JEM?

23   A.  No.

24   Q.  Did those mortgages reflect all of your assets in 2019?

25   A.  No.  I had other accounts.

Nb62Cos7                    Pagan - Redirect

1    BY MS. GUABA:

2    Q.  What other accounts did you have?

3    A.  I had a Dade County savings account, I had my Chase

4    checking account, I had my construction rental account.

5    Q.  Were those mortgages for different properties?

6    A.  Yes.

7    Q.  Do you still own some of those properties?

8    A.  I still own them all except for my primary residence which

9    I sold.

10   Q.  And did those mortgages have anything to do with leaking

11   confidential information to the DEA?

12   A.  No.

13   Q.  Mr. Pagan, where did the money that went to John Costanzo,

14   Sr. come from?

15   A.  My Dade County Federal Credit Union savings account.

16   Q.  Where did the money in your Dade County Federal Credit

17   Union come from?

18   A.  It was money that 26 years ago I opened up that account,

19   and every paycheck I put money in there, so twice a month money

20   automatically goes in there; any tax credit or tax return that

21   I get, gets automatically put in there; if I get a -- if I have

22   a claim, an insurance claim, and the insurance company pays me

23   money, once I fix the repairs, if there is any money, I put it

24   in there; and rental income sometimes goes in there also.

25   Q.  And you were asked some questions about the JEM bank

Nb62Cos7                    Pagan - Redirect

1    accounts.

2    A.   Yes.

3    Q.   When did you open that bank account?

4    A.   January -- it was early 2019.

5    Q.   Did you receive any bribery money into that bank account?

6    A.   No.

7    Q.   Did you give John any bribery money from that bank

8    account?

9    A.   No.

10   Q.   When did you start JEM Solutions?

11   A.   January 2019.

12   Q.   What was the status of JEM Solutions in January 2019?

13   A.   I just opened the company.

14   Q.   And approximately how many hours were you working --

15   devoting to JEM in early 2019?

16   A.   Not many.  I still had my full-time job that I worked.

17   Q.   And when you started JEM Solutions, how many people worked

18   at JEM Solutions?

19   A.   Just me.

20   Q.   And Mr. Pagan, are you a lawyer?

21   A.   No.

22   Q.   Are you a CPA?

23   A.   No.

24   Q.   Do you have an MBA?

25   A.   I have a masters in science.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   Is that an MBA?

2    A.   No.

3    Q.   And have you ever worked as an officer for a corporation?

4    A.   No.

5    Q.   A Fortune 500 company?

6    A.   No.

7    Q.   Was JEM a solo operation?

8    A.   Yes, when I had to teach classes, I would hire other people

9    to help me out.

10   Q.   For the most part it was just you?

11   A.   Yes.

12   Q.   And for JEM, you used your own credit card as the sole

13   owner, right?

14   A.   Yes.

15   Q.   Now, you were asked some questions about communications

16   with Mr. Recio.  How would you communicate with Mr. Recio?

17   A.   Mostly in person, a phone call, or a text message.

18   Q.   Where did you guys meet?

19   A.   Which day are you talking about?

20   Q.   Generally, how did you guys meet?

21   A.   Oh, we would meet here usually in Brickell, we would go to

22   a restaurant that we like, we hang out there.  When Manny was

23   traveling a lot, John would -- I would tell John, when you talk

24   to Manny, set some lunch up when he gets back in town or set a

25   dinner up when he is back in town.

Nb62Cos7                         Pagan - Redirect

1    Q.  So even though you don't have those phone calls with Manny,

2    you spoke to Manny in 2019, right?

3    A.  Yes.

4    Q.  You were asked about the Johnny Grobman case and work that

5    you did on the Johnny Grobman case.  What was the assignment

6    that Manny gave you?

7    A.  He told me look through the e-mails and the text messages,

8    anything that had to deal with money or bribery or anything

9    that showed that he was not a victim highlighted so I can

10   review it to see if it's important.

11   Q.  And was Manny asking you to do any legal analysis on these

12   documents?

13   A.  No.

14   Q.  Were you asked to write any records on these documents?

15   A.  No.

16   Q.  You were only asked to just sort of note the documents that

17   sort of seemed important?

18   A.  Yes.

19   Q.  And did you know if anyone else reviewed those documents

20   after you?

21   A.  I don't know.

22   Q.  And why did you feel comfortable doing that work on the

23   Johnny Grobman case?

24   A.  Why did I feel comfortable?

25   Q.  Yeah.

Nb62Cos7                         Pagan - Redirect

1    A.  I don't understand the question.  I'm sorry.

2    Q.  You agreed to do the work on the Johnny Grobman case,

3    right?

4    A.  Yes.

5    Q.  And did you feel like it was something that you can do?

6    A.  Yes.

7    Q.  Why?

8    A.  Why?  Because it was just pointing out important things

9    that turn -- that talked about certain topics.

10   Q.  And Mr. Pagan, you were asked about a payment that you gave

11   to Susana Rueda for $20,000?

12   A.  Yes.

13   Q.  Why did you make that payment for John to Susana?

14   A.  Because John was under a lot of pressure and he just -- the

15   F.B.I. came to his house and I didn't want him to worry about

16   her asking him for money and asking him for money, so I just

17   paid it for him.

18   Q.  And what sort of things has John done for you in your

19   life?

20   A.  A lot of things as a friend.  I mean, countless things.

21   For my family he's done stuff.  If I can't do something, he

22   will do it for me.  It's a long, long list.

23   Q.  What about during your divorce, what did he do for you

24   then?

25   A.  He was constantly at my house trying to -- I was in a bad

1    place, consoling me, taking me out, you gotta get out, let's

2    work out, let's go play football, let's go do something.

3    Q.  Mr. Pagan, what is the value of all of your properties?

4    A.  Today?  Over a million dollars.

5    Q.  Is that an estimate?

6    A.  Yes.

7              MS. GUABA:  No further questions.

8              THE COURT:  All right.  Mr. Gainor?

9              MR. GAINOR:  No questions, your Honor.

10             THE COURT:  Okay.  Mr. Andrews.

11             MR. ANDREWS:  Very briefly.

12   RECROSS EXAMINATION

13   BY MR. ANDREWS:

14   Q.  Mr. Pagan, do you remember being asked about where the

15   $50,000 came from?

16   A.  Yes.

17   Q.  And do you remember that you said that it came from your

18   Dade County account, correct?

19   A.  Right.

20   Q.  You said you had been saving up for about 26 years for that

21   Dade County account, correct?

22   A.  I believe so, yeah.

23   Q.  So if we just want to publish Government Exhibit 401B.  So

24   can you please read the name that we see here under

25   305-471-5080?

Nb62Cos7

1    A.  Say it again?  Read my name?

2    Q.  Edwin Pagan.

3    A.  III, yes.

4    Q.  If we take a look at the previous balance before the

5    $50,000 you had $113,574.38, correct?

6    A.  Yes.

7    Q.  Then you paid the $50,000, correct?

8    A.  Right.

9    Q.  So you paid about 50 percent of the money out of your

10   account, correct?

11   A.  Right.

12   Q.  Money you had been saving for 26 years, right?

13   A.  Right.

14          MR. ANDREWS:  No further questions.

15          THE COURT:  Anything further?

16          MS. GUABA:  Nothing further.

17          THE COURT:  All right.  Thank you, sir.  You may step

18   down.

19          THE WITNESS:  Thank you, your Honor.

20          (Witness excused)

21          THE COURT:  And members of the jury -- can I let the

22   jury go for the evening?

23          MR. MUKASEY:  Yes, definitely.

24          THE COURT:  Okay, folks.  Please leave your notepads

25   on your chairs and have a good evening, everybody.  We will

Nb62Cos7

1   resume at 9:30 tomorrow morning.  See you tomorrow.  Have a

2   good night.

3               (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nb62Cos7

1           (Jury not present)

2           THE COURT:  Please be seated.  So is the defense going

3    to rest in the morning?

4           MR. MUKASEY:  It's our expectation.  We are going to

5    make sure our exhibits are moved and our ducks are in a row,

6    but that's our expectation.

7           THE COURT:  All right.

8           MR. GAINOR:  I mean, we will come to a final decision

9    very early, but we anticipate resting also.

10          THE COURT:  Okay.  So I guess we have a couple of

11   things.  If anybody wants to put anything further on the

12   record on the Rule 29 motions, you can, or I think you have

13   made your motions.  Up to you.

14          Then we need to go over anything else regarding the

15   jury charge, which I think people wanted to do in the morning.

16   Is that all right with everybody?

17          MR. MUKASEY:  Yeah.  We want to do that, obviously,

18   before summations.  Does the government still have two

19   rebuttals?

20          MS. DEININGER:  Yes.  I think we need to discuss, but

21   our current expectation is that we would have two very short

22   rebuttal case witnesses.

23          MR. MUKASEY:  I just don't want to get a flood of

24   documents at 11:00 tonight when we are writing a summation.

25          MR. ANDREWS:  At the risk of the pot calling the

Nb62Cos7

1  kettle black, I guess we are calling each other pots and

2  kettles, I guess we will do our best.

3        THE COURT:  So two rebuttal witnesses first thing in

4  the morning.  I guess so we will definitely get to closings

5  tomorrow.  I'm not sure you will have a final clean version of

6  the jury charge if we are not going to talk about it tonight.

7  We will have to be working on it tomorrow.

8        MR. MUKASEY:  I don't think we need a final clean

9  version.  I think there may be a couple of points we want to

10 make in the morning.

11       THE COURT:  Okay.

12       MS. DEININGER:  Does your Honor want to meet earlier

13 tomorrow so we can address the issues of the jury charge at

14 9:00 or do you want us back at 9:15?  I'm not sure how you

15 wanted to handle it.

16       THE COURT:  How about 9:15?  Does that work?

17       MR. MUKASEY:  I think that's fine.

18       MS. DEININGER:  Okay.

19       THE COURT:  And anything else anybody wants to cover

20 tonight?

21       MR. MUKASEY:  No, Judge.

22       MR. GAINOR:  No.

23       THE COURT:  Have a good night.

24       (Adjourned to Tuesday, November 7, 2023, at 9:15 a.m.)

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    NEIL ROSS

 4   Direct By Ms. Young  . . . . . . . . . . .1596

 5   Cross By Mr. Swett . . . . . . . . . . . .1606

 6   Redirect By Ms. Young  . . . . . . . . . .1630

 7   Recross By Mr. Swett . . . . . . . . . . .1631

 8

 9   ELGIN FRANKLIN POLO

10   Direct By Ms. Young  . . . . . . . . . . .1633

11   Cross By Mr. Andrews . . . . . . . . . . .1656

12   Redirect By Ms. Young  . . . . . . . . . .1692

13   Recross By Mr. Andrews . . . . . . . . . .1697

14

15    EDWIN PAGAN III

16   Direct By Ms. Guaba  . . . . . . . . . . .1724

17   Direct By Mr. Gainor . . . . . . . . . . .1765

18   Cross By Mr. Andrews . . . . . . . . . . .1767

19   Redirect By Ms. Guaba  . . . . . . . . . .1813

20   Recross By Mr. Andrews . . . . . . . . . .1819

21

22                    GOVERNMENT EXHIBITS

23   Exhibit No.                          Received

24    1037, 1037A, 1037B . . . . . . . . . . .1590

25    2010A   . . . . . . . . . . . . . . . . .1683
```

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                           Received

 3     S11   . . . . . . . . . . . . . . . .1723

 4

 5

 6                      DEFENDANT EXHIBITS

 7    Exhibit No.                           Received

 8    JC 742, JC 768A, JC 775A, JC 1311A, JC1316,

 9    JC 1317, JC 1318 . . . . . . . . . . . . . 1634

10    JC 2621 . . . . . . . . . . . . . . . . .1638

11    JC 2622  . . . . . . . . . . . . . . . . .1643

12    JC 2623  . . . . . . . . . . . . . . . . .1650

13    JC 1018  . . . . . . . . . . . . . . . . .1679

14    JC 1040  . . . . . . . . . . . . . . . . .1747

15

16

17

18

19

20

21

22

23

24

25
```